UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

| | | |
|---|---|---|
| In re FOSSIL, INC. DERIVATIVE LITIGATION | § § § | Civil Action No. 3:06-cv-01672-F |
| This Document Relates To: | § § § § | |
| ALL ACTIONS. | § § | DEMAND FOR JURY TRIAL |

**SECOND AMENDED CONSOLIDATED VERIFIED
SHAREHOLDER DERIVATIVE COMPLAINT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...........................................................................................................1

NATURE OF THE ACTION ..........................................................................................2

JURISDICTION AND VENUE ......................................................................................4

PARTIES .........................................................................................................................5

THE FIDUCIARY DUTIES OF FOSSIL'S DIRECTORS AND OFFICERS ..............19

BACKDATING ALLEGATIONS .................................................................................21

    Fossil's Stock Option Plans Authorized by the Shareholders ............................21

    January 10, 1996 Stock Option Grant .................................................................31

    August 30, 1996 Stock Option Grant .................................................................33

    February 6, 1997 Stock Option Grant .................................................................34

    January 12, 1998 Stock Option Grant .................................................................35

    February 12, 1999 Stock Option Grant ...............................................................36

    February 2, 2000 Stock Option Grant .................................................................37

    March 14, 2000 Stock Option Grant ...................................................................38

    October 25, 2000 Stock Option Grant ................................................................39

    December 29, 2000 Stock Option Grant .............................................................40

    January 14, 2002 Stock Option Grant .................................................................41

    February 23, 2004 Stock Option Grant ...............................................................42

FOSSIL'S FALSE AND MISLEADING PROXY STATEMENTS ............................47

    Proxy Statement Filed in Connection with the 1997 Annual Meeting ..............49

    Proxy Statement Filed in Connection with the 1998 Annual Meeting ..............50

    Proxy Statement Filed in Connection with the 1999 Annual Meeting ..............52

    Proxy Statement Filed in Connection with the 2000 Annual Meeting ..............54

    Proxy Statement Filed in Connection with the 2001 Annual Meeting ..............55

**Page**

Proxy Statement Filed in Connection with the 2002 Annual Meeting ..............................58

Proxy Statement Filed in Connection with the 2003 Annual Meeting ............................60

Proxy Statement Filed in Connection with the 2004 Annual Meeting ............................63

Proxy Statement Filed in Connection with the 2005 Annual Meeting ............................66

Proxy Statement Filed in Connection with the 2006 Annual Meeting ............................68

False and Misleading Forms 3, 4 and 5 ...........................................................70

BACKDATING FOSSIL'S STOCK OPTIONS FALSIFIED THE COMPANY'S
FINANCIAL STATEMENTS ............................................................................70

Audit Committee Members Who Engaged in Backdating Options Turned a Blind
Eye to Internal Control Failures and Inadequate Disclosures...............................73

False Financial Statements.............................................................................75

Fossil's Materially False and Misleading Reports on Form 10-K ...................................80

The Fiscal 1996 Report on Form 10-K ..............................................................81

The Fiscal 1997 Report on Form 10-K ..............................................................82

The Fiscal 1998 Report on Form 10-K ..............................................................83

The Fiscal 1999 Report on Form 10-K ..............................................................85

The Fiscal 2000 Report on Form 10-K ..............................................................86

The Fiscal 2001 Report on Form 10-K ..............................................................87

The Fiscal 2002 Report on Form 10-K ..............................................................88

The Fiscal 2003 Report on Form 10-K ..............................................................90

The Fiscal 2004 Report on Form 10-K ..............................................................91

The Fiscal 2005 Report on Form 10-K ..............................................................92

False and Misleading Sarbanes-Oxley Certifications .........................................93

False and Misleading Reports on Form 10-Q..................................................94

INSIDER TRADING...........................................................................................96

Page

DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS ................................. 109

CONCEALMENT AND TOLLING OF THE STATUTE OF LIMITATIONS ........................ 118

COUNT I ............................................................................. 120

    (Against Defendants Kercho, K. Kartsotis, T. Kartsotis, Tunnell, Gold, Anderson, Stone and Steinberg for Violation of Section 14(a) of the Exchange Act) .......... 120

COUNT II ............................................................................ 121

    (Against Defendants T. Kartsotis, K. Kartsotis, Kercho, Kovar, Tunnell, Barnes, Gold, Anderson, Stone and Steinberg for Violation of Section 10(b) of the Exchange Act) .................................................................. 121

COUNT III ........................................................................... 124

    (Against Defendants Barnes, Kercho, Kovar, Steinberg, Shroff and Tunnel for Violation of Section 29(b) of the Exchange Act) ................................ 124

COUNT IV ............................................................................ 124

    (Against All Defendants for Breach of Fiduciary Duties and Aiding and Abetting Breach of Fiduciary Duties) ..................................................... 124

COUNT V ............................................................................. 126

    (Against All Defendants for Corporate Waste) ............................................ 126

COUNT VI ............................................................................ 126

    (Against All Defendants for Gross Mismanagement) .................................. 126

COUNT VII ........................................................................... 126

    (Against All Defendants for Unjust Enrichment) ......................................... 126

COUNT VIII .......................................................................... 127

    (Against All Defendants for Abuse of Control) ............................................ 127

COUNT IX ............................................................................ 128

    (Against Defendants T. Kartsotis, K. Kartsotis, Barnes, Kovar, Kercho, Shroff, Gold, Anderson, Stone, and Tunnell for Insider Selling and Misappropriation of Information) ........................................................ 128

**Page**

COUNT X.........................................................................................................................128

    (Against All Defendants for Rescission) ........................................................128

COUNT XI.......................................................................................................................129

    (Against All Defendants for an Accounting)................................................129

PRAYER FOR RELIEF ..................................................................................................130

JURY DEMAND..............................................................................................................132

## INTRODUCTION

1.      This is a shareholder derivative action on behalf of nominal defendant Fossil, Inc. ("Fossil" or the "Company") against members of Fossil's Board of Directors (the "Board") and certain of Fossil's current and former top officers and directors (together, "defendants") for violations of federal and state law.  The alleged violations include breaches of fiduciary duty, abuse of control, corporate waste, unjust enrichment and gross mismanagement.  Defendants backdated stock option grants to themselves, other top Fossil executives, and Fossil employees.  Each of the defendants also participated in the concealment of the backdating option scheme detailed herein, and/or refused to take advantage of the Company's legal rights to require these insiders to disgorge the illicitly obtained incentive compensation and proceeds diverted to them since at least 1996.

2.      For nearly a decade, a majority of Fossil's directors, together with its top officers, engaged in a secret scheme to grant undisclosed, in-the-money stock options to themselves and others by backdating stock option grants to coincide with historically low closing prices of Fossil's common stock.  Instead of granting options at market value, defendants retroactively selected the grant date of options based on the lowest price.

3.      Lynn Turner, the Securities and Exchange Commission's ("SEC") former Chief Accountant, described undisclosed backdating as follows:  "It's like allowing people to place bets on a horse race after the horses have crossed the finish line."  Arthur Levitt, former Chairman of the SEC, described backdating as stealing:  "It is ripping off shareholders in an unconscionable way" and "represents the ultimate in greed."  And President George W. Bush declared backdating "bad for America:"  "[O]vercompensating or trying to *backdate things is . . . bad for America*.  And there ought to be consequences when people don't tell the truth and are not transparent."

4.      By engaging in this scheme, defendants were able to conceal that Fossil was not recording material compensation expenses and was materially overstating the Company's net income

and earnings for at least 1996-2006.  Defendants collectively realized over $300 million in illicit compensation through the exercise of illegally backdated options grants and subsequent sale of Fossil stock.  By contrast, Fossil has suffered, and will continue to suffer, significant financial and non-monetary damages and injuries.

## NATURE OF THE ACTION

5.    On March 18, 2006, an article appeared in the *Wall Street Journal* entitled, "The Perfect Payday – Some CEOs reap millions by landing stock options when they are most valuable; Luck – or something else?"  The *Wall Street Journal*'s analysis focused on financial filings from several companies and was an extension of recent academic articles which suggested that "backdating [stock options] was widespread, particularly from the start of the tech-stock boom in the 1990s through the Sarbanes-Oxley corporate reform act of 2002."  While Fossil was not directly implicated in the option-timing scandal at that point, that was soon to change.

6.    On November 14, 2006, the Company announced the commencement of an investigation into its prior stock option granting practices.  Further, Fossil announced that it would miss its deadline for the filing of its Form 10-Q for the quarter ended October 7, 2006.

7.    On November 20, 2006, Fossil received a Staff Determination notice from Nasdaq. The notice indicated that Fossil was no longer in compliance with marketplace rules because of its inability to timely file its Form 10-Q.  Fossil appealed the determination, and the Nasdaq Listing Qualifications Panel decided to grant the Company's request for continued listing subject to certain conditions which require the Company to become current in their SEC filings and file restatements by May 21, 2007.  The Company then announced that it did "not expect that it would be able to become current in its delinquent periodic reports and file required restatements by May 21, 2007, and is seeking an additional extension of time. . . .  If that request is denied, and the Company's

delinquent reports are not filed by May 21, 2007, the Company's common stock will be delisted from NASDAQ."[1]

8.      On May 7, 2007, Fossil issued a press release announcing the findings of its "Special Committee" of Fossil directors with respect to their investigation of the Company's historical equity granting practices. The Special Committee's Final Report admits that grants were indeed backdated:

> With respect to annual mass grants made from 1994 to 2002, one new hire grant in 2003, two incentive grants in 1999 and 2001, and one promotional grant in 2000, all made under the Company's Long-Term Incentive Plan for employees (the LTIP), *favorable grant dates were selected with the benefit of hindsight*.

9.      The Company also admitted that as a result of the Special Committee's findings, it would be forced to issue restatements of its financial statements based on the recording of additional compensation expense.

10.     As further reported in the May 7, 2007 press release, the Special Committee also recommended in the Final Report various corporate governance reforms and reimbursement of all

---

[1]     On May 22, 2007, Fossil announced in a press release that the Nasdaq Listing and Hearing Review Council's April 24, 2007 decision to suspend the Company's securities from trading had been stayed:

> [O]n May 18, 2007, the Company received notice from the Nasdaq Listing and Hearing Review Council (the "Council") indicating that the Council had called for review the April 24, 2007 decision of the Nasdaq Listing Qualifications Panel (the "Panel"). In addition, the Company received notice that the Council, pursuant to its discretionary authority under Nasdaq Marketplace Rule 4807(b), has also decided to stay the April 24, 2007 decision to suspend the Company's securities from trading, pending further action by the Council. The Council granted this stay in response to a request by the Company for the Council to review and stay the April 24, 2007 decision by the Panel to delist the Company's securities unless the Company, prior to May 21, 2007, became current in its periodic filings and had filed all required restatements. During the stay, the Company's shares will remain listed on the Nasdaq Global Select Market.

This information was substantially repeated in the Form 8-K filed on May 23, 2007.

stock option proceeds received as a result of the use of improper measurement dates. The information in the May 7, 2007 press release was largely repeated in the May 9, 2007 Form 8-K.

11.    Defendants' misconduct, which is now largely admitted, is no trifling matter. Backdating at Fossil has admittedly unjustly enriched the Company's directors and top officers. A key purpose of granting stock options is to give recipients an incentive to improve their employer's performance, including its stock price. Backdating options such that they carry a lower price runs counter to this goal, giving the recipient a "paper profit" right from the start. For example, if a company grants options on May 20, when its stock price is $20, but records the date of issue as April 22, when the stock price was only $15, it would be giving those who were granted options a risk-less profit.

12.    Moreover, due to defendants' misconduct, Fossil has been forced to undertake and respond to costly investigations. Such expenditures are but a subset of the problems caused by defendants' options malfeasance – Fossil's annual reports and proxy materials filed with the SEC are false and misleading; the Company-reported financial results which violated Generally Accepted Accounting Principles ("GAAP") required formal restatement; and Fossil may be in violation of certain provisions of the Internal Revenue Code.

13.    By this action, plaintiffs seek to recover damages, defendants' ill-gotten profits, and to institute corporate governance reforms to ensure the compliance of Fossil's directors and officers with the high fiduciary standards expected of them.

## JURISDICTION AND VENUE

14.    This Court has jurisdiction over this action pursuant to §§10(b), 14(a) and 29(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b), 78n(a) and 78cc(b), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder. Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, or of the mails, or the facilities of a national

securities exchange in connection with the acts, transactions, practices and course of business alleged herein. This Court also has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. §1367. This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

15.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District. Fossil is located in and conducts its business in this District. Further, defendants conduct business in this District, and certain of the defendants are citizens of Texas and reside in this District.

## PARTIES

16.     Lead Plaintiff City of Pontiac Police and Fire Retirement System is a shareholder of Fossil and has owned Fossil stock at all times relevant to this action.

17.     Lead Plaintiff Robert B. Minich is a shareholder of Fossil and has owned Fossil stock at all times relevant to this action.

18.     Nominal defendant Fossil, Inc. ("Fossil" or the "Company") is a Delaware corporation with its principal executive offices located at 2280 N. Greenville Avenue, Richardson, Texas. Fossil designs, develops, markets, and distributes fashion watches and accessories.

19.     Defendant **Tom Kartsotis** ("T. Kartsotis") founded the Company and has served as Fossil's Chairman of the Board since December 1991. Previously, he served as Fossil's CEO from December 1991 to October 2000 and as its President from 1984 to December 1991. T. Kartsotis was responsible in part for establishing the process in which millions of options were backdated and as CEO during 1996 to 2000 he recommended millions of backdated options to the Compensation Committee for approval, in contravention of the express authorization of the Company's shareholders and Fossil's stock option plans. He knew the adverse non-public information about the

business of the Company, as well as its finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to him in connection therewith.  Through this and his recommendation for approval of millions of backdated options, T. Kartsotis knew that the Company's directors and officers were backdating stock option grants.

20.     T. Kartsotis participated in (and did work in connection with) recommendations of backdated options for Compensation Committee approval in connection with each meeting of the Compensation Committee during the fiscal years ended December 31, 1996 to at least January 1, 2000, during which he approved of the backdating of options.

21.     T. Kartsotis participated in the preparation of management representation letters to Fossil's auditors that falsely omitted (i) breaches of the Company's internal controls, namely the backdating of stock options; (ii) material inflation of the Company's reported financial results due to the false underreporting of compensation expense; and (iii) the resulting irregularities of the Company's deceptive stock option granting practices and false financial reporting that would require a restatement of the Company's financial statements and/or the withdrawal or modification of audit opinions certifying the Company's financial reports.

22.     Although he disregarded that he and other of the Company's directors and officers were involved in the backdating of stock option grants, during 1996 to 2006 T. Kartsotis participated in the preparation of, and approved, false and misleading statements, including press releases and SEC filings, including proxy statements, and he signed the Company's false and misleading Reports on Form 10-K.

23.     Notwithstanding his knowledge of the backdating, that Fossil's reported earnings were falsely inflated by understatement of compensation expense and that the Company's internal

controls were materially impaired, T. Kartsotis sold over 14.6 million shares of Fossil stock without disclosing this material adverse information.

24.       Defendant **Kosta N. Kartsotis** ("K. Kartsotis") has served as Fossil's CEO since October 2000, and as a Fossil Director since 1990.  Previously, K. Kartsotis served as Fossil's President from December 1991 to December 2006 and Chief Operating Officer from December 1991 to October 2000.   K. Kartsotis, as CEO starting in October 2000 and until at least 2004, recommended millions of backdated options to the Compensation Committee for approval, in contravention of the express authorization of the Company's shareholders and Fossil's stock option plans.  He knew the adverse non-public information about the business of the Company, as well as its finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to him in connection therewith.  Through this and his recommendation for approval of millions of backdated options, K. Kartsotis knew that the Company's directors and officers were backdating stock option grants.

25.       K. Kartsotis participated in (and did work in connection with) recommendations of backdated options for Compensation Committee approval in connection with each meeting of the Compensation Committee during the fiscal years ended December 30, 2000 to at least January 1, 2005, during which he approved of the backdating of options.

26.       K. Kartsotis participated in the preparation of management representation letters to Fossil's auditors that falsely omitted (i) breaches of the Company's internal controls, namely the backdating of stock options; (ii) material inflation of the Company's reported financial results due to the false underreporting of compensation expense; and (iii) the resulting irregularities of the Company's deceptive stock option granting practices and false financial reporting that would require

a restatement of the Company's financial statements and/or the withdrawal or modification of audit opinions certifying the Company's financial reports.

27.     Although he disregarded that he and other of the Company's directors and officers were involved in the backdating of stock option grants, during 1996 to 2006 K. Kartsotis participated in the preparation of, and approved, false and misleading statements, including press releases and SEC filings, including proxy statements, and he signed the Company's false and misleading Reports on Forms 10-K and 10-Q, Forms 3, 4 and 5, and, from 2002 onward, he also signed false and misleading Certifications pursuant to the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") attached to Fossil's Reports on Forms 10-K and 10-Q.

28.     Notwithstanding his knowledge of the backdating, that Fossil's reported earnings were falsely inflated by understatement of compensation expense and that the Company's internal controls were materially impaired, K. Kartsotis sold over 4.7 million shares of Fossil stock without disclosing this material adverse information.

29.     Defendant **Michael W. Barnes** ("Barnes") has served as a Fossil Director since February 1993.  He has also served as Fossil's President, International and Special Markets Division since October 2000.  Previously, Barnes served as Executive Vice President from 1995 to October 2000.  From October 2000 onward, Barnes recommended for approval by the Compensation Committee millions of backdated options and he accepted hundreds of thousands of backdated options, in contravention of the express authorization of the Company's shareholders and Fossil's stock option plans.  Barnes knew the adverse non-public information about the business of the Company, as well as its finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to him in connection therewith.  Through this and his

recommendation for approval of millions of backdated options and acceptance of hundreds of thousands of backdated options, Barnes knew that the Company's directors and officers were backdating stock option grants.

30.     Barnes participated in (and did work in connection with) recommendations of backdated options for Compensation Committee approval in connection with each meeting of the Compensation Committee during the fiscal years ended December 30, 2000 to at least January 1, 2005, during which he approved of the backdating of options.

31.     Although he disregarded that he and other of the Company's directors and officers were backdating and/or accepting backdated stock option grants, during 1996 to 2006 Barnes participated in the preparation of, and approved, false and misleading statements, including press releases and SEC filings, and he signed the Company's false and misleading Reports on Form 10-K, Forms 3, 4 and 5, and proxy statements.

32.     Notwithstanding his knowledge of the backdating, that Fossil's reported earnings were falsely inflated by understatement of compensation expense and that the Company's internal controls were materially impaired, Barnes sold over 809,000 shares of Fossil stock without disclosing this material adverse information.

33.     Defendant **Jal A. Shroff** ("Shroff") has served as a Fossil Director since April 1993. Shroff has also served as Managing Director of Fossil (East) Limited, a wholly owned subsidiary of Fossil, since January 1991.  Shroff accepted hundreds of thousands of backdated options, in contravention of the express authorization of the Company's shareholders and Fossil's stock option plans.  Shroff knew the adverse non-public information about the business of the Company, as well as its finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information

- 9 -

provided to him in connection therewith.  Through this and his acceptance of hundreds of thousands

of backdated options, Shroff knew that the Company's directors and officers were backdating stock

option grants.

34.     Although he disregarded that Fossil's directors and officers were backdating stock

option grants, Shroff participated in the preparation of, and approved, false and misleading

statements, including press releases and SEC filings, and he signed the Company's false and

misleading Reports on Form 10-K and Forms 3, 4 and 5.

35.     Notwithstanding his knowledge of the backdating, that Fossil's reported earnings

were falsely inflated by understatement of compensation expense and that the Company's internal

controls were materially impaired, Shroff sold over 415,000 shares of Fossil stock without disclosing

this material adverse information.

36.     Defendant **Alan J. Gold** ("Gold") has served as a Director of Fossil since April 1993.

Gold was a member of both the Audit and Compensation Committees from 1996 to 2005.  Gold

granted millions of backdated options to Fossil executives, officers and employees, in contravention

of the express authorization of the Company's shareholders and Fossil's stock option plans.  Gold

knew the adverse non-public information about the business of the Company, as well as its finances,

markets, and present and future business prospects, via access to internal corporate documents,

conversations and connections with other corporate officers and employees, attendance at

management and/or Board meetings and committees thereof, and via reports and other information

provided to him in connection therewith.  Through this and his approval of millions of backdated

options, Gold knew that the Company's directors and officers were backdating stock option grants.

37.     Gold participated in (and did work in connection with) each meeting of the

Compensation Committee during fiscal years ended December 31, 1996 to January 1, 2005, and

executed at least one unanimous written consent ("UWC") during each of those fiscal years, during

which he engaged in backdating options. Gold also did work and/or communicated with the Company's external auditors in connection with one meeting of the Audit Committee in the fiscal year ended December 31, 1996, two Audit Committee meetings in each of the fiscal years ended January 1, 1998 to January 1, 2000, and at least one meeting in connection with interim and annual reviews in each of the fiscal years ended December 30, 2000 to December 31, 2005, during which he withheld from the Company's auditors (i) breaches of the Company's internal controls, namely the backdating of stock options; (ii) material inflation of the Company's reported financial results due to the false underreporting of compensation expense; and (iii) the resulting irregularities of the Company's deceptive stock option granting practices and false financial reporting that would require a restatement of the Company's financial statements and/or the withdrawal or modification of audit opinions certifying the Company's financial reports.

38.     Although he disregarded that Fossil's directors and officers were backdating stock option grants, during 1996 to 2006 Gold participated in the preparation of, and approved, false and misleading statements, including press releases and SEC filings, and he signed the Company's false and misleading Reports on Form 10-K, Forms 3, 4 and 5, and proxy statements.

39.     Notwithstanding his knowledge of the backdating, that Fossil's reported earnings were falsely inflated by understatement of compensation expense and that the Company's internal controls were materially impaired, Gold sold over 120,000 shares of Fossil stock without disclosing this material adverse information.

40.     Defendant **Kenneth W. Anderson** ("Anderson") has served as a Director of Fossil since April 1993. Anderson was a member of both the Audit and Compensation Committees from 1996 to 2005. Anderson granted millions of backdated options to Fossil executives, officers and employees, in contravention of the express authorization of the Company's shareholders and Fossil's stock option plans. He knew the adverse non-public information about the business of the Company,

- 11 -

as well as its finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to him in connection therewith.  Through this and his approval of millions of backdated options, Anderson knew that the Company's directors and officers were backdating stock option grants.

41.     Anderson participated in (and did work in connection with) each meeting of the Compensation Committee during fiscal years ended December 31, 1996 to January 1, 2005, and executed at least one UWC during each of those fiscal years, during which he engaged in backdating options.  Anderson also did work and/or communicated with the Company's external auditors in connection with one meeting of the Audit Committee in the fiscal year ended December 31, 1996, two Audit Committee meetings in each of the fiscal years ended January 1, 1998 to January 1, 2000, and at least one meeting in connection with interim and annual reviews in each of the fiscal years ended December 30, 2000 to December 31, 2005, during which he withheld from the Company's auditors (i) breaches of the Company's internal controls, namely the backdating of stock options; (ii) material inflation of the Company's reported financial results due to the false underreporting of compensation expense; and (iii) the resulting irregularities of the Company's deceptive stock option granting practices and false financial reporting that would require a restatement of the Company's financial statements and/or the withdrawal or modification of audit opinions certifying the Company's financial reports.

42.     Although he disregarded that Fossil's directors and officers were backdating stock option grants, during 1996 to 2006 Anderson participated in the preparation of, and approved, false and misleading statements, including press releases and SEC filings, and he signed the Company's false and misleading Reports on Form 10-K, Forms 3, 4 and 5, and proxy statements.

43.     Notwithstanding his knowledge of the backdating, that Fossil's reported earnings were falsely inflated by understatement of compensation expense and that the Company's internal controls were materially impaired, Anderson sold over 89,000 shares of Fossil stock without disclosing this material adverse information.

44.     Defendant **Donald J. Stone** ("Stone") has served as a Director of Fossil since April 1993.  Stone was a member of both the Audit and Compensation Committees from 1996 to 2005. Stone granted millions of backdated options to Fossil executives, officers and employees, in contravention of the express authorization of the Company's shareholders and Fossil's stock option plans.  He knew the adverse non-public information about the business of the Company, as well as its finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to him in connection therewith.  Through this and his approval of millions of backdated options, Stone knew that the Company's directors and officers were backdating stock option grants.

45.     Stone participated in (and did work in connection with) each meeting of the Compensation Committee during fiscal years ended December 31, 1996 to January 1, 2005, and executed at least one UWC during each of those fiscal years, during which he engaged in backdating options.  Stone also did work and/or communicated with the Company's external auditors in connection with one meeting of the Audit Committee in the fiscal year ended December 31, 1996, two Audit Committee meetings in each of the fiscal years ended January 1, 1998 to January 1, 2000, and at least one meeting in connection with interim and annual reviews in each of the fiscal years ended December 30, 2000 to December 31, 2005, during which he withheld from the Company's auditors (i) breaches of the Company's internal controls, namely the backdating of stock options; (ii) material inflation of the Company's reported financial results due to the false underreporting of

compensation expense; and (iii) the resulting irregularities of the Company's deceptive stock option granting practices and false financial reporting that would require a restatement of the Company's financial statements and/or the withdrawal or modification of audit opinions certifying the Company's financial reports.

46.     Although he disregarded that Fossil's directors and officers were backdating stock option grants, during 1996 to 2006 Stone participated in the preparation of, and approved, false and misleading statements, including press releases and SEC filings, and he signed the Company's false and misleading Reports on Form 10-K, Forms 3, 4 and 5, and proxy statements.

47.     Notwithstanding his knowledge of the backdating, that Fossil's reported earnings were falsely inflated by understatement of compensation expense and that the Company's internal controls were materially impaired, Stone sold over 86,000 shares of Fossil stock without disclosing this material adverse information.

48.     Defendant **Michael Steinberg** ("Steinberg") has served as a Director of Fossil since March 2000.  Steinberg was a member of the Compensation Committee from 2001 to 2005, and a member of the Audit Committee from 1999 to 2005.  Steinberg granted millions of backdated options to Fossil executives, officers and employees, in contravention of the express authorization of the Company's shareholders and Fossil's stock option plans.  He knew the adverse non-public information about the business of the Company, as well as its finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to him in connection therewith.  Through this and his approval of millions of backdated options, Steinberg knew that the Company's directors and officers were backdating stock option grants.

49.     Steinberg participated in (and did work in connection with) each meeting of the Compensation Committee during fiscal years ended January 5, 2002 to January 1, 2005, and executed at least one UWC during each of those fiscal years, during which he engaged in backdating options.  Steinberg also did work and/or communicated with the Company's external auditors in connection with two Audit Committee meetings in each of the fiscal years ended January 2, 1999 to January 1, 2000, and at least one meeting in connection with interim and annual reviews in each of the fiscal years ended December 30, 2000 to December 31, 2005, during which he withheld from the Company's auditors (i) breaches of the Company's internal controls, namely the backdating of stock options; (ii) material inflation of the Company's reported financial results due to the false underreporting of compensation expense; and (iii) the resulting irregularities of the Company's deceptive stock option granting practices and false financial reporting that would require a restatement of the Company's financial statements and/or the withdrawal or modification of audit opinions certifying the Company's financial reports.

50.     Although he disregarded that Fossil's directors and officers were backdating stock option grants, during 1999 to 2006 Steinberg participated in the preparation of, and approved, false and misleading statements, including press releases and SEC filings, and he signed the Company's false and misleading Reports on Form 10-K, Forms 3, 4 and 5, and proxy statements.

51.     Defendant **Randy S. Kercho** ("Kercho") has served as Fossil's Executive Vice President since March 1997.  Previously, Kercho served as Fossil's Chief Financial Officer ("CFO") from February 1995 to October 2000, Senior Vice President from February 1995 to March 1997, and Treasurer from May 1995 to October 2000.  Kercho accepted hundreds of thousands of backdated options in contravention of the express authorization of the Company's shareholders and Fossil's stock option plans.  Kercho knew the adverse non-public information about the business of the Company, as well as its finances, markets, and present and future business prospects, via access to

internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to him in connection therewith. Through this, his acceptance of hundreds of thousands of backdated options, and his oversight of the recordation of millions of stock option grants and compensation expense associated therewith, Kercho knew that the Company's directors and officers were backdating stock option grants.

52. Kercho participated in the preparation of management representation letters to Fossil's auditors that falsely omitted (i) breaches of the Company's internal controls, namely the backdating of stock options; (ii) material inflation of the Company's reported financial results due to the false underreporting of compensation expense; and (iii) the resulting irregularities of the Company's deceptive stock option granting practices and false financial reporting that would require a restatement of the Company's financial statements and/or the withdrawal or modification of audit opinions certifying the Company's financial reports.

53. Although he disregarded that the Company's directors and officers were backdating and/or accepting backdated stock option grants, Kercho participated in the preparation of, and approved, false and misleading statements, including press releases and SEC filings, including proxy statements, and he signed the Company's false and misleading Reports on Form 10-Q and Forms 3, 4 and 5.

54. Notwithstanding his knowledge of the backdating, that Fossil's reported earnings were falsely inflated by understatement of compensation expense and that the Company's internal controls were materially impaired, Kercho sold over 239,000 shares of Fossil stock without disclosing this material adverse information.

55. Defendant **Michael L. Kovar** ("Kovar") has served as Fossil's Senior Vice President, CFO and Treasurer since October 2000. Previously, Kovar served as Fossil's Senior Vice President,

Finance from March 2000 to October 2000.  Kovar accepted hundreds of thousands of backdated options in contravention of the express authorization of the Company's shareholders and Fossil's stock option plans.  Kovar knew the adverse non-public information about the business of the Company, as well as its finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to him in connection therewith.  Through this, his acceptance of hundreds of thousands of backdated options, and his oversight of the recordation of millions of backdated stock option grants and compensation expense associated therewith, Kovar knew that the Company's directors and officers were backdating stock option grants.

56.     Kovar participated in the preparation of management representation letters to Fossil's auditors that falsely omitted (i) breaches of the Company's internal controls, namely the backdating of stock options; (ii) material inflation of the Company's reported financial results due to the false underreporting of compensation expense; and (iii) the resulting irregularities of the Company's deceptive stock option granting practices and false financial reporting that would require a restatement of the Company's financial statements and/or the withdrawal or modification of audit opinions certifying the Company's financial reports.

57.     Although he disregarded that he and other of the Company's directors and officers were backdating and/or accepting backdated stock option grants, Kovar participated in the preparation of, and approved, false and misleading statements, including press releases and SEC filings, including proxy statements, and he signed the Company's false and misleading Reports on Forms 10-K and 10-Q, Forms 3, 4 and 5, and Sarbanes-Oxley Certifications attached to Fossil's Reports on Forms 10-K and 10-Q.

58.     Notwithstanding his knowledge of the backdating, that Fossil's reported earnings were falsely inflated by understatement of compensation expense and that the Company's internal controls were materially impaired, Kovar sold over 18,000 shares of Fossil stock without disclosing this material adverse information.

59.     Defendant **Thomas R. Tunnell** ("Tunnell") served as Fossil's Senior Vice President, Development, Chief Legal Officer and Corporate Secretary from December 1996 to 2005.  Tunnell knew the adverse non-public information about the business of the Company, as well as its finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to him in connection therewith.  Through this, his acceptance of hundreds of thousands of backdated options, and his documentation of millions of backdated stock option grants, Tunnell knew that the Company's directors and officers were backdating stock option grants

60.     As Corporate Secretary and Chief Legal Officer, Tunnell was responsible for approving the documentation of option grants, and attending and documenting Board and committee meetings (among other things).  He documented millions of option grants on (among other things) UWCs that were on their face backdated, in Company records, including minutes, and in SEC filings that he signed.

61.     Although he disregarded that he and other of Fossil's officers were engaging in backdating stock option grants, Tunnell participated in the preparation of, and approved, false and misleading statements, including press releases and SEC filings, and he signed Fossil's proxy statements and Forms 3, 4 and 5.

62.     Notwithstanding his knowledge of the backdating, that Fossil's reported earnings were falsely inflated by understatement of compensation expense and that the Company's internal

controls were materially impaired, Tunnell sold over 196,000 shares of Fossil stock without disclosing this material adverse information.

63.     Each of the defendants is sued individually as a conspirator and aider and abettor, as well as in his capacity as an officer and/or director of Fossil, and the liability of each arises from the fact that he has engaged in all or part of the unlawful acts, plans, schemes or transactions complained of herein.

## THE FIDUCIARY DUTIES OF FOSSIL'S
## DIRECTORS AND OFFICERS

64.     As Fossil's directors and officers, defendants owed Fossil fiduciary duties, including duties of good faith, fair dealing, honesty and loyalty, in the performance of their responsibilities with respect to the management and administration of the affairs of Fossil, as well as the duty of full and candid disclosure of all material facts related thereto.

65.     In addition, defendants owed to Fossil the duty to ensure that its shareholder reports about the Company and its business and finances were accurate, complete and truthful and not in any way false and/or materially misleading.   The conduct of Fossil's executives who engaged in unlawful insider trading in violation of the securities laws, as well as their fiduciary duties of good faith and loyalty, has been ratified by Fossil's Board of Directors, which failed to take action against them.

66.     To discharge their duties, defendants were required to exercise good faith and reasonable diligence in the supervision of Fossil's business and financial affairs, including, without limitation, the administration of its stock option plans.   By virtue of these obligations, defendants were required, among other things:

(a)     to manage, conduct, supervise, and direct the business and affairs of Fossil in good faith in accordance with state and federal laws and regulations and the Articles of Incorporation and By-Laws of Fossil;

(b)      to exercise reasonable control and supervision over the officers and employees of Fossil;

(c)      to exercise good faith in evaluation of the prudence and soundness of policies and practices proposed to be undertaken by Fossil;

(d)      to ensure that Fossil did not engage in unsafe, imprudent or unsound practices and that Fossil complied with all applicable laws and regulations;

(e)      to establish guidelines and policies adequately governing the structure and organization of the Company's operations;

(f)      to establish guidelines and policies adequately governing the administration of and accounting for Fossil's stock options;

(g)      to maintain a proper division of authority and responsibility among the officers and directors of Fossil so as to prevent the dominance of any officer or director in the conduct of the business and affairs of Fossil;

(h)      to ensure that Fossil did not engage in unsafe, imprudent or unsound practices and to become and remain informed as to how Fossil was, in fact, operating;

(i)      to maintain and implement an adequate and functioning system of internal financial and accounting controls, such that Fossil's assets would be safeguarded, its financial statements and information would be accurately recorded and reported, and corporate managers would be given prompt notice of serious problems or divergences so that risk to the corporation would be minimized; and

(j)      to supervise the preparation and filing of financial results and financial statements required by law from Fossil, including the Company's SEC reports, and to examine and evaluate any reports of examination, audits or other information required by law concerning the

financial condition of Fossil and to make full and accurate disclosure of all material facts concerning, among other things, each of the subjects and duties set forth above.

67.     At all relevant times, defendants occupied positions with Fossil or were associated with the Company in such a manner as to make them privy to confidential proprietary information concerning not only Fossil's business and finances but also the administration of and accounting for its stock option plans.  Because of these positions and such access, each of these defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public.

## BACKDATING ALLEGATIONS

**Fossil's Stock Option Plans Authorized by the Shareholders**

68.     At all relevant times Fossil granted incentive stock options (or otherwise purported "fair market value" options) under the 1993 Long-Term Incentive Plan of Fossil, Inc. ("1993 Stock Option Plan") and the 1993 Nonemployee Director Stock Option Plan of Fossil, Inc. ("Director Plan") (collectively, the "stock option plans").  A fundamental requirement of Fossil's stock option plans is, and in all relevant instances was, that the exercise price of incentive stock options be calculated relative to the fair market value (the closing price) of the Company's common stock ***on the date of the grant of the option***.

69.     Fossil's stock option plans restricted the exercise price at which options could be granted under the plans.  For example, the Director Plan required that stock options granted under the plan "be 100% of the fair market value of such share of Common Stock on the date the Option is granted."  Likewise, the 1993 Incentive Plan required that incentive stock options be granted in conformance with Internal Revenue Code §422(b)(4), which requires that "the option price is not less than the fair market value of the stock at the time such option is granted."  *See* 26 U.S.C.

§422(b)(4); 1993 Stock Option Plan (original and as amended March 30, 1995, March 3, 1998, March 19, 2001, April 22, 2004 and February 17, 2006), §7(a).

70.     The aforementioned fundamental requirements directly contradict dating or approving a stock option as if it were granted on a date prior to its actual grant date, pricing a stock option as if it were dated prior to the date of the grant, or accepting (as if granted on such a date) an option so dated or priced.  Dating or approving a stock option as if it were granted on a date prior to its actual grant date and thereby underreporting compensation expense and tax liability, also violates state and federal securities laws as well as the Internal Revenue Code.  Nonetheless, the Compensation Committee over the years repeatedly approved stock options which on their face were backdated and retroactively priced.  The Compensation Committee backdated incentive stock options and priced those options (purportedly at fair market value) as if they were dated prior to the date of the actual grant.

**FOSSIL, INC.**
**Alleged Backdated Stock Option Grants**

| Purported Option Grant Date (Expiration Date) | Price (split-adjusted price)[2] | Some Directors & Officers Who Received Grants[3] | Number of Options Received[4] | Option Exercised, Stock Sold[5] | Defendants Who Engaged in Backdating the Purported Stock Option Grant |
|---|---|---|---|---|---|
| 1/10/1996 (1/10/2006) | $6.63 ($1.31) | Gundy | 30,000 | √ | T. Kartsotis, Barnes, Gold, Anderson and Stone |
| | | Barnes | 253,125 | | |
| | | Kercho | 8,166 | √ | |
| | | Shroff | 75,938 | √ | |
| (2/14/2004) | | Kercho | 50,625 | | |
| (4/04/2004) | | Gundy | 229,807 | √ | |
| 8/30/1996 (8/30/2006) | $8.25 ($1.63) | Kercho | 126,562 | √ | T. Kartsotis, Barnes, Gold, Anderson and Stone |
| 12/02/1996 (12/02/2006) | $13.38 ($2.64) | Tunnell | 32,300 | √ | T. Kartsotis, Barnes, Gold, Anderson and Stone |
| 2/06/1997 (2/06/2007) | $12.50 ($2.47) | Barnes | 126,563 | | T. Kartsotis, Barnes, Gold, Anderson and Stone |
| | | Quick | 126,563 | | |
| | | Gundy | 31,021 | √ | |
| | | Kercho | 50,628 | √ | |
| | | Shroff | 75,936 | √ | |
| | | Tunnell | 23,203 | √ | |
| 1/12/1998 (1/12/2008) | $21.94 ($4.33) | Barnes | 88,594 | | T. Kartsotis, Barnes, Gold, Anderson and Stone |
| | | Gundy | 79,260 | √ | |
| | | Quick | 75,938 | | |
| | | Shroff | 53,156 | √ | |

---

[2]      Certain defendants caused the Company to engage in three-for-two stock splits on April 9, 1998, August 18, 1999, June 10, 2002 and April 12, 2004.  Split-adjusted prices are stated in parenthesis.  If options were exercised, the split-adjusted price is indicated as of the exercise date.  Otherwise, the price in parenthesis is fully split adjusted.

[3]      Executives whose names are not previously defined are:  Richard S. Gundy ("Gundy"), Mark D. Quick ("Quick") and Stephen Bock ("Bock").

[4]      Number of options received is split adjusted.  If options were exercised, the split-adjusted quantity is indicated as of the exercise date.  Otherwise, the quantity is fully split adjusted.  This includes options where there is no public record of the grant but only a record of the exercise of the options; therefore, the number of options received is based on the number of options exercised, and the number of options received could be understated.

[5]      "√" indicates the recipient exercised/converted all or a substantial portion of the options received and thereafter sold, transferred or exchanged the stock issued from the option exercise.  *See infra* ¶239 (insider trading table).

- 23 -

| Purported Option Grant Date (Expiration Date) | Price (split-adjusted price)[2] | Some Directors & Officers Who Received Grants[3] | Number of Options Received[4] | Option Exercised, Stock Sold[5] | Defendants Who Engaged in Backdating the Purported Stock Option Grant |
|---|---|---|---|---|---|
| | | Tunnell | 13,420 | √ | |
| 2/12/1999 (2/12/2009) | $27.06 ($8.02) | Gundy | 154,687 | √ | T. Kartsotis, Barnes, Gold, Anderson and Stone |
| | | Kercho | 50,625 | | |
| | | Quick | 51,188 | √ | |
| | | Barnes | 64,169 | √ | |
| 2/02/2000 (2/02/2010) | $16.00 ($7.11) | Barnes | 49,280 | √ | T. Kartsotis, Barnes, Gold, Anderson and Stone |
| | | Gundy | 72,000 | √ | |
| | | Quick | 58,500 | √ | |
| | | Kercho | 45,000 | | |
| | | Shroff | 22,500 | √ | |
| | | Tunnell | 56,250 | √ | |
| 3/14/2000 (3/14/2010) | $19.62 ($8.72) | Steinberg | 11,250 | √ | T. Kartsotis, Barnes, Gold, Anderson and Stone |
| 10/25/2000 (10/25/2010) | $11.19 ($4.97) | Barnes | 72,188 | √ | T. Kartsotis, Barnes, Gold, Anderson and Stone |
| | | Gundy | 72,188 | √ | |
| | | Quick | 72,188 | √ | |
| | | Kercho | 56,250 | | |
| | | Tunnell | 32,744 | √ | |
| | | Kovar | 14,438 | √ | |
| 12/29/2000 (12/29/2010) | $14.48 (6.44) | Steinberg | 6,750 | | K. Kartsotis, Barnes, Gold, Anderson and Stone |
| 1/22/2001 (1/22/2011) | $17.06 ($7.58) | Kovar | 15,598 | √ | K. Kartsotis, Barnes, Gold, Anderson, Stone and Steinberg |
| | | Shroff | 16,874 | √ | |
| 1/14/2002 (1/14/2012) | $20.75 ($9.22) | Barnes | 73,500 | √ | K. Kartsotis, Barnes, Gold, Anderson, Stone and Steinberg |
| | | Gundy | 68,250 | √ | |
| | | Quick | 68,250 | √ | |
| | | Kercho | 112,500 | | |
| | | Tunnell | 42,000 | √ | |
| | | Kovar | 16,800 | √ | |
| | | Shroff | 16,875 | √ | |
| 2/24/2003 (2/24/2013) | $17.50 ($11.67) | Barnes | 63,750 | √ | K. Kartsotis, Barnes, Gold, Anderson, Stone and Steinberg |
| | | Gundy | 59,500 | √ | |
| | | Quick | 59,500 | √ | |
| | | Kercho | 37,500 | | |
| | | Tunnell | 26,250 | √ | |
| | | Kovar | 12,000 | | |
| | | Shroff | 30,000 | √ | |
| 2/23/2004 (2/23/2014) | $28.70 ($19.13) | Barnes | 60,000 | | K. Kartsotis, Barnes, Gold, Anderson, Stone and Steinberg |
| | | Bock | 22,500 | | |
| | | Quick | 60,000 | √ | |
| | | Kercho | 33,749 | | |
| | | Tunnell | 22,500 | | |
| | | Kovar | 22,500 | | |

71.     The Compensation Committee was delegated ultimate responsibility and authority for administration of the Company's 1993 Stock Option Plan. *See* 1997 Proxy Statement at 6 ("functions of the Compensation Committee are to . . . administer the 1993 Long-Term Incentive Plan"); 1998 Proxy Statement at 20 ("The Board of Directors has delegated to the Compensation Committee the responsibility and authority to administer the Incentive Plan, including . . . the making of Awards." "Stock Options. The purchase price for shares subject to Options will be determined by the Compensation Committee."); 1999 Proxy Statement at 5-6 (same as 1997 Proxy Statement); 2000 Proxy Statement at 7 (same); 2001 Proxy Statement at 21 (same as 1998 Proxy Statement); 2002 Proxy Statement at 7 (same as 1997 Proxy Statement); 2003 Proxy Statement at 16 (same as 1998 Proxy Statement); 2004 Proxy Statement at 20-21 (same as 1998 Proxy Statement). And the Compensation Committee was the sole authority for granting stock options to officers and executives of the Company subject to reporting requirements of Section 16 of the Exchange Act. *See* 1993 Long-Term Incentive Plan (original and as amended March 30, 1995, March 3, 1998, March 19, 2001, April 22, 2004 and February 17, 2006), ¶6 ("[T]he Committee may not delegate to any person the authority to grant Awards to, or take other action with respect to, Participants who are subject to Section 16 of the Exchange Act.").

72.     Specifically, from at least 1996 until 2005, Gold, Anderson and Stone had the responsibility and authority to grant options to the Company's officers and executives. From 2002-2005, Steinberg additionally had the responsibility and authority to grant options to the Company's officers and executives.

73.     The Compensation Committee's authority and responsibility at all relevant times has been to, as a committee, grant stock options and determine the recipients and terms of options, including the time of grant, nature of option (incentive or not), number of shares subject to the option, and the terms and conditions of exercise, among other things. *See* 1993 Long-Term

Incentive Plan (original and as amended March 30, 1995, March 3, 1998, March 19, 2001, April 22, 2004 and February 17, 2006), ¶7 ("terms, conditions and limitations . . . shall be determined by the Committee in its sole discretion").

74.    Abusing their authority and committing bad faith and *ultra vires* acts, defendants Anderson, Gold, Steinberg and Stone violated Fossil's stock option plans, in that they: (i) backdated and mispriced stock options; and (ii) in collusion with one another, other defendants, or current or former employees of the Company, determined and granted option awards dated with dates prior to the dates the awards were properly authorized, employees were entitled to receive the options, or the option or price was known.  As admitted by the Company after the filing of this lawsuit, T. Kartsotis, as CEO during 1996 to October 2000, K. Kartsotis, as CEO during October 2000 to at least 2004 and Barnes, as President during 1996 to at least 2004, selected option grant exercise prices and dates and those terms were later approved by the Compensation Committee by the use of (among other things) UWCs that dated and priced the options well prior to execution of the UWCs.  The Compensation Committee, with the knowledge of Barnes, T. Kartsotis, K. Kartsotis and Tunnell (who documented all backdated grants) otherwise also executed UWCs that on their face backdated stock options. Indeed, the Company has admitted the "as of" date on the UWCs used to date and price the options was "selected with the benefit of hindsight."   In other words, the Compensation Committee, in collusion with T. Kartsotis, K. Kartsotis and Barnes, backdated stock options.  Each of the defendants abused their authority in causing the backdating and mispricing to occur and/or accepting such options without disclosure of the true facts.

75.    An objective analytical review, using court-accepted methodologies of all publicly reported stock option dates in option grants to directors and officers of Fossil between 1996 and 2004, over 25 dates, reveals that discretionary stock option grants tended to be dated and priced based on dates: (i) following significant decreases in the Company's stock price; (ii) near or on the

very day that Fossil's stock price closed at the lowest closing price for the month, quarter and/or year; and (iii) preceding significant stock price increases. To illustrate, the following graph depicts the *cumulative* increase/decrease in Fossil's stock price preceding and following all publicly reported stock option dates in option grants to directors and officers of Fossil between 1996 and 2004.



76.     The data points reflected in the graph above are cumulative, meaning they represent the cumulative effect or average of increases and decreases in Fossil's closing stock price 20 trading days before and after all the purported option grant dates. Fossil's closing stock price might have been less or more at any point in time for a particular grant. But the cumulative data points clearly and objectively demonstrate the predominance of Fossil's closing stock prices preceding and

following the option dates, namely that options were dated shortly after significant decreases in Fossil's stock price and preceding very large increases in the stock's price. In addition, it is clear that during the 40 trading-day period (and more) defendants overwhelmingly selected as the option date the date on which the market for Fossil's stock closed at the lowest closing price.

77. Indeed, between 1996 and 2004, approximately 40% of discretionary option grants to Fossil's directors and officers were dated as of and priced based on Fossil's lowest or next-to-lowest closing stock price of the month. And in the same period *prior* to enactment of Sarbanes-Oxley on July 30, 2002 (which made it harder to secretly backdate options to officers), approximately 80% of discretionary option grants to Fossil's directors and officers were dated as of and priced based on Fossil's lowest or next-to-lowest closing stock price of the month. The odds of that happening absent intentional manipulation are so remote (well over 1 in 1,000,000) that backdating is a rational if not the most rational explanation for these fortuitous option grants.[6] And that is not even considering the fact that a number of the reported option grants were dated as of and priced based on Fossil's lowest or second-lowest closing price of the *quarter*, which, in and of itself, is even more improbable than selecting a single grant date that falls on the lowest closing price of the month.

78. Another indication of backdating may be seen in the period of time between the purported grant date and the date the grant was disclosed to the SEC. Thus, plaintiffs also reviewed the amount of time between the purported stock option grant date and disclosure of the grants to the SEC via Forms 3, 4 or 5. Grants that are not disclosed to the SEC in a timely fashion are more likely backdated. "If executives are backdating, a longer reporting lag implies that, on average, they were

---

[6] This conservatively reflects the results of a binomial statistical analysis based on all reported discretionary option grants to Fossil's officers and directors during the analytical review period above and how many such grants were dated as of the date in which Fossil's stock price reached the lowest closing price of the month.

backdating aggressively, seeking a lower exercise price.  This in turn implies that the extent of stock price rise following the manager-designated grant date will be positively correlated with the reporting lag."  M. P. Narayanan, Cindy A. Schipani & H. Nejat Seyhun, *The Economic Impact of Backdating of Executive Stock Options*, 105 Mich. L. Rev. 1597, 1603 (2007).

79.     With respect to a number of the alleged backdated option grants, there are no known SEC Forms 4 or Thomson financial data derived from such filings, showing the changes in beneficial ownership from these purported grants – the options were not evidenced until *years* later, when SEC filings were made indicating the *exercise* or exchange of these options.  Otherwise, Forms 4 or holdings records evidencing these backdated grants (and others) were filed by defendants and others weeks, or, in most instances, many months, after the purported grant date.[7]

80.     For the stock option grants plaintiffs allege were backdated after Sarbanes-Oxley was enacted, plaintiffs reviewed the price movement in the lag time between the grant dates and the dates defendants disclosed the grants to the SEC.

81.     Similarly, stock option grants are more likely backdated when they are discretionary and granted by a sporadic method.[8]  Accordingly, plaintiffs also reviewed each grant to determine

---

[7]     In some instances it appears that defendants exploited the look-back period created by their backdating by granting options *after* or on a stock split and backdating those options to *before* the stock split.  This effectively granted significantly more stock derivatively owned than what was stated on the option grant, and also effectively granted the options at an even lower exercise price than what was stated.  Fossil executed three-for-two stock splits on April 9, 1998, August 18, 1999, June 10, 2002 and April 12, 2004.  The effect of the stock splits was huge.  For example, the options dated January 14, 2002 and granted to certain directors and officers were first disclosed the date of Fossil's June 10, 2002 stock split, and thus almost instantly the option grants increased 150% in volume and decreased in price by two thirds.

[8]     That a stock option grant might be issued pursuant to a non-discretionary fixed date plan only reduces, but does not eliminate, the likelihood that stock options were being backdated.  For example, in a recent stock option backdating action against CNET Networks, Inc., the company was forced to re-price so-called non-discretionary fixed-date grants and admit that those grants were not actually granted on the fixed date required by the applicable stock option plan.

whether or not it was granted in a sporadic fashion or on a fixed date pursuant to a non-discretionary stock option plan.  The alleged backdated grants were discretionary and sporadic.

82.     In its proxy statement for the 2007 annual meeting of shareholders, Fossil was required to disclose stock option awards held by named executive officers during fiscal 2006.[9]  In the table, footnotes appended to the table, and findings cross-referenced in footnotes appended to the table, the Company obliquely admitted actual option approval dates were *after* stated option grant dates and the option prices on those options were *lower* than the market value, *i.e.*, lower than the price of Fossil's stock on the purportedly true option grant date.  According to Fossil, the actual prices of such options were as much as $6.40 *more* per share than the stated (backdated) option price.

83.     For example, alleged backdated options purportedly granted January 22, 2001, were actually granted *after* January 22, 2001, and when Fossil's stock price was $18.18, more than $1.00 *higher* than the retroactively set exercise price of $17.06 per share.  Alleged backdated options purportedly granted February 2, 2000, were actually granted *after* February 2, 2000, and when Fossil's stock price was more than $3.60 *higher* than the retroactively set exercise price of $16.00 per share.  Alleged backdated options purportedly granted January 14, 2002, were actually granted *after* January 14, 2002, and when Fossil's stock price was more than $6.00 *higher* than the retroactively set exercise price of $20.75 per share.  And the Company admitted alleged backdated options purportedly granted on February 24, 2003, were actually granted *after* February 24, 2003,

---

[9]     The admissions only concerned the specific option awards then held by named executive officers.  The Company's revisions to its reported net income and reported findings of the Special Committee's investigation indicate that many more option grants were backdated.

and when Fossil's stock price was **higher** than the retroactively set exercise price of $17.50 per share.[10]

84.     The following describes some of the backdated and otherwise manipulated option grants and their recipients.  As demonstrated by the graphs and accompanying data herein, significant decreases in the price of Fossil's stock tended to immediately precede the option dates of alleged backdated grants and following those dates the price of the Company's stock tended to significantly increase.  Overall, post-option-date stock price movement was positive, pre-option-date stock price movement tended to be negative, and post-option-date returns tended to exceed pre-option-date returns.

**January 10, 1996 Stock Option Grant**[11]

85.     During fiscal 1996, the public trading price of Fossil common stock ranged from a price of $1.31 to $3.14 per share, with a weighted average closing price of $2.24.  A total of 405,000 options were purportedly granted on January 10, 1996, to three executives, including Fossil's President.  The exercise price was $1.31 per share, which is $0.93 less than the weighted average closing price for the fiscal year.  The price of the stock 20 trading days after the grant was $1.48 per share, for a 20-day cumulative return based on the exercise price of 13.2%.  The exercise price was the lowest closing price for the month of January 1996 and the entire fiscal year.  A graph demonstrating the timing of this grant follows below:

---

[10]     Prices indicated here are unadjusted for stock splits and therefore based on actual trading prices during the period of time in which options were purportedly granted.

[11]     Prices indicated in this section and the following sections that detail some of the alleged backdated grants, are fully adjusted for stock splits, given that holdings indicated reflect option quantities adjusted for stock splits.  The following tables containing grant data do not necessarily identify all backdated options received by officers and directors.  *See supra* ¶70 (table containing all alleged backdated options received by officers and directors).



| Date | Executive | No. of Options Granted | Exercise Price | Total Grant Value on Option Date | Total Grant Value 20 Trading Days After Option Date |
|---|---|---|---|---|---|
| 1/10/1996 | Barnes | 253,125 | $1.31 | $331,593.75 | $374,625.00 |
| 1/10/1996 | Gundy | 30,000 | $1.31 | $39,300.00 | $44,400.00 |
| 1/10/1996 | Kercho | 8,166 | $1.31 | $10.697.46 | $12,085.68 |
| 1/10/1996 | Shroff | 75,938 | $1.31 | $99,478.78 | $112,388.24 |

**August 30, 1996 Stock Option Grant**

86.     A total of 126,565 options were purportedly granted on August 30, 1996, to Fossil's Executive Vice President, defendant Kercho.  The exercise price was $1.63 per share, which is $0.61 less than the weighted average closing price for the fiscal year.  The price of the stock 20 trading days after the grant was $2.27 per share, for a 20-day cumulative return based on the exercise price of 39.4%.  The exercise price was one of the lowest closing prices for the month of August 1996.  A graph demonstrating the timing of this grant follows below:



| Date | Executive | No. of Options Granted | Exercise Price | Total Grant Value on Option Date | Total Grant Value 20 Trading Days After Option Date |
|---|---|---|---|---|---|
| 8/30/1996 | Kercho | 126,565 | $1.63 | $206,300.95 | $287,302.55 |

- 33 -

**February 6, 1997 Stock Option Grant**

87.     During fiscal 1997, the public trading price of Fossil common stock ranged from a price of $2.20 to $5.11 per share, with a weighted average closing price of $3.44.  A total of 354,376 options were purportedly granted on February 6, 1997, to three executives, including Fossil's President.  The exercise price was $2.47 per share, which is $0.97 less than the weighted average closing price for the fiscal year.  The price of the stock 20 trading days after the grant was $2.72 per share, for a 20-day cumulative return based on the exercise price of 10%.  The exercise price was the second-lowest closing price for the month of February 1997.  A graph demonstrating the timing of this grant follows below:



| Date | Executive | No. of Options Granted | Exercise Price | Total Grant Value on Option Date | Total Grant Value 20 Trading Days After Option Date |
|---|---|---|---|---|---|
| 2/6/1997 | Barnes | 126,563 | $2.47 | $312,610.61 | $344,251.36 |
| 2/6/1997 | Quick | 126,563 | $2.47 | $312,610.61 | $344,251.36 |
| 2/6/1997 | Gundy | 31,021 | $2.47 | $76,621.87 | $84,377.12 |

**January 12, 1998 Stock Option Grant**

88.     During fiscal 1998, the public trading price of Fossil common stock ranged from a price of $3.85 to $8.81 per share, with a weighted average closing price of $6.08. A total of 253,129 options were purportedly granted on January 12, 1998, to three Fossil executives, including its President. The exercise price was $4.33 per share, which is $1.75 less than the weighted average closing price for the fiscal year. The price of the stock 20 trading days after the grant was $5.38 per share, for a 20-day cumulative return based on the exercise price of 20%. The exercise price was the lowest closing price for the month of January 1998 and the entire fiscal quarter. A graph demonstrating the timing of this grant follows below:



| Date | Executive | No. of Options Granted | Exercise Price | Total Grant Value on Option Date | Total Grant Value 20 Trading Days After Option Date |
|---|---|---|---|---|---|
| 1/12/1998 | Barnes | 88,594 | $4.33 | $383,612.02 | $476,635.72 |
| 1/12/1998 | Gundy | 79,260 | $4.33 | $343,195.80 | $426,418.80 |
| 1/12/1998 | Quick | 75,938 | $4.33 | $328,811.54 | $408,546.44 |

- 35 -

**February 12, 1999 Stock Option Grant**

89.     During fiscal 1999, the public trading price of Fossil common stock ranged from a price of $7.72 to $15.91 per share, with a weighted average closing price of $11.16.  A total of 227,798 options were purportedly granted on February 12, 1999, to three executives, including Fossil's President.  The exercise price was $8.02 per share, which is $3.14 less than the weighted average closing price for the fiscal year.  The price of the stock 20 trading days after the grant was $9.83 per share, for a 20-day cumulative return based on the exercise price of 22.6%.  The exercise price was the second-lowest closing price for the month of February 1999 and the entire fiscal quarter.  A graph demonstrating the timing of this grant follows below:



| Date | Executive | No. of Options Granted | Exercise Price | Total Grant Value on Option Date | Total Grant Value 20 Trading Days After Option Date |
|------|-----------|------------------------|----------------|----------------------------------|-----------------------------------------------------|
| 2/12/1999 | Barnes | 64,169 | $8.02 | $514,635.38 | $630,781.27 |
| 2/12/1999 | Gundy | 154,687 | $8.02 | $1,240,589.74 | $1,520,573.21 |
| 2/12/1999 | Quick | 51,188 | $8.02 | $410,527.76 | $503,178.04 |

**February 2, 2000 Stock Option Grant**

90.     During fiscal 2000, the public trading price of Fossil common stock ranged from a price of $4.89 to $11.11 per share, with a weighted average closing price of $8.04.  A total of 213,750 options were purportedly granted on February 2, 2000, to three Fossil executives, including its President.  The exercise price was $7.11 per share, which is $0.93 less than the weighted average closing price for the fiscal year.  The price of the stock 20 trading days after the grant was $9.97 per share, for a 20-day cumulative return based on the exercise price of 40.2%.  The exercise price was the lowest closing price for the month of February 2000 and the entire fiscal quarter.  A graph demonstrating the timing of this grant follows below:



| Date | Executive | No. of Options Granted | Exercise Price | Total Grant Value on Option Date | Total Grant Value 20 Trading Days After Option Date |
|---|---|---|---|---|---|
| 2/2/2000 | Gundy | 72,000 | $7.11 | $511,920.00 | $717,840.00 |
| 2/2/2000 | Barnes | 49,280 | $7.11 | $350,380.80 | $491,321.60 |
| 2/2/2000 | Quick | 58,500 | $7.11 | $415,935.00 | $583,245.00 |

**March 14, 2000 Stock Option Grant**

91.    A total of 11,250 options were purportedly granted on March 14, 2000, to Fossil director, defendant Steinberg.  The exercise price was $8.72 per share, which is $0.68 more than the weighted average closing price for the fiscal year.  The price of the stock 20 trading days after the grant was $11.10 per share, for a 20-day cumulative return based on the exercise price of 27.2%.  The exercise price was the second-lowest closing price for the month of March 2000.  A graph demonstrating the timing of this grant follows below:



| Date | Executive | No. of Options Granted | Exercise Price | Total Grant Value on Option Date | Total Grant Value 20 Trading Days After Option Date |
|------|-----------|------------------------|----------------|----------------------------------|-----------------------------------------------------|
| 3/14/2000 | Steinberg | 11,250 | $8.72 | $98,100.00 | $124,875.00 |

- 38 -

**October 25, 2000 Stock Option Grant**

92.     A total of 236,250 options were purportedly granted on October 25, 2000, to three executives, including Fossil's President.  The exercise price was $4.97 per share, which is $3.07 less than the weighted average closing price for the fiscal year.  The price of the stock 20 trading days after the grant was $6.56 per share, for a 20-day cumulative return based on the exercise price of 31.8%.  The exercise price was the second-lowest closing price for the month of October 2000 and the entire fiscal year.  A graph demonstrating the timing of this grant follows below:



| Date | Executive | No. of Options Granted | Exercise Price | Total Grant Value on Option Date | Total Grant Value 20 Trading Days After Option Date |
|---|---|---|---|---|---|
| 10/25/2000 | Barnes | 72,188 | $4.97 | $358,774.36 | $473,553.28 |
| 10/25/2000 | Gundy | 72,188 | $4.97 | $358,774.36 | $473,553.28 |
| 10/25/2000 | Quick | 72,188 | $4.97 | $358,774.36 | $473,553.28 |

**December 29, 2000 Stock Option Grant**

93.     A total of 6,750 options were purportedly granted on December 29, 2000, to Fossil director, defendant Steinberg.  The exercise price was $6.44 per share, which is $1.60 less than the weighted average closing price for the fiscal year.  The price of the stock 20 trading days after the grant was $8.40 per share, for a 20-day cumulative return based on the exercise price of 30.4%.  The exercise price was one of the lowest closing prices for the month of December 2000.  A graph demonstrating the timing of this grant follows below:



| Date | Executive | No. of Options Granted | Exercise Price | Total Grant Value on Option Date | Total Grant Value 20 Trading Days After Option Date |
|---|---|---|---|---|---|
| 12/29/2000 | Steinberg | 6,750 | $6.44 | $43,470.00 | $56,700.00 |

- 40 -

**January 14, 2002 Stock Option Grant**

94.     During fiscal 2002, the public trading price of Fossil common stock ranged from a price of $8.87 to $16.13 per share, with a weighted average closing price of $12.86.  A total of 236,193 options were purportedly granted on January 14, 2002, to three Fossil executives, including its President.  The exercise price was $9.22 per share, which is $3.64 less than the weighted average closing price for the fiscal year.  The price of the stock 20 trading days after the grant was $10.60 per share, for a 20-day cumulative return based on the exercise price of 14.9%.  The exercise price was one of the lowest closing prices for the month of January 2002.  A graph demonstrating the timing of this grant follows below:



| Date | Executive | No. of Options Granted | Exercise Price | Total Grant Value on Option Date | Total Grant Value 20 Trading Days After Option Date |
|---|---|---|---|---|---|
| 1/14/2002 | Barnes | 73,500 | $9.22 | $677,670.00 | $779,100.00 |
| 1/14/2002 | Gundy | 68,250 | $9.22 | $629,265.00 | $723,450.00 |
| 1/14/2002 | Quick | 68,250 | $9.22 | $629,265.00 | $723,450.00 |

**February 23, 2004 Stock Option Grant**

95.     During fiscal 2004, the public trading price of Fossil common stock ranged from a price of $18.01 to $31.73 per share, with a weighted average closing price of $24.91.  A total of 176,249 options were purportedly granted on February 23, 2004, to four executives, including Fossil's President.  The exercise price was $19.13 per share, which is $5.78 less than the weighted average closing price for the fiscal year.  The price of the stock 20 trading days after the grant was $22.18 per share, for a 20-day cumulative return based on the exercise price of 15.9%.  The exercise price was one of the lowest closing prices for the month of February 2004 and immediately preceded a sharp increase in the trading price of Fossil common stock.  A graph demonstrating the timing of this grant follows below:



| Date | Executive | No. of Options Granted | Exercise Price | Total Grant Value on Option Date | Total Grant Value 20 Trading Days After Option Date |
|---|---|---|---|---|---|
| 2/23/2004 | Barnes | 60,000 | $19.13 | $1,147,800.00 | $1,330,800.00 |
| 2/23/2004 | Quick | 60,000 | $19.13 | $1,147,800.00 | $1,330,800.00 |
| 2/23/2004 | Bock | 22,500 | $19.13 | $430,425.00 | $499,050.00 |
| 2/23/2004 | Kercho | 33,749 | $19.13 | $645,618.37 | $748,552.82 |

96.     A composite of the increase/decrease in Fossil's stock price in the 20 trading days preceding and following all alleged backdated option dates identified by plaintiffs clearly demonstrates defendants overwhelmingly approved and accepted options dated at the lowest closing price of Fossil's stock precisely following significant decreases in Fossil's closing stock prices and immediately in advance of significant increases in Fossil's closing stock prices.  Backdating is a reasonable, if not the most reasonable and rational, explanation for such improbable timing of option date selection.



97.     The issuance and acceptance of options identified above violated Fossil's stock option plans as set forth at ¶¶68-74.  Indeed, the options identified above were **not** dated with the date when they were granted.  As alleged herein, these *ultra vires* acts also contradicted the Company's

statements in SEC filings and other reports to Fossil's shareholders and violated federal and state securities laws.  The secret practice of backdating stock option grants to themselves and their colleagues was in breach of defendants' fiduciary duties, including their duties of good faith, honesty and loyalty, owed to Fossil and its shareholders.

98.     The backdating, among other things, enabled defendants to (i) hide the fact that the Company was paying higher compensation to executives and employees by awarding them more valuable options on the grant date than represented; (ii) avoid recording the hidden compensation as compensation expense; and (iii) thus conceal reductions in the Company's net income, shareholders' equity and tax obligations.  Keeping the scheme secret also hid the injury to the Company which occurred when executives and employees exercised the options and made capital contributions to Fossil that were less than they should have paid, had the options not been granted in-the-money or deeper in-the-money than represented.

99.     Defendants also reaped more than the personal financial benefits of "in-the-money" stock options they secretly overvalued by millions of dollars.  Upon exercise of the stock options and sale of stock issued thereby, defendants not only obtained more cash than they otherwise would have by virtue of the artificially deflated exercise price, they also benefitted because Fossil's stock traded at prices propelled in part by the false financial statements defendants had caused the Company to issue.  Indeed, Fossil's stock price significantly increased in response to the Company's reported financial statements that overstated income, net income, and earnings per share ("EPS") as a result of the backdating.  And Fossil's directors in particular profited handsomely from the backdating. Those on the Board who received and approved backdated options, alone, cashed in options and garnered proceeds from stock sales of over $300 million.  Damages to the Company related to these stock sales, although not equal to the amount of proceeds from the sales, nonetheless, are in the millions of dollars.

100.     It should be no wonder that the Company has now admitted that in its historical option granting practices "*favorable grant dates were selected with the benefit of hindsight.*"

101.     On November 14, 2006, the Company announced it would investigate into its prior stock option granting practices, and that as a result of that investigation, it would miss its deadline for the filing of its Form 10-Q for the quarter ended October 7, 2006.

102.     On May 7, 2007, Fossil issued a press release announcing that a "Special Committee," consisting of Fossil directors, charged with investigating the Company's historical equity granting practices, had presented its Final Report to the Board on May 4, 2007.  Based on the report, the Company admitted millions of option grants were in fact backdated:

- With respect to annual mass grants made from 1994 to 2002, one new hire grant in 2003, two incentive grants in 1999 and 2001, and one promotional grant in 2000, all made under the Company's Long-Term Incentive Plan for employees (the "LTIP"), *favorable grant dates were selected with the benefit of hindsight*.

- The 2003 to 2006 annual mass grants and certain new hire and other non-annual mass grants made under the LTIP were not properly authorized and/or *used incorrect measurement dates* . . . .

103.     The May 7, 2007 press release further disclosed that as a result of the Special Committee's findings, the Company would be forced to issue restatements for multiple years of financial statements.

104.     In addition, the Special Committee made recommendations regarding reimbursement and tax implications for backdated stock options:

- The Company will request reimbursement from all Section 16 officers (current and former) of an amount equal to the after-tax difference between the stock option proceeds received upon exercise of stock options by them and the proceeds that would have been received had the proper measurement dates been used.

- The Company's Section 16 officers entered into agreements in December 2006 to voluntarily reprice any then unexercised "in the money" options that vest after December 31, 2004 to make them "at the money" options in accordance with Section 409A's transition rules.  Section 16 officers will be

asked to voluntarily (i) either forego the bonus which the Company agreed to
pay them in connection with those agreements to reprice their unexercised
options or reduce their compensation by the amount of any such bonus paid,
and (ii) reprice all unexercised "in the money" options that vest on or prior to
December 31, 2004 to make them "at the money" options.

- In order to address Section 409A excise tax and other adverse consequences
  to non-Section 16 employees who received options that were "in the money"
  and that vest after December 31, 2004, the Company will reprice any
  unexercised options making them "at the money" options and will give
  affected non-Section 16 employees a cash bonus equal to the difference
  between the old exercise price and the new exercise price, which bonus will
  not be paid prior to 2008.

- For options that have already been exercised and are subject to the Section
  409A excise tax, the Company will give all affected employees (other than
  the two former employees who participated in the selection of favorable grant
  dates) a cash bonus equal to the tax liability (plus penalties and interest) such
  employees incurred as a result of exercising "in the money" options.

105.    Thus, not only has Fossil has admitted that years of financial statements **_understated_**
compensation expense and **_overstated_** income, net income and EPS, it has also admitted the resulting
implications of this will additionally cost the Company tens of millions of dollars in cash outlay.
With respect to the Company's damages, based only on those options the Company admits were
backdated or otherwise falsely dated and priced, expenses include overvalued options, tax payments
based on reclassification of options, and United States and foreign payroll tax, which in total to date
have amounted to tens of millions of dollars.  In addition, costs and expenses associated with the
Company's attempt to mop up the mess defendants created include fees associated with the option
grants "review," audit fees, severance payments, and payments to employees in connection with the
repricing of backdated options, in total to date have amounted to tens of millions of dollars.

106.    As a further result of the options malfeasance and Fossil's subsequent failure to file a
timely Form 10-Q, Fossil continued to face possible delisting from Nasdaq.  Nasdaq notified Fossil
on or about November 20, 2006 that it was subject to possible delisting.  As reported in the May 7,
2007 press release, the Nasdaq Listing Qualifications Panel had since granted the Company

continued listing subject to certain conditions some of which the Company has admitted it would not be able to meet. The Company thereafter struggled under the threat of delisting for months.

**FOSSIL'S FALSE AND MISLEADING PROXY STATEMENTS**

107.    One of the primary methods in which defendants concealed their breaches of fiduciary duty arising out of the backdating was by making false statements and omitting material facts in the Company's proxy statements. In its proxy statements the Company (and numerous defendants) repeatedly communicated to Fossil's shareholders that: (i) stock option grants would be determined pursuant to authorization of the shareholders and in accordance with Fossil's stock option plans; (ii) the Company had been granting and would continue to grant incentive stock options dated and priced based on fair market value on the date of the grant of the option, in accordance with Fossil's stock option plans; (iii) stock options were being granted prudently and consistent with the Company's compensation policies to compensate management through future growth in the Company's market value (*i.e.*, not by granting backdated "in-the-money" stock options), so that option holders would benefit only when, and to the extent, the Company's stock price increased after the grant; and (iv) the Audit Committee had fulfilled its duties to help ensure the adequacy of the Company's internal controls in recommending the inclusion of the Company's financial statements in its periodic SEC filings. The proxy statements also referenced options prices, market prices on purported grant dates and grant dates (identifiable by expiration date or otherwise) in stating the equity holdings of, and options grants to, officers and directors, but omitted that the grants were backdated and therefore stock option compensation was artificially inflated and underreported.

108.    The statements in Fossil's proxy statements (many of which are identified below) were materially false and misleading and omitted material information about the Company's improper stock option practices, as detailed herein. In truth, and as those who signed and approved

the Company's proxy statements in bad faith knew or were negligent or severely reckless in not knowing, stock options at Fossil were: (i) backdated in violation of the Company's stock option plans and state and federal laws; (ii) otherwise determined and granted in contravention of the vested authority provided by shareholders and the stock option plans; and (iii) dated with dates prior to the dates the awards were properly authorized, employees were entitled to receive the options, or the option or price was known.  Furthermore, those defendants who sat on the Audit Committee were in fact circumventing the Company's internal controls and withholding from Fossil's external auditors their knowledge of backdating.

109.    As former SEC Chairman Harvey L. Pitt stated: "What's so terrible about backdating options grants?  For one thing, it likely renders a company's proxy materials false and misleading.  Proxies typically indicate that options are granted at fair market value.  But if the grant is backdated, the options value isn't fair – at least not from the vantage point of the company and its shareholders."

110.    By issuing false and misleading statements in Fossil's proxy statements, the defendants identified below were able to: (i) increase the numbers of authorized shares of common stock of Fossil from which defendants could gain shares by exercise of their backdated stock options; (ii) gain the ability to grant to themselves and others backdated stock options; and (iii) obtain elected directorships enabling them to perpetuate the scheme.  Were the truth disclosed, the Company's shareholders would not have reasonably followed defendants' recommendations concerning the proposals submitted for their approval in the Company's proxy statements identified below.

111.    Fossil relied upon the facts stated in the Company's false and misleading proxy statements to seek the shareholders' vote for approval of the proposals identified herein.  Thus, both the Company and its shareholders relied on the following materially false proxy statements.

**Proxy Statement Filed in Connection with the 1997 Annual Meeting**

112.    On or about May 22, 1997, Fossil filed with the SEC its definitive proxy statement for the 1997 annual meeting of shareholders ("1997 Proxy Statement" or "1997 Proxy").  The 1997 Proxy Statement was signed by Tunnell and reviewed and approved by Kercho, Tunnell, Anderson, Gold, Stone, T. Kartsotis and K. Kartsotis.  The 1997 Proxy included a "Compensation Committee Report on Executive Compensation" signed by Anderson, Gold and Stone.

113.    The 1997 Proxy Statement made numerous significant representations and omitted material facts concerning Fossil's stock option plans, for instance, relating to the purpose of stock option grants, how stock options were being granted, and how stock options would be granted in the future.

(a)    The 1997 Proxy Statement communicated that stock option grants were not being backdated and would not be backdated in the future.  In the Compensation Committee Report, under "Compensation Vehicles," the 1997 Proxy stated stock options "instill stockholder considerations and values in the actions of all the employees and executive officers," "enhance[] . . . stockholder value," and "tie" executive officers' "success directly to the growth of stockholder value."  1997 Proxy at 16.  When identifying stock option grants, including the backdated January 10, 1996 and August 30, 1996 options, the 1997 Proxy stated: "Pursuant to the Incentive Plan under which this option was granted, the exercise price was the closing price of a share of Common Stock on the Nasdaq National Market on the date of grant."  *Id*. at 13.  The 1997 Proxy made similar statements related to the granting of options and suggesting options were accurately dated to be the grant date.

(b)    The 1997 Proxy also materially understated the "potential realizable value" of options held by Barnes, Gundy and Kercho, and materially understated the "value of unexercised in-

the-money options" they held, insofar as these defendants held backdated options.  *See supra* ¶70

(table).

114.    The 1997 Proxy Statement representations were made in connection with and

essential to the first proposal Fossil's Board made to the Company's shareholders for a vote.  The

first proposal concerned "ELECTION OF DIRECTORS" – including certain of the same directors

who were backdating and/or receiving backdated stock options and making misrepresentations to the

Company's shareholders.  Each defendant then a director explicitly recommended that Fossil's

shareholders vote for the election of each of the nominees:  "THE BOARD OF DIRECTORS

UNANIMOUSLY RECOMMENDS A VOTE 'FOR' THE ELECTION OF EACH OF THE

INDIVIDUALS NOMINATED FOR ELECTIONS AS A DIRECTOR."  1997 Proxy at 19.

**Proxy Statement Filed in Connection with the 1998 Annual Meeting**

115.    On or about May 27, 1998, Fossil filed with the SEC its definitive proxy statement

for the 1998 annual meeting of shareholders ("1998 Proxy Statement" or "1998 Proxy").  The 1998

Proxy Statement was signed by Tunnell and reviewed and approved by Kercho, Tunnell, Anderson,

Gold, Stone, T. Kartsotis and K. Kartsotis.  The 1998 Proxy included a "Compensation Committee

Report on Executive Compensation" signed by Anderson, Gold and Stone.

116.    The 1998 Proxy Statement made numerous significant representations and omitted

material facts concerning Fossil's stock option plans, for instance, relating to the purpose of stock

option grants, how stock options were being granted, and how stock options would be granted in the

future.

(a)    The 1998 Proxy Statement communicated that stock option grants were not

being backdated and would not be backdated in the future.  In the Compensation Committee Report,

under "Compensation Vehicles," the 1998 Proxy stated stock options "instill stockholder

considerations and values in the actions of all the employees and executive officers,"

"enhance[] . . . stockholder value," and "tie" executive officers' "success directly to the growth of stockholder value." 1998 Proxy at 17. When identifying stock option grants, including the backdated February 6, 1997 options, the 1998 Proxy stated: "Pursuant to the Incentive Plan under which this option was granted, the exercise price was the closing price of a share of Common Stock on the Nasdaq National Market on the date of grant." *Id*. at 15. The 1998 Proxy made similar statements related to the granting of options and suggesting options were accurately dated to be the grant date.

(b)     The 1998 Proxy also materially understated the "potential realizable value" of options held by Barnes, Gundy and Quick, and materially understated the "value of unexercised in-the-money options" they held, insofar as these defendants held backdated options. *See supra* ¶70 (table).

(c)     In recommending approval of an amendment to the 1993 Stock Option Plan to "INCREASE THE NUMBER OF SHARES OF COMMON STOCK THAT MAY BE THE SUBJECT OF GRANTS," the 1998 Proxy stated that "incentive stock options . . . meet[] the requirements of Section 422 of the Internal Revenue Code of 1986," which mandates that the option price be not less than the fair market value of the stock at the time such option is granted. 1998 Proxy at 20. The 1998 Proxy also stated that vesting terms of options were based on the "date of the grant." *Id.* at 20-21.

117.    The 1998 Proxy Statement representations were made in connection with and essential to a number of proposals Fossil's Board made to the Company's shareholders for a vote.

(a)     The first proposal concerned "AMENDMENT TO THE AMENDED AND RESTATED CERTIFICATE OF INCORPORATION TO ESTABLISH A CLASSIFIED BOARD OF DIRECTORS," thereby permitting three classes of directors and significantly extending the time required to make any change in control of the Board. Each defendant then a director explicitly

- 51 -

recommended that Fossil's shareholders vote for the election of each of the nominees: "THE BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS A VOTE 'FOR' THE AMENDMENT TO THE COMPANY'S AMENDED AND RESTATED CERTIFICATE OF INCORPORATION TO CREATE A CLASSIFIED BOARD OF DIRECTORS." 1998 Proxy at 7.

(b)     The second proposal concerned "ELECTION OF DIRECTORS" – including certain of the same directors who were backdating and/or receiving backdated stock options and making misrepresentations to the Company's shareholders. Each defendant then a director explicitly recommended that Fossil's shareholders vote for the election of each of the nominees: "THE BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS A VOTE 'FOR' THE ELECTION OF EACH OF THE INDIVIDUALS NOMINATED FOR ELECTIONS AS A DIRECTOR." 1998 Proxy at 19.

(c)     The third proposal concerned an amendment to the 1993 Stock Option Plan to "INCREASE THE NUMBER OF SHARES OF COMMON STOCK THAT MAY BE THE SUBJECT OF GRANTS," by 900,000 shares. Each defendant then a director explicitly recommended Fossil's shareholders approve the amendment: "THE BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS A VOTE 'FOR' THE INCREASE IN THE NUMBER OF SHARES OF COMMON STOCK THAT MAY BE THE SUBJECT OF GRANTS UNDER THE 1993 LONG-TERM INCENTIVE PLAN OF FOSSIL, INC." 1998 Proxy at 24.

**Proxy Statement Filed in Connection with the 1999 Annual Meeting**

118.     On or about May 26, 1999, Fossil filed with the SEC its definitive proxy statement for the 1999 annual meeting of shareholders ("1999 Proxy Statement" or "1999 Proxy"). The 1999 Proxy Statement was signed by Tunnell and reviewed and approved by Kercho, Tunnell, Anderson, Gold, Stone, T. Kartsotis and K. Kartsotis. The 1999 Proxy included a "Compensation Committee Report on Executive Compensation" signed by Anderson, Gold and Stone.

119.    The 1999 Proxy Statement made numerous significant representations and omitted material facts concerning Fossil's stock option plans, for instance, relating to the purpose of stock option grants, how stock options were being granted, and how stock options would be granted in the future.

(a)    The 1999 Proxy Statement communicated that stock option grants were not being backdated and would not be backdated in the future.  In the Compensation Committee Report, under "Compensation Vehicles," the 1999 Proxy stated stock options "instill stockholder considerations and values in the actions of all the employees and executive officers," "enhance[] . . . stockholder value," and "tie" executive officers' "success directly to the growth of stockholder value."  1999 Proxy at 14.  When identifying stock option grants, including the backdated January 12, 1998 options, the 1999 Proxy stated: "Pursuant to the Incentive Plan under which this option was granted, the exercise price was the closing price of a share of Common Stock on the Nasdaq National Market on the date of grant."  *Id*. at 12.  The 1999 Proxy made similar statements related to the granting of options and suggesting options were accurately dated to be the grant date.

(b)    The 1999 Proxy also materially understated the "potential realizable value" of options held by Barnes, Gundy and Quick, and materially understated the "value of unexercised in-the-money options" they held, insofar as these defendants held backdated options.  *See supra* ¶70 (table).

120.    The 1999 Proxy Statement representations were made in connection with and essential to the first proposal Fossil's Board made to the Company's shareholders for a vote.  The first proposal concerned "ELECTION OF DIRECTORS" – including certain of the same directors who were backdating and/or receiving backdated stock options and making misrepresentations to the Company's shareholders.  Each defendant then a director explicitly recommended that Fossil's

shareholders vote for the election of each of the nominees:  "THE BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS A VOTE 'FOR' THE ELECTION OF EACH OF THE INDIVIDUALS NOMINATED FOR ELECTION AS A DIRECTOR."  1999 Proxy at 5.

**Proxy Statement Filed in Connection with the 2000 Annual Meeting**

121.    On or about May 24, 2000, Fossil filed with the SEC its definitive proxy statement for the 2000 annual meeting of shareholders ("2000 Proxy Statement" or "2000 Proxy").  The 2000 Proxy Statement was signed by Tunnell and reviewed and approved by Kercho, Tunnell, Anderson, Gold, Steinberg, Stone, T. Kartsotis and K. Kartsotis.  The 2000 Proxy included a "Compensation Committee Report on Executive Compensation" signed by Anderson, Gold, Steinberg and Stone.

122.    The 2000 Proxy Statement made numerous significant representations and omitted material facts concerning Fossil's stock option plans, for instance, relating to the purpose of stock option grants, how stock options were being granted, and how stock options would be granted in the future.

(a)    The 2000 Proxy Statement communicated that stock option grants were not being backdated and would not be backdated in the future.  In the Compensation Committee Report, under "Compensation Vehicles," the 2000 Proxy stated stock options "instill stockholder considerations and values in the actions of all the employees and executive officers," "enhance[] . . . stockholder value," and "tie" executive officers' "success directly to the growth of stockholder value."  2000 Proxy at 16.  When identifying stock option grants, including the backdated February 12, 1999 options, the 2000 Proxy stated: "Pursuant to the Incentive Plan under which this option was granted, the exercise price was the closing price of a share of Common Stock on the Nasdaq National Market on the date of grant."  *Id.* at 14.  The 2000 Proxy made similar statements related to the granting of options and suggesting options were accurately dated to be the grant date.

(b)     The 2000 Proxy also materially understated the "potential realizable value" of options held by Barnes, Gundy and Quick, and materially understated the "value of unexercised in-the-money options" they held, insofar as these defendants held backdated options. *See supra* ¶70 (table).

123.    The 2000 Proxy Statement representations were made in connection with and essential to a number of proposals Fossil's Board made to the Company's shareholders for a vote.

(a)     The first proposal concerned "ELECTION OF DIRECTORS" – including certain of the same directors who were backdating and/or receiving backdated stock options and making misrepresentations to the Company's shareholders. Each defendant then a director explicitly recommended that Fossil's shareholders vote for the election of each of the nominees:  "THE BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS THAT STOCKHOLDERS VOTE FOR EACH DIRECTOR NOMINEE FOR THE BOARD OF DIRECTORS." 2000 Proxy at 6.

(b)     The second proposal concerned an amendment to Article IV of the Amended and Restated Certificate of Incorporation, to effect an "INCREASE IN NUMBER OF AUTHORIZED SHARES OF COMMON STOCK," to (among other things) provide shares for issuance of stock upon exercise of stock. Each defendant then a director explicitly recommended Fossil's shareholders approve the amendment:  "THE BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS A VOTE 'FOR' THE INCREASE IN NUMBER OF AUTHORIZED SHARES OF COMMON STOCK." 2000 Proxy at 21.

**Proxy Statement Filed in Connection with the 2001 Annual Meeting**

124.    On or about May 24, 2001, Fossil filed with the SEC its definitive proxy statement for the 2001 annual meeting of shareholders ("2001 Proxy Statement" or "2001 Proxy"). The 2001 Proxy Statement was signed by Tunnell and reviewed and approved by Anderson, Tunnell, Gold, Steinberg, Stone, T. Kartsotis and K. Kartsotis.  The 2001 Proxy included a "Compensation

- 55 -

Committee Report on Executive Compensation" signed by Anderson, Gold, Steinberg and Stone. The 2001 Proxy also contained a "Report of the Audit Committee," signed by Anderson, Gold, Steinberg and Stone.

125.    The 2001 Proxy Statement made numerous significant representations and omitted material facts concerning Fossil's stock option plans, for instance, relating to the purpose of stock option grants, how stock options were being granted, and how stock options would be granted in the future.

(a)    The 2001 Proxy Statement communicated that stock option grants were not being backdated and would not be backdated in the future.  In the Compensation Committee Report, under "Compensation Vehicles," the 2001 Proxy stated stock options "instill stockholder considerations and values in the actions of all the employees and executive officers," "enhance[] . . . stockholder value," and "tie" executive officers' "success directly to the growth of stockholder value."  2001 Proxy at 18.  When identifying stock option grants, including the backdated February 2, 2000 and October 25, 2000 options, the 2001 Proxy stated: "Pursuant to the Incentive Plan under which this option was granted, the exercise price was the closing price of a share of Common Stock on the Nasdaq National Market value on the date of grant."  *Id*. at 16.  The 2001 Proxy made similar statements related to the granting of options and suggesting options were accurately dated to be the grant date.

(b)    The 2001 Proxy also materially understated the "potential realizable value" of options held by Barnes, Gundy and Quick, and materially understated the "value of unexercised in-the-money options" they held, insofar as these defendants held backdated options.  *See supra* ¶70 (table).

(c)    In recommending approval of an amendment to the 1993 Stock Option Plan to "INCREASE THE NUMBER OF SHARES OF COMMON STOCK THAT MAY BE THE

SUBJECT OF GRANTS," the 2001 Proxy stated that "incentive stock options . . . meet[] the requirements of Section 422 of the Internal Revenue Code of 1986," which mandates that the option price be not less than the fair market value of the stock at the time such option is granted. 2001 Proxy at 21. The 2001 Proxy also stated that vesting terms of options were based on the "date of the grant." *Id.* at 21-22.

126.   The 2001 Proxy Statement contained a "Report of the Audit Committee" made with respect to the Company's financial statements for the fiscal year ended December 30, 2000, which included Fossil's 1998-2000 financial statements and selected financial data from the Company's 1995-2000 financial statements (including income statement and balance sheet data, *i.e.*, net income, net income per share and shareholders' equity), all of which were falsified by the backdating alleged herein. The Audit Committee Charter, referenced in the 2001 Proxy and attached to the 2000 Proxy, demonstrated the Audit Committee's substantial oversight authority and responsibilities aimed at ensuring the Company's integrity of reported financial results, soundness of internal controls, adequacy of disclosures, and compliance with laws and regulations. In the report, Anderson, Gold, Steinberg and Stone represented they had fulfilled their duties to help ensure the adequacy of the Company's internal controls and endorsed the integrity of Fossil's financial statements and internal controls and adequacy of disclosures. In so doing, they stated (among other things) "the Audit Committee recommended to the Company's Board of Directors that the Company's audited financial statements be included in the Company's Annual Report on Form 10-K for the fiscal year ended December 30, 2000." 2001 Proxy at 8.

127.   The 2001 Proxy Statement representations were made in connection with and essential to a number of proposals Fossil's Board made to the Company's shareholders for a vote.

(a)   The first proposal concerned "ELECTION OF DIRECTORS" – including certain of the same directors who were backdating and/or receiving backdated stock options and

making misrepresentations to the Company's shareholders. Each defendant then a director explicitly recommended that Fossil's shareholders vote for the election of each of the nominees: "THE BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS THAT STOCKHOLDERS VOTE FOR EACH DIRECTOR NOMINEE FOR THE BOARD OF DIRECTORS." 2001 Proxy at 6.

(b)     The second proposal concerned an amendment to the 1993 Stock Option Plan to "INCREASE THE NUMBER OF SHARES OF COMMON STOCK THAT MAY BE THE SUBJECT OF GRANTS," by 1,350,000 shares. Each defendant then a director explicitly recommended Fossil's shareholders approve the amendment: "THE BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS A VOTE 'FOR' THE INCREASE IN THE NUMBER OF SHARES OF COMMON STOCK THAT MAY BE THE SUBJECT OF GRANTS UNDER THE 1993 LONG-TERM INCENTIVE PLAN OF FOSSIL, INC." 2001 Proxy at 25.

**Proxy Statement Filed in Connection with the 2002 Annual Meeting**

128.    On or about May 22, 2002, Fossil filed with the SEC its definitive proxy statement for the 2002 annual meeting of shareholders ("2002 Proxy Statement" or "2002 Proxy"). The 2002 Proxy Statement was signed by Tunnell and reviewed and approved by Anderson, Tunnell, Gold, Steinberg, Stone, T. Kartsotis and K. Kartsotis. The 2002 Proxy included a "Compensation Committee Report on Executive Compensation" signed by Anderson, Gold, Steinberg and Stone. The 2002 Proxy also contained a "Report of the Audit Committee," signed by Anderson, Gold, Steinberg and Stone.

129.    The 2002 Proxy Statement made numerous significant representations and omitted material facts concerning Fossil's stock option plans, for instance, relating to the purpose of stock option grants, how stock options were being granted, and how stock options would be granted in the future.

(a)     The 2002 Proxy Statement communicated that stock option grants were not being backdated and would not be backdated in the future.  In the Compensation Committee Report, under "Compensation Vehicles," the 2002 Proxy stated stock options "instill stockholder considerations and values in the actions of all the employees and executive officers," "enhance[] . . . stockholder value," and "tie" executive officers' "success directly to the growth of stockholder value."  2002 Proxy at 17-18.  When identifying stock option grants, the 2002 Proxy also materially understated the "potential realizable value" of options held by Barnes, Gundy and Quick, and materially understated the "value of unexercised in-the-money options" they held, insofar as these defendants held backdated options.  *See supra* ¶70 (table).

(b)     In recommending approval of an amendment to the 1993 Stock Option Plan to "INCREASE THE NUMBER OF SHARES OF COMMON STOCK THAT MAY BE THE SUBJECT OF GRANTS UNDER THE NONEMPLOYEE DIRECTOR STOCK OPTION PLAN," the 2002 Proxy stated that "[t]he purchase price for the shares subject to an Option will be the fair market value of the Common Stock on the date the Option is granted."  2002 Proxy at 20.

130.    The 2002 Proxy Statement contained a "Report of the Audit Committee" made with respect to the Company's financial statements for the fiscal year ended January 5, 2002, which included Fossil's 1999-2002 financial statements and selected financial data from the Company's 1996-2002 financial statements (including income statement and balance sheet data, *i.e.*, net income, net income per share and shareholders' equity), all of which were falsified by the backdating alleged herein.  The Audit Committee Charter, referenced in the 2002 Proxy and attached to the 2000 Proxy, demonstrated the Audit Committee's substantial oversight authority and responsibilities aimed at ensuring the Company's integrity of reported financial results, soundness of internal controls, adequacy of disclosures, and compliance with laws and regulations.  In the report, Anderson, Gold, Steinberg and Stone represented they had fulfilled their duties to help ensure the adequacy of the

Company's internal controls and endorsed the integrity of Fossil's financial statements and internal controls and adequacy of disclosures.  In so doing, they stated (among other things) "the Audit Committee recommended to the Company's Board of Directors that the Company's audited financial statements be included in the Company's Annual Report on Form 10-K for the fiscal year ended January 5, 2002."  2002 Proxy at 8.

131.    The 2002 Proxy Statement representations were made in connection with and essential to a number of proposals Fossil's Board made to the Company's shareholders for a vote.

(a)    The first proposal concerned "ELECTION OF DIRECTORS" – including certain of the same directors who were backdating and/or receiving backdated stock options and making misrepresentations to the Company's shareholders.  Each defendant then a director explicitly recommended that Fossil's shareholders vote for the election of each of the nominees:  "THE BOARD OF DIRECTORS RECOMMENDS THAT STOCKHOLDERS VOTE FOR EACH DIRECTOR NOMINEE FOR THE BOARD OF DIRECTORS."  2002 Proxy at 6.

(b)    The second proposal concerned an amendment to the 1993 Nonemployee Director Stock Option Plan to "INCREASE THE NUMBER OF SHARES OF COMMON STOCK THAT MAY BE THE SUBJECT OF GRANTS," by 50,000 shares.  Each defendant then a director explicitly recommended Fossil's shareholders approve the amendment:  "THE BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS A VOTE 'FOR' THE INCREASE IN THE NUMBER OF SHARES OF COMMON STOCK THAT MAY BE THE SUBJECT OF GRANTS UNDER THE 1993 NONEMPLOYEE DIRECTOR STOCK OPTION PLAN OF FOSSIL, INC."  2002 Proxy at 22.

**Proxy Statement Filed in Connection with the 2003 Annual Meeting**

132.    On or about May 21, 2003, Fossil filed with the SEC its definitive proxy statement for the 2003 annual meeting of shareholders ("2003 Proxy Statement" or "2003 Proxy").  The 2003

Proxy Statement was signed by Tunnell and reviewed and approved by Anderson, Tunnell, Gold, Steinberg, Stone, T. Kartsotis and K. Kartsotis. The 2003 Proxy included a "Compensation Committee Report on Executive Compensation" signed by Anderson, Gold, Steinberg and Stone. The 2003 Proxy also contained a "Report of the Audit Committee," signed by Anderson, Gold, Steinberg and Stone.

133.    The 2003 Proxy Statement made numerous significant representations and omitted material facts concerning Fossil's stock option plans, for instance, relating to the purpose of stock option grants, how stock options were being granted, and how stock options would be granted in the future.

(a)    The 2003 Proxy Statement communicated that stock option grants were not being backdated and would not be backdated in the future. In the Compensation Committee Report, under "Compensation Vehicles," the 2003 Proxy stated stock options "instill stockholder considerations and values in the actions of all the employees and executive officers," "enhance[] . . . stockholder value," and "tie" executive officers' "success directly to the growth of stockholder value." 2003 Proxy at 13. When identifying stock option grants, including the backdated January 14, 2002 options, the 2003 Proxy stated: "Pursuant to the Incentive Plan under which this option was granted, the exercise price was the closing price of a share of Common Stock on the Nasdaq National Market on the date of grant." *Id*. at 11. The 2003 Proxy made similar statements related to the granting of options and suggesting options were accurately dated to be the grant date.

(b)    The 2003 Proxy also materially understated the "potential realizable value" of options held by Barnes, Gundy and Quick, and materially understated the "value of unexercised in-the-money options" they held, insofar as these defendants held backdated options. *See supra* ¶70 (table).

- 61 -

(c)      In recommending approval of an amendment to the 1993 Stock Option Plan to "INCREASE THE NUMBER OF SHARES OF COMMON STOCK THAT MAY BE THE SUBJECT OF GRANTS," the 2003 Proxy stated that "incentive stock options . . . meet[] the requirements of Section 422 of the Internal Revenue Code of 1986," which mandates that the option price be not less than the fair market value of the stock at the time such option is granted.  2003 Proxy at 16.  The 2003 Proxy also stated that vesting terms of options were based on the "date of the grant."  *Id.* at 16-17.

134.    The 2003 Proxy Statement contained a "Report of the Audit Committee"  made with respect to the Company's financial statements for the fiscal year ended January 4, 2003, which included Fossil's 2001-2003 financial statements and selected financial data from the Company's 1999-2003 financial statements (including income statement and balance sheet data, *i.e.*, net income, net income per share and shareholders' equity), all of which were falsified by the backdating alleged herein.  The Audit Committee Charter, referenced in, and attached to, the 2003 Proxy, demonstrated the Audit Committee's substantial oversight authority and responsibilities aimed at ensuring the Company's integrity of reported financial results, soundness of internal controls, adequacy of disclosures, and compliance with laws and regulations.  In the report, Anderson, Gold, Steinberg and Stone represented they had fulfilled their duties to help ensure the adequacy of the Company's internal controls and endorsed the integrity of Fossil's financial statements and internal controls and adequacy of disclosures.  In so doing, they stated (among other things) "the Audit Committee recommended to the Company's Board of Directors that the Company's audited financial statements be included in the Company's Annual Report on Form 10-K for the fiscal year ended January 4, 2003."  2003 Proxy at 8.

135.    The 2003 Proxy Statement representations were made in connection with and essential to a number of proposals Fossil's Board made to the Company's shareholders for a vote.

(a)     The first proposal concerned "ELECTION OF DIRECTORS" – including certain of the same directors who were backdating and/or receiving backdated stock options and making misrepresentations to the Company's shareholders.  Each defendant then a director explicitly recommended that Fossil's shareholders vote for the election of each of the nominees:  "THE BOARD OF DIRECTORS RECOMMENDS THAT STOCKHOLDERS VOTE FOR EACH DIRECTOR NOMINEE FOR THE BOARD OF DIRECTORS."  2003 Proxy at 6.

(b)     The second proposal concerned an amendment to the 1993 Stock Option Plan to "INCREASE THE NUMBER OF SHARES OF COMMON STOCK THAT MAY BE THE SUBJECT OF GRANTS," by 2,025,000 shares.   Each defendant then a director explicitly recommended Fossil's shareholders approve the amendment:  "THE BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS A VOTE 'FOR' THE INCREASE IN THE NUMBER OF SHARES OF COMMON STOCK THAT MAY BE THE SUBJECT OF GRANTS UNDER THE 1993 LONG-TERM INCENTIVE PLAN OF FOSSIL, INC."  2003 Proxy at 21.

**Proxy Statement Filed in Connection with the 2004 Annual Meeting**

136.    On or about May 26, 2004, Fossil filed with the SEC its definitive proxy statement for the 2004 annual meeting of shareholders ("2004 Proxy Statement" or "2004 Proxy").  The 2004 Proxy Statement was signed by Tunnell and reviewed and approved by Anderson, Tunnell, Gold, Steinberg, Stone, T. Kartsotis and K. Kartsotis.  The 2004 Proxy included a "Compensation Committee Report on Executive Compensation" signed by Anderson, Gold, Steinberg and Stone. The 2004 Proxy also contained a "Report of the Audit Committee," signed by Anderson, Gold, Steinberg and Stone.

137.    The 2004 Proxy Statement made numerous significant representations and omitted material facts concerning Fossil's stock option plans, for instance, relating to the purpose of stock

option grants, how stock options were being granted, and how stock options would be granted in the future.

(a)     The 2004 Proxy Statement communicated that stock option grants were not being backdated and would not be backdated in the future.  In the Compensation Committee Report, under "Compensation Vehicles," the 2004 Proxy stated stock options "instill stockholder considerations and values in the actions of all the employees and executive officers," "enhance[] . . . stockholder value," and "tie" executive officers' "success directly to the growth of stockholder value."  2004 Proxy at 17.  When identifying stock option grants, including the backdated February 24, 2003 options, the 2004 Proxy stated: "Pursuant to the Incentive Plan under which this option was granted, the exercise price was the closing price of a share of Common Stock on the Nasdaq National Market on the date of grant."  *Id*. at 15.  The 2004 Proxy made similar statements related to the granting of options and suggesting options were accurately dated to be the grant date.

(b)     The 2004 Proxy also materially understated the "potential realizable value" of options held by Barnes, Gundy, Quick and Kercho, and materially understated the "value of unexercised in-the-money options" they held, insofar as these defendants held backdated options. *See supra* ¶70 (table).

(c)     In recommending approval "TO AMEND THE 2004 LONG-TERM INCENTIVE PLAN OF FOSSIL, INC. (FORMERLY THE '1993 LONG-TERM INCENTIVE PLAN OF FOSSIL, INC.') TO EXPAND THE CLASS OF PERSONS ELIGIBLE TO RECEIVE AWARDS," the 2004 Proxy stated that "incentive stock options . . . meet[] the requirements of Section 422 of the Internal Revenue Code of 1986," which mandates that the option price be not less than the fair market value of the stock at the time such option is granted.  2004 Proxy at 20.  The

2004 Proxy also stated that vesting terms of options were based on the "date of the grant." *Id.* at 20-21.

138.    The 2004 Proxy Statement contained a "Report of the Audit Committee" made with respect to the Company's financial statements for the fiscal year ended January 3, 2004, which included Fossil's 2002-2004 financial statements and selected financial data from the Company's 2000-2004 financial statements (including income statement and balance sheet data, *i.e.*, net income, net income per share and shareholders' equity), all of which were falsified by the backdating alleged herein. The Audit Committee Charter, referenced in, and attached to, the 2004 Proxy, demonstrated the Audit Committee's substantial oversight authority and responsibilities aimed at ensuring the Company's integrity of reported financial results, soundness of internal controls, adequacy of disclosures, and compliance with laws and regulations. In the report, Anderson, Gold, Steinberg and Stone represented they had fulfilled their duties to help ensure the adequacy of the Company's internal controls and endorsed the integrity of Fossil's financial statements and internal controls and adequacy of disclosures. In so doing, they stated (among other things) "the Audit Committee recommended to the Company's Board of Directors that the Company's audited financial statements be included in the Company's Annual Report on Form 10-K for the fiscal year ended January 3, 2004." 2004 Proxy at 8.

139.    The 2004 Proxy Statement representations were made in connection with and essential to a number of proposals Fossil's Board made to the Company's shareholders for a vote.

(a)      The first proposal concerned "ELECTION OF DIRECTORS" – including certain of the same directors who were backdating and/or receiving backdated stock options and making misrepresentations to the Company's shareholders. Each defendant then a director explicitly recommended that Fossil's shareholders vote for the election of each of the nominees: "THE

BOARD OF DIRECTORS RECOMMENDS THAT STOCKHOLDERS VOTE FOR EACH DIRECTOR NOMINEE FOR THE BOARD OF DIRECTORS."  2004 Proxy at 6.

(b)     The second proposal concerned an amendment to the 1993 Stock Option Plan to "TO AMEND THE 2004 LONG-TERM INCENTIVE PLAN OF FOSSIL, INC. (FORMERLY THE '1993 LONG-TERM INCENTIVE PLAN OF FOSSIL, INC.') TO EXPAND THE CLASS OF PERSONS ELIGIBLE TO RECEIVE AWARDS."  Each defendant then a director explicitly recommended Fossil's shareholders approve the amendment:  "THE BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS A VOTE 'FOR' THE EXPANSION OF THE PERSONS WHO MAY BE GRANTED AWARDS UNDER THE PLAN."  2004 Proxy at 25.

**Proxy Statement Filed in Connection with the 2005 Annual Meeting**

140.     On or about May 25, 2005, Fossil filed with the SEC its definitive proxy statement for the 2005 annual meeting of shareholders ("2005 Proxy Statement" or "2005 Proxy").  The 2005 Proxy Statement was signed by Randy S. Hyne ("Hyne") and reviewed and approved by Anderson, Hyne, Gold, Steinberg, Stone, T. Kartsotis and K. Kartsotis.  The 2005 Proxy included a "Compensation Committee Report on Executive Compensation" signed by Anderson, Gold, Steinberg and Stone.  The 2005 also contained a "Report of the Audit Committee," signed by Anderson, Gold, Steinberg and Stone.

141.     The 2005 Proxy Statement made numerous significant representations and omitted material facts concerning Fossil's stock option plans, for instance, relating to the purpose of stock option grants, how stock options were being granted, and how stock options would be granted in the future.

(a)     The 2005 Proxy Statement communicated that stock option grants were not being backdated and would not be backdated in the future.  In the Compensation Committee Report, under "Compensation Vehicles," the 2005 Proxy stated stock options "instill stockholder

considerations and values in the actions of all the employees and executive officers," "enhance[] . . . stockholder value," and "tie" executive officers' "success directly to the growth of stockholder value." 2005 Proxy at 16. When identifying stock option grants, including the backdated February 23, 2004 options, the 2005 Proxy stated: "Pursuant to the Incentive Plan under which this option was granted, the exercise price was the closing price of a share of Common Stock on the Nasdaq National Market value on the date of grant." *Id.* The 2005 Proxy made similar statements related to the granting of options and suggesting options were accurately dated to be the grant date.

(b)     The 2005 Proxy also materially understated the "potential realizable value" of options held by Barnes, Bock, Quick and Kercho, and materially understated the "value of unexercised in-the-money options" they held, insofar as these defendants held backdated options. *See supra* ¶70 (table).

142.     The 2005 Proxy Statement contained a "Report of the Audit Committee" made with respect to the Company's financial statements for the fiscal year ended January 1, 2005, which included Fossil's 2003-2005 financial statements and selected financial data from the Company's 2001-2005 financial statements (including income statement and balance sheet data, *i.e.*, net income, net income per share and shareholders' equity), all of which were falsified by the backdating alleged herein. The Audit Committee Charter, referenced in, and attached to, the 2005 Proxy, demonstrated the Audit Committee's substantial oversight authority and responsibilities aimed at ensuring the Company's integrity of reported financial results, soundness of internal controls, adequacy of disclosures, and compliance with laws and regulations. In the report, Anderson, Gold, Steinberg and Stone represented they had fulfilled their duties to help ensure the adequacy of the Company's internal controls and endorsed the integrity of Fossil's financial statements and internal controls and adequacy of disclosures. In so doing, they stated (among other things) "the Audit Committee

recommended to the Company's Board of Directors that the Company's audited financial statements be included in the Company's Annual Report on Form 10-K for the fiscal year ended January 1, 2005." 2005 Proxy at 8.

143.    The 2005 Proxy Statement representations were made in connection with and essential to the first proposal Fossil's Board made to the Company's shareholders for a vote. The first proposal concerned "ELECTION OF DIRECTORS" – including certain of the same directors who were backdating and/or receiving backdated stock options and making misrepresentations to the Company's shareholders. Each defendant then a director explicitly recommended that Fossil's shareholders vote for the election of each of the nominees: "THE BOARD OF DIRECTORS RECOMMENDS THAT STOCKHOLDERS VOTE FOR EACH DIRECTOR NOMINEE FOR THE BOARD OF DIRECTORS." 2005 Proxy at 6.

**Proxy Statement Filed in Connection with the 2006 Annual Meeting**

144.    On or about May 24, 2006, Fossil filed with the SEC its definitive proxy statement for the 2006 annual meeting of shareholders ("2006 Proxy Statement" or "2006 Proxy"). The 2006 Proxy Statement was signed by Hyne and reviewed and approved by Anderson, Hyne, Gold, Steinberg, Stone, Caden Wang ("Wang"), T. Kartsotis and K. Kartsotis. The 2006 Proxy included a "Compensation Committee Report on Executive Compensation" signed by Anderson, Gold, Steinberg and Stone. The 2006 Proxy also contained a "Report of the Audit Committee," signed by Anderson, Gold, Wang and Stone.

145.    The 2006 Proxy Statement made numerous significant representations and omitted material facts concerning Fossil's stock option plans, for instance, relating to the purpose of stock option grants, how stock options were being granted, and the Company's historical stock option granting practices.

(a)      In the Compensation Committee Report, under "Compensation Philosophy," the 2006 Proxy stated stock options "emphasize the link between executive compensation and the creation of stockholder value" and in discussing "Long-Term Incentives," the report said stock options "instill stockholder considerations and values in the actions of all the employees and executive officers," and "tie" executive officers' "success directly to the growth of stockholder value." 2006 Proxy at 17.  When identifying stock option grants, the 2006 Proxy stated: "Pursuant to the Incentive Plan under which this option was granted, the exercise price was the closing price of a share of Common Stock on the Nasdaq National Market on the date of grant." *Id*. at 15.  The 2006 Proxy made similar statements related to the granting of options and suggesting options were accurately dated to be the grant date.

(b)      The 2006 Proxy also materially understated the "value of unexercised in-the-money options" held by Barnes, Bock and Quick, insofar as they held backdated options. *See supra* ¶70 (table).

146.    The 2006 Proxy Statement contained a "Report of the Audit Committee" made with respect to the Company's financial statements for the fiscal year ended December 31, 2005, which included Fossil's 2004-2005 financial statements and selected financial data from the Company's 2002-2005 financial statements (including income statement and balance sheet data, *i.e.*, net income, net income per share and shareholders' equity), all of which were falsified by the backdating alleged herein.  The Audit Committee Charter, referenced in, and attached to, the 2006 Proxy, demonstrated the Audit Committee's substantial oversight authority and responsibilities aimed at ensuring the Company's integrity of reported financial results, soundness of internal controls, adequacy of disclosures, and compliance with laws and regulations.  In the report, Anderson, Gold, Steinberg and Stone represented they had fulfilled their duties to help ensure the adequacy of the Company's internal controls and endorsed the integrity of Fossil's financial statements and internal controls and

adequacy of disclosures.  In so doing, they stated (among other things) "the Audit Committee recommended to the Company's Board of Directors that the Company's audited financial statements be included in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2005."  2006 Proxy at 9.

147.    The 2006 Proxy Statement representations were made in connection with and essential to the first proposal Fossil's Board made to the Company's shareholders for a vote.  The first proposal concerned "ELECTION OF DIRECTORS" – including certain of the same directors who were backdating and/or receiving backdated stock options and making misrepresentations to the Company's shareholders.  Each defendant then a director explicitly recommended that Fossil's shareholders vote for the election of each of the nominees:  "THE BOARD OF DIRECTORS RECOMMENDS THAT STOCKHOLDERS VOTE FOR EACH DIRECTOR NOMINEE FOR THE BOARD OF DIRECTORS."  2006 Proxy at 6.

**False and Misleading Forms 3, 4 and 5**

148.    Fossil and certain defendants, with the knowledge, approval and participation of each of the defendants, filed with the SEC Forms 3, 4 or 5 that falsely reported the dates of Fossil stock option grants to the defendants and others, for each of the option grants referenced in ¶70, *supra*. Those forms incorrectly stated the grant date of the options in the transaction date column for the derivative securities section of the forms.

## BACKDATING FOSSIL'S STOCK OPTIONS FALSIFIED THE COMPANY'S FINANCIAL STATEMENTS

149.    Backdating Fossil's stock options materially falsified the Company's financial statements by causing the understatement of compensation expense, the overstatement of earnings and the overstatement of shareholders' equity, among other things.  For at least a decade, defendants caused and/or allowed the Company to understate its compensation expense by not properly accounting for its stock options under GAAP and thus overstated the Company's net earnings.

150.     Pursuant to Accounting Principles Board Opinion ("APB") No. 25, the applicable GAAP provision at the time of the options grants set forth herein, an option that is in-the-money on the measurement date has intrinsic value, and the difference between its exercise price and the quoted market price must be recorded as compensation expense to be recognized over the vesting period of the option.  If the stock's market price on the date of grant exceeds the exercise price of the options, the corporation must recognize the difference as an expense, which directly impacts earnings.  It is well known that "in-the-money" stock options must be recorded as an expense.  But backdated stock options cause a company to not properly expense its option grants because the actual grant date escapes detection.  Similarly, under Statement of Financial Accounting Standards No. 123 ("SFAS No. 123") share-based compensation expense was determined by fair value of the options on the grant date, and therefore options backdated to be "in-the-money" also hid compensation expense.  Thus, Fossil did not properly expense its backdated options and this was with full knowledge of the defendants who engaged in the backdating and/or received backdated options.

151.     Although defendants received lucrative "in-the-money" options that were reported as market value options, they and Fossil did not disclose this to shareholders or, worse, did not report the compensation expense (and reduced earnings) incurred by the Company as a result of those backdated options.  The unreported compensation expense infected Fossil's financial statements, for it caused (among other falsifications) understatement of compensation expense and associated tax liabilities and overstatement of earnings and shareholder equity accounts.  The backdated options falsified the Company's financial statements and periodic reports, not only during the quarterly and annual periods in which they were granted, but also as the options vested and were exercised in the following years.  Generally, the stock options at issue in this case vested 20% per year over five

years, which means unreported compensation expense for backdated options falsely inflated Fossil's earnings for six fiscal years after the option date.

152.     Nor did defendants and Fossil properly report defendants' compensation to the Internal Revenue Service ("IRS").  For years, defendants caused the Company and rank-and-file employees to violate the Internal Revenue Code as a result of backdated stock options.  Furthermore, Internal Revenue Code §162(m) generally limits a publicly traded company's tax deductions for compensation paid to each of its named executive officers to $1 million unless the pay is determined to be "performance-based."  In order for compensation to be performance-based, the compensation committee must have set pre-established and objective performance goals.  The goals must then be approved by the shareholders.  Section 162(m) defines stock options as performance-based provided they are issued at an exercise price that is no less than the fair market value of the stock on the date of the grant.  According to former SEC Chairman Harvey Pitt: "What [162(m)] did was create incentives to find other forms of compensation so people could get over the $1 million threshold without running afoul of the code."[12]  Stock options Fossil purportedly issued were not taken into account in calculating whether the compensation of certain executives exceeded the $1 million compensation cap when they should have been, because they were backdated to be "in-the-money."

153.     Additionally, defendants failed to ensure that the Company maintained a system of internal accounting controls sufficient to provide assurances that stock option grants were recorded as necessary to permit the proper preparation of financial statements in conformity with GAAP, including APB No. 25, SFAS Nos. 123 and 123R, and SEC rules and regulations.  As stated by Harvey Pitt, former Chairman of the SEC:

---

[12]     Brian Graw & Eamon Javers, *Executive Pay Practices Under Scrutiny: Companies' Skirting of a Tax Rule Meant to Spur Performance-Based Pay Contributed to the Options Scandal.  Penalties May Follow a Senate Hearing*., Bus. Wk., Sept. 5, 2006.

> Options backdating calls a company's internal controls into question. Many discussions of backdating start with the observation that backdating is not, per se, illegal. That is wrong. Options backdating frequently involves falsification of records used to gain access to corporate assets. . . . If corporate directors were complicit in these efforts, state law fiduciary obligations are violated. Backdating is not only illegal and unethical, it points to a lack of integrity in a company's internal controls.

Harvey Pitt, *Lessons of the Stock Option Scandal*, Fin. Times, June 2, 2006. Through their fiduciary duties of good faith and loyalty, defendants owed to Fossil a duty to ensure that the Company's financial reporting fairly presented, in all material respects, the operations and financial condition of the Company. In order to adequately carry out these duties, it is necessary for the defendants to know and understand the material non-public information to be either disclosed or omitted from the Company's public statements. This material non-public information included the problems the Company faced because of its deficient internal controls.

**Audit Committee Members Who Engaged in Backdating Options Turned a Blind Eye to Internal Control Failures and Inadequate Disclosures**

154.    The conduct of certain members of the Board was particularly egregious because of their special obligations as members of Fossil's Audit Committee. Not only did Anderson, Gold, Steinberg and Stone approve backdated option grants in violation of the Company's stock option plans, they also turned a blind eye to their explicit obligations (as members of the Audit Committee) to report to Fossil's external auditors the internal control failures caused by that conduct and the conduct of their fellow directors in backdating options. Nonetheless, they reported no audit failures and recommended that the Company's financial statements be included in its SEC filings year after year. Only now has the Company admitted to "material weakness in our internal control over financial reporting relating to equity grant administration and accounting for and disclosure of equity grants."

155.    As members of the Audit Committee, Anderson, Gold, Steinberg and Stone had the highest obligation to inform Fossil's external auditors of the backdating deception. Despite

possessing knowledge that they and fellow members of the Board had approved millions of backdated option grants, they turned a blind eye to the backdating when performing their duties and their Audit Committee duties in particular.

156.    The Audit Committee Charters set forth extensive responsibilities, including reviewing with the Company's independent accountants the adequacy and effectiveness of the accounting and financial controls of the corporation, the plan and results of the annual audit, and material events or transactions and the reasoning for the appropriateness of accounting principles and financial disclosure practices used or proposed to be adopted by the Company.  For example, as reported to shareholders in the Audit Committee's Charter, Anderson, Gold, Steinberg and Stone had the authority and responsibility to, among other things:  (i) monitor the integrity of the Company's financial statements, reports and other financial information provided by Fossil to any governmental body or the public; (ii) monitor the reliability and integrity of the Company's auditing, accounting, and financial and operating reporting; (iii) monitor the independence and performance of the Company's outside and internal auditors; (iv) monitor the Company's compliance with legal and regulatory requirements; (v) review the adequacy of and compliance with the Company's financial policies and procedures and systems of internal accounting controls; and (vi) discuss with the auditors matters relevant to the audit, including suspicion or detection of fraud or concerns about the integrity of management or the Company's financial reporting.  *See* Audit Committee Charter (as of May 24, 2000, May 21, 2003, May 26, 2004 and revised May 26, 2005).  In so doing, the Audit Committee was empowered and authorized to conduct inquiries into any matters within the committee's scope of responsibility and obtain advice and assistance from internal or outside counsel or other advisors.

157.    Indeed, the members of the Audit Committee were charged with the Board's fiduciary responsibility to ensure the integrity of the Company's reported financial results and internal control

systems.  Nonetheless, during Anderson's, Gold's and Stone's meetings and communications with the Company's auditors from 1996 to 2005, and during Steinberg's meetings and communications with the Company's auditors from 1999 to 2005, Anderson, Gold, Stone and Steinberg, respectively, withheld from the Company's auditors: (i) intentional breaches of the Company's internal controls, namely the backdating of stock options; (ii) material inflation of the Company's reported financial results due to the false underreporting of compensation expense; and (iii) the resulting irregularities of the Company's deceptive stock option granting practices and false financial reporting that would require a restatement of (or charges to) the Company's financial statements and/or the withdrawal or modification of audit opinions certifying the Company's financial reports.

**False Financial Statements**

158.    Specifically, since fiscal 1996, Fossil has reported false and misleading fiscal annual and quarterly financial results which materially understated its compensation expenses and thus overstated the Company's earnings as follows:

| Fiscal Year | Reported Earnings (in thousands) | Reported Shares (in thousands) | Reported Diluted EPS |
|---|---|---|---|
| 1996 | $13,591 | 67,727 | $0.20 |
| 1997 | $18,942 | 70,313 | $0.27 |
| 1998 | $32,161 | 73,319 | $0.44 |
| 1999 | $51,826 | 75,213 | $0.67 |
| 2000 | $55,883 | 73,520 | $0.76 |
| 2001 | $43,683 | 70,290 | $0.62 |
| 2002 | $58,907 | 72,357 | $0.81 |
| 2003 | $68,335 | 73,182 | $0.93 |
| 2004 | $90,569 | 74,462 | $1.22 |
| 2005 | $78,059 | 73,209 | $1.07 |

159.    Unreported compensation expense directly affected Fossil's bottom line net income, dollar for dollar.  Even if Fossil's annual EPS was overstated by one cent per share, it is material. Indeed, historically it has not been unusual for the stock price of companies such as Fossil to plummet in response to an earnings miss of just one cent.

160.    Since fiscal 1996, Fossil has also reported false and misleading financial statements that materially understated the weighted average fair value per share at date of grant for options granted, fully split adjusted, as follows:

| Fiscal Year Ended | Weighted-Average Fair Value Per Option Granted |
|---|---|
| 12/31/1996 | $0.98 |
| 01/03/1998 | $1.59 |
| 01/02/1999 | $2.79 |
| 01/01/2000 | $5.34 |
| 12/20/2000 | $3.99 |
| 01/05/2002 | $4.49 |
| 01/04/2003 | $5.30 |
| 01/03/2004 | $8.78 |
| 01/01/2005 | $10.46 |
| 12/31/2005 | $13.73 |

161.    Fossil has admitted that its financial statements were false and has restated its financial statements.  For example, Fossil has stated:

As a result of the deficiencies identified by the Special Committee in the Company's processes relating to its equity granting practices, the Company's management is evaluating the appropriate accounting measurement dates to determine the amount of compensation charges and related tax impact that may be recorded against the consolidated financial statements previously filed by the Company with the Securities and Exchange Commission.  Although this evaluation is still in process, *the Company estimates the cumulative pre-tax financial impact of recording additional compensation expense associated with equity grants from 1993 to 2006 to be up to approximately $16 million.  Based upon this preliminary estimate, the Company and its Audit Committee concluded that the cumulative impact for all prior periods would result in a restatement of the Company's previously issued consolidated financial statements for fiscal years 2004 and 2005, for all fiscal quarters of 2005 and the first and second fiscal quarters of 2006*.  However, because the evaluation is ongoing, the Company has not identified the amount to be recorded in any specific periods.  Nevertheless, the Company and its Audit Committee concluded on May 4, 2007 the cumulative impact for all prior periods that require that the *Company's consolidated financial statements for fiscal years 2004 and 2005 (together with the related reports from the Company's independent registered public accounting firm), for all fiscal quarters of 2005 and for the first and second fiscal quarters of 2006, previously filed with the Securities and Exchange Commission, should not be relied upon*.  The Company and its Audit Committee have discussed the above matters with Deloitte & Touche LLP, the Company's independent registered public accounting firm.

162.    Pursuant to GAAP, as set forth in APB Opinion No. 20, the type of restatements and revisions announced by Fossil will correct for material errors in previously issued financial statements.   APB Opinion No. 25, ¶¶7-13.   The restatement of past financial statements is a disfavored method of recognizing an accounting change as it dilutes confidence by investors in the financial statements, it makes it difficult to compare financial statements and it is often difficult, if not impossible, to generate the numbers when restatement occurs.   *Id.*, ¶14.   Thus, GAAP provides that financial statements should only be restated in limited circumstances, *i.e.*, when there is a change in the reporting entity, there is a change in accounting principles used or to correct an error in previously issued financial statements.   Fossil's forthcoming restatements and revisions are not due to a change in reporting entity or a change in accounting principle, but rather to errors in previously issued financial statements.   Thus, the forthcoming restatements and revisions are an admission by Fossil that its previously issued financial results and its public statements regarding those results were false and misleading.

163.    Indeed, the effect of the backdating and the backdating itself is, and always has been, material to Fossil's financial statements and should have been reported long ago.   Relevant guidance on whether accounting items are material is found in the Supreme Court's ruling in *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449 (1976), and in SEC Staff Accounting Bulletin ("SAB") No. 99, released August 12, 1999.   The Court ruled in *TSC* that a fact is material to investors if there is "a substantial likelihood that the . . . fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."   426 U.S. at 449.   SAB No. 99 explains that both "quantitative" and "qualitative" factors help determine an item's materiality, rather than purely quantitative factors alone.   Qualitative factors that can make a misstated fact material include, among others:

(a)     whether the misstatement has the effect of increasing management's compensation – for example, by satisfying requirements for the award of bonuses or other forms of incentive compensation;

(b)     whether the misstatement arises from an item "capable of precise measurement";

(c)     whether the misstatement masks a change in earnings;

(d)     whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability; and

(e)     whether the misstatement affects the registrant's compliance with regulatory requirements.

164.    SAB Topic 1M, Materiality, summarizes GAAP definitions of materiality.[13]  Among other items, SAB Topic 1M says:  "A matter is 'material' if there is a substantial likelihood that a reasonable person would consider it important."  It also stresses that materiality requires qualitative, as well as quantitative, considerations.  For example, if a known misstatement would cause a significant market reaction that reaction should be taken into account in determining the materiality of the misstatement.

165.    SAB Topic 1M further states:

---

[13]     SAB Topic 1M, Materiality, represents the codification of certain SABs, including SAB No. 99, Materiality, as of May 9, 2003.  SAB No. 99 was effective August 12, 1999.  On September 13, 2006, the SEC issued SAB No. 108 – new guidance for determining materiality of past errors.  This new standard is effective for financial statements for fiscal years ending after November 15, 2006.  Under SAB No. 108, the fundamental principles surrounding materiality remain consistent with materiality under the prior guidance.  However, this new guidance requires companies to evaluate known errors to a finer degree than in the past.

Among the considerations that may well render material a quantitatively small misstatement of a financial statement item are –

        *       *       *

- whether the misstatement masks a change in earnings or other trends

- whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise

        *       *       *

- whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability.

166.    SAB Topic 1M also says that an intentional misstatement of even immaterial items may be illegal and constitute fraudulent financial reporting.

167.    Fossil's misstatements, by its own admissions, satisfy these criteria and thus were material from both a quantitative and qualitative perspective.  First, there is a substantial likelihood that the reasonable investor would consider that facts about backdating significantly alter the total mix of information about Fossil.  That is because, among other things, improper backdating of stock options reflects the degree to which the Company's insiders promote their own interests ahead of the Company's.  The SEC has stated that the integrity of a company's management "is always a material factor."  Second, the improper backdating increased management's and directors' compensation, and reduced requirements for those insiders to gain bonuses and incentive compensation.  Third, the correct dates of option grants and the correct closing prices for stock on those dates can be precisely recorded and measured.  Fourth, the improper backdating of stock options masked the Company's true net income, which should have been reported as lower, due to greater compensation expenses. Fifth, the improper backdating affects the incentives for management and directors to improve the Company's operations and profitability.  Sixth, the improper backdating of stock options violates financial-reporting requirements of public companies and violates tax laws related to compensation

expenses.  Further, the backdating here was intentional conduct and therefore, by its nature, was material.

168.   Although any of the above qualitative factors would have identified the defendants' stock option backdating as "material," the backdating also was material under quantitative criteria. Backdating contributed to the defendants' ability to sell tens of millions of dollars worth of the Company's stock while in possession of material, non-public adverse information about the backdating practices.  Therefore, the defendants' only appropriate response would be to properly correct the errors for each of the periods affected by the backdating scheme and thus provide the shareholders and the investing public the transparency they deserve.

169.   In addition, under current accounting rules, a financial misstatement that appears immaterial as to a single reporting period may have a cumulative material impact on other periods. In such a situation, the misstatement must be disclosed, according to SAB No. 108.  This principle, which is reflected in SAB No. 108, has always been recognized in the financial accounting concept of materiality.  For at least ten years Fossil understated compensation expense and overstated its earnings as a result of stock option backdating.  The conduct and its effect in these individual years from fiscal 1996 onward was material in and of itself.  Cumulatively, the financial statement effect is even more significant.

170.   Fossil's materially false and misleading financial statements were included in periodic reports filed with the SEC.  The results were also included in press releases issued by the Company.

**Fossil's Materially False and Misleading Reports on Form 10-K**

171.   Fossil's Reports on Form 10-K filed from 1996 through at least 2006 contained false and misleading financial statements and other statements understating compensation expense, overstating shareholders' equity, and overstating income (or understating loss), net income (or net

loss) and earnings (or loss) per share.  The notes to the Company's financial statements falsely communicated that stock options were being granted in accordance with Fossil's stock option plans, namely by pricing options based on the Company's stock price on the date of the grant.  And they falsely stated the weighted average fair value per share at date of grant for Fossil's options, as well as compensation cost.  The notes to the Company's financial statements further materially overstated pro forma net earnings and EPS (or understated pro forma net loss and loss per share) as if compensation cost for the Company's stock-based compensation plans had been determined based on the estimated fair value of the options at the grant dates.  These Reports on Form 10-K were false and misleading because (among other things) defendants were backdating and mispricing stock options.  As those who engaged in the backdating and/or received backdated options knew or in bad faith or with severe recklessness disregarded, many purportedly at-market option grants were backdated and retroactively priced to be "in-the-money."

**The Fiscal 1996 Report on Form 10-K**

172.    On or about March 31, 1997, Fossil filed its 1996 Report on Form 10-K with the SEC (the "1996 10-K").  The 1996 10-K was simultaneously distributed to shareholders and the public. The 1996 10-K included Fossil's 1994-1996 financial statements and selected financial data from the Company's 1992-1996 financial statements (including income statement and balance sheet data, *i.e.*, net income, net income per share and shareholders' equity), which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  Because stock options identified herein were backdated to be "in-the-money," the option grants constituted significant unreported non-cash compensation expense.  As a result, Fossil's compensation expense was understated and its income, net income and shareholders' equity were overstated.

173.    In addition, the 1996 10-K included the following false representations about Fossil's 1993 Incentive Plan:

> The current options outstanding . . . were priced at not less than estimated fair market value of the Company's Common Stock at the date of grant.

174.    Further, as to Fossil's accounting for stock options, the 1996 10-K falsely represented that:

> The Company applies Accounting Principles Board Opinion No. 25 and related Interpretations in accounting for its stock option plans. Accordingly, no compensation cost (generally measured as the excess, if any, of the quoted market price of the Common Stock at the date of the grant over the amount an employee must pay to acquire the Common Stock) has been recognized for the Company's stock option plans.

175.    The 1996 10-K was signed by defendants T. Kartsotis, K. Kartsotis, Kercho, Barnes, Shroff, Anderson, Gold and Stone.

**The Fiscal 1997 Report on Form 10-K**

176.    On or about April 3, 1998, Fossil filed its 1997 Report on Form 10-K with the SEC for the 1997 fiscal period ended January 3, 1998 (the "1997 10-K"). The 1997 10-K was simultaneously distributed to shareholders and the public. The 1997 10-K included Fossil's 1995-1997 financial statements and selected financial data from the Company's 1993-1997 financial statements (including income statement and balance sheet data, *i.e.*, net income, net income per share and shareholders' equity), which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. Because stock options identified herein were backdated to be "in-the-money," the option grants constituted significant unreported non-cash compensation expense. As a result, Fossil's compensation expense was understated and its income, net income and shareholders' equity were overstated.

177.    In addition, the 1997 10-K included the following representations about Fossil's stock option plans:

The current options outstanding . . . were priced at not less than estimated fair market value of the Company's Common Stock at the date of grant. . . .

. . . The exercise prices of options granted under this plan were not less than the fair market value of the Common Stock at the date of grant.

178.    Further, as to Fossil's accounting for stock options, the 1997 10-K falsely represented that:

The Company applies Accounting Principles Board Opinion No. 25 and related Interpretations in accounting for its stock option plans.  Accordingly, no compensation cost (generally measured as the excess, if any, of the quoted market price of the Common Stock at the date of the grant over the amount an employee must pay to acquire the Common Stock) has been recognized for the Company's stock option plans.

179.    The 1997 10-K also materially understated the weighted average fair value of options granted.  Because options had been backdated to be "in-the-money," the value of those options was understated, and so too was the weighted average fair value of those options.  Similarly, "[p]ro forma" net income and EPS purportedly reported under SFAS No. 123 were materially overstated because the fair value of options granted and related compensation costs were understated.

180.    The 1997 10-K also incorporated by reference the false and misleading statements about Fossil's stock option plans contained in the Company's 1997 Proxy Statement.

181.    The 1997 10-K was signed by defendants T. Kartsotis, K. Kartsotis, Kercho, Barnes, Shroff, Anderson, Gold and Stone.

**The Fiscal 1998 Report on Form 10-K**

182.    On or about April 2, 1999, Fossil filed its 1998 Report on Form 10-K with the SEC. The Form 10-K included Fossil's financial statements for the 1998 fiscal period ended January 2, 1999 (the "1998 10-K").  The 1998 10-K was simultaneously distributed to shareholders and the public.  The 1998 10-K included Fossil's 1996-1998 financial statements and selected financial data from the Company's 1994-1998 financial statements (including income statement and balance sheet data, *i.e.*, net income, net income per share and shareholders' equity), which were materially false

and misleading and presented in violation of GAAP, due to improper accounting for the backdated

stock options.  Because stock options identified herein were backdated to be "in-the-money," the

option grants constituted significant unreported non-cash compensation expense.  As a result,

Fossil's compensation expense was understated and its income, net income and shareholders' equity

were overstated.

183.    In addition, the 1998 10-K included the following false representations about Fossil's

stock option plans:

> The current options outstanding . . . were priced at not less than estimated fair market
> value of the Company's Common Stock at the date of grant. . . .
>
> . . . The exercise prices of options granted under this plan were not less than
> the fair market value of the Common Stock at the date of grant.

184.    Further, as to Fossil's accounting for stock options, the 1998 10-K falsely represented

that:

> The Company applies Accounting Principles Board Opinion No. 25 and
> related Interpretations in accounting for its stock option plans.  Accordingly, no
> compensation cost (generally measured as the excess, if any, of the quoted market
> price of the Common Stock at the date of the grant over the amount an employee
> must pay to acquire the Common Stock) has been recognized for the Company's
> stock option plans

185.    The 1998 10-K also materially understated the weighted average fair value of options

granted.  Because options had been backdated to be "in-the-money," the value of those options was

understated, and so too was the weighted average fair value of those options.  Similarly, "[p]ro

forma" net income and EPS purportedly reported under SFAS No. 123 were materially overstated

because the fair value of options granted and related compensation costs were understated.

186.    The 1998 10-K also incorporated by reference the false and misleading statements

about Fossil's stock option plans contained in the Company's 1998 Proxy Statement.

187.    The 1998 10-K was signed by defendants T. Kartsotis, K. Kartsotis, Kercho, Barnes,

Shroff, Anderson, Gold and Stone.

**The Fiscal 1999 Report on Form 10-K**

188.    On or about March 31, 2000, Fossil filed with the SEC its Report on Form 10-K for the 1999 fiscal period ended January 1, 2000 (the "1999 10-K").  The 1999 10-K was simultaneously distributed to shareholders and the public.  The 1999 10-K included Fossil's fiscal 1997-1999 financial statements and selected financial data from the Company's 1995-1999 financial statements (including income statement and balance sheet data, *i.e.*, net income, net income per share and shareholders' equity), which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  Because stock options identified herein were backdated to be "in-the-money," the option grants constituted significant unreported non-cash compensation expense.  As a result, Fossil's compensation expense was understated and its income, net income and shareholders' equity were overstated.

189.    The 1999 10-K also included the following false representations about Fossil's stock option plans:

> The current options outstanding . . . were priced at not less than the fair market value of the Company's Common Stock at the date of grant. . . .
>
> . . . The exercise prices of options granted under this plan were not less than the fair market value of the Common Stock at the date of grant.

190.    Further, as to Fossil's accounting for stock options, the 1999 10-K falsely represented that:

> The Company applies Accounting Principles Board Opinion No. 25 and related Interpretations in accounting for its stock option plans.  No compensation cost has been recognized for the Company's stock option plans because the quoted market price of the Common Stock at the date of the grant was not in excess of the amount an employee must pay to acquire the Common Stock.

191.    The 1999 10-K also materially understated the weighted average fair value of options granted.  Because options had been backdated to be "in-the-money," the value of those options was understated, and so too was the weighted average fair value of those options.  Similarly, "[p]ro

forma" net income and EPS purportedly reported under SFAS No. 123 were materially overstated because the fair value of options granted and related compensation costs were understated.

192.   The 1999 10-K also incorporated by reference the false and misleading statements about Fossil's stock option plans contained in the Company's 1999 Proxy Statement.

193.   The 1999 10-K was signed by defendants T. Kartsotis, K. Kartsotis, Kercho, Barnes, Shroff, Anderson, Gold, Steinberg and Stone.

**The Fiscal 2000 Report on Form 10-K**

194.   On or about March 30, 2001, Fossil filed with the SEC its Report on Form 10-K for the 2000 fiscal period ended December 30, 2000  (the "2000 10-K").  The 2000 10-K was simultaneously distributed to shareholders and the public.  The 2000 10-K included Fossil's fiscal 1998-2000 financial statements and selected financial data from the Company's 1995-2000 financial statements (including income statement and balance sheet data, *i.e.*, net income, net income per share and shareholders' equity), which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  Because stock options identified herein were backdated to be "in-the-money," the option grants constituted significant unreported non-cash compensation expense.  As a result, Fossil's compensation expense was understated and its income, net income and shareholders' equity were overstated.

195.   The 2000 10-K also included the following false representations about Fossil's stock option plans:

> The current options outstanding  . . . were priced at not less than the fair market value of the Company's Common Stock at the date of grant. . . .
>
> . . . The exercise prices of options granted under this plan were not less than the fair market value of the Common Stock at the date of grant.

196.   Further, as to Fossil's accounting for stock options, the 2000 10-K falsely represented that:

The Company applies Accounting Principles Board Opinion No. 25 and related Interpretations in accounting for its stock option plans. No compensation cost has been recognized for the Company's stock option plans because the quoted market price of the Common Stock at the date of the grant was not in excess of the amount an employee must pay to acquire the Common Stock.

197. The 2000 10-K also materially understated the weighted average fair value of options granted. Because options had been backdated to be "in-the-money," the value of those options was understated, and so too was the weighted average fair value of those options. Similarly, "[p]ro forma" net income and EPS purportedly reported under SFAS No. 123 were materially overstated because the fair value of options granted and related compensation costs were understated.

198. The 2000 10-K also incorporated by reference the false and misleading statements about Fossil's stock option plans contained in the Company's 2000 Proxy Statement.

199. The 2000 10-K was signed by defendants T. Kartsotis, K. Kartsotis, Kovar, Barnes, Shroff, Anderson, Gold, Steinberg and Stone.

**The Fiscal 2001 Report on Form 10-K**

200. On or about April 5, 2002, Fossil filed with the SEC its Report on Form 10-K for the 2001 fiscal period ended January 5, 2002 (the "2001 10-K"). The 2001 10-K was simultaneously distributed to shareholders and the public. The 2001 10-K included Fossil's fiscal 1999-2001 financial statements and selected financial data from the Company's 1996-2001 financial statements (including income statement and balance sheet data, *i.e.*, net income, net income per share and shareholders' equity), which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. Because stock options identified herein were backdated to be "in-the-money," the option grants constituted significant unreported non-cash compensation expense. As a result, Fossil's compensation expense was understated and its income, net income and shareholders' equity were overstated.

201.     The 2001 10-K also included the following false representations about Fossil's stock option plans:

> The current options outstanding . . . were priced at not less than the fair market value of the Company's Common Stock at the date of grant. . . .
>
> . . . The exercise prices of options granted under this plan were not less than the fair market value of the Common Stock at the date of grant.

202.     Further, as to Fossil's accounting for stock options, the 2001 10-K falsely represented that:

> The Company applies Accounting Principles Board Opinion No. 25 and related Interpretations in accounting for its stock option plans. No compensation cost has been recognized for the Company's stock option plans because the quoted market price of the Common Stock at the date of the grant was not in excess of the amount an employee must pay to acquire the Common Stock.

203.     The 2001 10-K also materially understated the weighted average fair value of options granted. Because options had been backdated to be "in-the-money," the value of those options was understated, and so too was the weighted average fair value of those options. Similarly, "[p]ro forma" net income and EPS purportedly reported under SFAS No. 123 were materially overstated because the fair value of options granted and related compensation costs were understated.

204.     The 2001 10-K also incorporated by reference the false and misleading statements about Fossil's stock option plans contained in the Company's 2001 Proxy Statement.

205.     The 2001 10-K was signed by defendants T. Kartsotis, K. Kartsotis, Kovar, Barnes, Shroff, Anderson, Gold, Steinberg and Stone.

**The Fiscal 2002 Report on Form 10-K**

206.     On or about April 4, 2003, Fossil filed with the SEC its Report on Form 10-K for the 2002 fiscal period ended January 4, 2003  (the "2002 10-K"). The 2002 10-K was simultaneously distributed to shareholders and the public. The 2002 10-K included Fossil's 2000-2002 financial statements and selected financial data from the Company's 1997-2002 financial statements (including income statement and balance sheet data, *i.e.*, net income, net income per share and

shareholders' equity), which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. Because stock options identified herein were backdated to be "in-the-money," the option grants constituted significant unreported non-cash compensation expense. As a result, Fossil's compensation expense was understated and its income, net income and shareholders' equity were overstated.

207.    The 2002 10-K also included the following false representations about Fossil's stock option plans:

> The current options outstanding ... were priced at not less than the fair market value of the Company's Common Stock at the date of grant. ...
>
> ... The exercise prices of options granted under this plan were not less than the fair market value of the Common Stock at the date of grant.

208.    Further, as to Fossil's accounting for stock options, the 2002 10-K falsely represented that:

> The Company applies Accounting Principles Board Opinion No. 25 and related Interpretations in accounting for its stock option plans. No compensation cost has been recognized for the Company's stock option plans because the quoted market price of the Common Stock at the date of the grant was not in excess of the amount an employee must pay to acquire the Common Stock.

209.    The 2002 10-K also materially understated the weighted average fair value of options granted. Because options had been backdated to be "in-the-money," the value of those options was understated, and so too was the weighted average fair value of those options. Similarly, "[p]ro forma" net income and EPS purportedly reported under SFAS No. 123 were materially overstated because the fair value of options granted and related compensation costs were understated.

210.    The 2002 10-K also incorporated by reference the false and misleading statements about Fossil's stock option plans contained in the Company's 2002 Proxy Statement.

211.    The 2002 10-K was signed by defendants T. Kartsotis, K. Kartsotis, Kovar, Barnes, Shroff, Anderson, Gold, Steinberg and Stone.

**The Fiscal 2003 Report on Form 10-K**

212.    On or about March 18, 2004, Fossil filed with the SEC its Report on Form 10-K for the fiscal period ended January 3, 2004  (the "2003 10-K").  The 2003 10-K was simultaneously distributed to shareholders and the public.  The 2003 10-K included Fossil's 1998-2003 financial statements and selected financial data from the Company's 2001-2003 financial statements (including income statement and balance sheet data, *i.e.*, net income, net income per share and shareholders' equity), which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  Because stock options identified herein were backdated to be "in-the-money," the option grants constituted significant unreported non-cash compensation expense.  As a result, Fossil's compensation expense was understated and its income, net income and shareholders' equity were overstated.

213.    The 2003 10-K also included the following false representations about Fossil's stock option plans:

> The current options outstanding  . . . were priced at not less than the fair market value of the Company's Common Stock at the date of grant. . . .
>
>      . . . The exercise prices of options granted under this plan were not less than the fair market value of the Common Stock at the date of grant.

214.    Further, as to Fossil's accounting for stock options, the 2003 10-K falsely represented that:

> The Company applies Accounting Principles Board Opinion No. 25 and related Interpretations in accounting for its stock option plans.  No compensation cost has been recognized for the Company's stock option plans because the quoted market price of the Common Stock at the date of the grant was not in excess of the amount an employee must pay to acquire the Common Stock.

215.    The 2003 10-K also materially understated the weighted average fair value of options granted.  Because options had been backdated to be "in-the-money," the value of those options was understated, and so too was the weighted average fair value of those options.  Similarly, "[p]ro

forma" net income and EPS purportedly reported under SFAS No. 123 were materially overstated because the fair value of options granted and related compensation costs were understated.

216.     The 2003 10-K also incorporated by reference the false and misleading statements about Fossil's stock option plans contained in the Company's 2003 Proxy Statement.

217.     The 2003 10-K was signed by defendants T. Kartsotis, K. Kartsotis, Kovar, Barnes, Shroff, Anderson, Gold, Steinberg and Stone.

**The Fiscal 2004 Report on Form 10-K**

218.     On or about March 17, 2005, Fossil filed with the SEC its Report on Form 10-K with the SEC for the 2004 period ended January 1, 2005 (the "2004 10-K").   The 2004 10-K was simultaneously distributed to shareholders and the public.   The 2004 10-K included Fossil's 2002-2004 financial statements and selected financial data from the Company's 1999-2004 financial statements (including income statement and balance sheet data, *i.e.*, net income, net income per share and shareholders' equity), which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.   Because stock options identified herein were backdated to be "in-the-money," the option grants constituted significant unreported non-cash compensation expense.   As a result, Fossil's compensation expense was understated and its income, net income and shareholders' equity were overstated.

219.     The 2004 10-K also included the following false representations about Fossil's stock option plans:

> The current options outstanding . . . were priced at not less than the fair market value of the Company's Common Stock at the date of grant. . . .
>
>      . . . The exercise prices of options granted under this plan were not less than the fair market value of the Common Stock at the date of grant.

220.     Further, as to Fossil's accounting for stock options, the 2004 10-K falsely represented that:

The Company applies Accounting Principles Board Opinion No. 25 and related Interpretations in accounting for its stock option plans. No compensation cost has been recognized for the Company's stock option plans because the quoted market price of the Common Stock at the date of the grant was not in excess of the amount an employee must pay to acquire the Common Stock.

221.    The 2004 10-K also materially understated the weighted average fair value of options granted. Because outstanding options had been backdated to be "in-the-money," the value of those options was understated, and so too was the weighted average fair value of those options. Similarly, "[p]ro forma" net income and EPS purportedly reported under SFAS No. 123 were materially overstated because the fair value of options granted and related compensation costs were understated.

222.    The 2004 10-K also incorporated by reference the false and misleading statements about Fossil's stock option plans contained in the Company's 2004 Proxy Statement.

223.    The 2004 10-K was signed by defendants T. Kartsotis, K. Kartsotis, Kovar, Barnes, Shroff, Anderson, Gold, Steinberg and Stone.

**The Fiscal 2005 Report on Form 10-K**

224.    On or about March 9, 2006, Fossil filed with the SEC its Report on Form 10-K with the SEC for the 2005 period ended December 31, 2005  (the "2005 10-K"). The 2005 10-K was simultaneously distributed to shareholders and the public. The 2005 10-K included Fossil's 2003-2005 financial statements and selected financial data from the Company's 2001-2005 financial statements (including income statement and balance sheet data, *i.e.*, net income, net income per share and shareholders' equity), which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. Because stock options identified herein were backdated to be "in-the-money," the option grants constituted significant unreported non-cash compensation expense. As a result, Fossil's compensation expense was understated and its income, net income and shareholders' equity were overstated.

225.    In addition, the 2005 10-K included the following false representations about Fossil's stock option plans:

> The current options outstanding . . . were priced at not less than the market value of the Company's Common Stock at the date of grant. . . .
>
>          . . . . The exercise prices of options granted under this plan were not less than the fair market value of the Common Stock at the date of grant.

226.    Further, as to Fossil's accounting for stock options, the 2005 10-K falsely represented that:

> The Company applies the intrinsic value method under Accounting Principles Board ("APB") Opinion No. 25, *Accounting for Stock Issued to Employees* ("APB 25"), and related Interpretations in accounting for its stock option plans.  No compensation cost has been recognized for the Company's stock option plans because the quoted market price of the Common Stock at the date of the grant was not in excess of the amount an employee must pay to acquire the Common Stock.

227.    The 2005 10-K also materially understated the weighted average fair value of options granted.  Because outstanding options had been backdated to be "in-the-money," the value of those options was understated, and so too was the weighted average fair value of those options.  Similarly, "[p]ro forma" net income and EPS purportedly reported under SFAS No. 123 were materially overstated because the fair value of options granted and related compensation costs were understated.

228.    The 2005 10-K also incorporated by reference the false and misleading statements about Fossil's stock option plans contained in the Company's 2005 Proxy Statement.

229.    The 2005 10-K was signed by defendants T. Kartsotis, K. Kartsotis, Kovar, Barnes, Shroff, Anderson, Gold, Steinberg and Stone.

**False and Misleading Sarbanes-Oxley Certifications**

230.    The Reports on Form 10-K for fiscal years ended January 4, 2003, January 3, 2004, January 1, 2005 and December 31, 2005 each contained Sarbanes-Oxley Certifications, signed by K. Kartsotis and Kovar.  Those Certifications provided (among other things) that:  (i) the "report does

not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading"; (ii) the "financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows" of the Company; and (iii) they had "disclosed . . . to [Fossil's] auditors and the audit committee of registrant's board of directors . . . [a]ll significant deficiencies and material weakness in the design or operation of internal control . . . and . . . [a]ny fraud, whether or not material, that involves management or other employees who have a significant role in [Fossil's] internal control over financial reporting."

231.    The Sarbanes-Oxley Certifications were false because, as defendants knew or in bad faith or with severe recklessness disregarded, the Reports on Form 10-K contained false and misleading statements as a result of the backdating alleged herein.  Backdating by Board members, including Gold, Anderson, Stone, Steinberg, Barnes, T. Kartsotis and K. Kartsotis, had been concealed from the Company's auditors, and the backdating scheme constituted a fraud that involved the top levels of management (including Barnes, Shroff, Tunnell, Kercho, Kovar, T. Kartsotis and K. Kartsotis) and Audit Committee members – those who had the most significant role in Fossil's internal controls.

**False and Misleading Reports on Form 10-Q**

232.    Kercho signed the Reports on Form 10-Q filed by Fossil on or about May 15, 1996, August 14, 1996, August 16, 1996, November 12, 1996, May 19, 1997, August 19, 1997, November 18, 1997, May 18, 1998, August 18, 1998, November 16, 1998, May 18, 1999, August 17, 1999, November 16, 1999, May 16, 2000, and August 15, 2000.

233.    Kovar signed the Reports on Form 10-Q filed by Fossil on or about November 14, 2000, May 22, 2001, August 21, 2001, November 20, 2001, and May 20, 2002.

234.    K. Kartsotis and Kovar signed the Reports on Form 10-Q filed by Fossil on or about August 20, 2002, November 19, 2002, May 20, 2003, August 19, 2003, November 18, 2003, May 12, 2004, August 12, 2004, November 12, 2004, May 12, 2005, August 11, 2005, September 19, 2005, November 10, 2005, May 18, 2006, August 17, 2006, and August 8, 2007.

235.    The Reports on Form 10-Q identified contained the Company's interim unaudited financial statements for current and previous reporting periods, which were false and misleading for *understating* compensation expense and *overstating* income, net income and EPS.  These reports were false and misleading because (among other things) defendants were backdating stock options. As Kercho, K. Kartsotis and Kovar knew or in bad faith or with severe recklessness disregarded, through receiving and/or approving backdated options, as alleged herein, option grants were being backdated and thus constituted significant unreported compensation expense.

236.    The Reports on Form 10-Q filed on August 20, 2002, November 19, 2002, May 20, 2003, August 19, 2003, November 18, 2003, May 12, 2004, August 12, 2004, November 12, 2004, May 12, 2005, August 11, 2005, September 19, 2005, November 10, 2005, May 18, 2006, August 17, 2006, and August 8, 2007 each contained Sarbanes-Oxley Certifications signed by K. Kartsotis and Kovar.

237.    Those Sarbanes-Oxley Certifications provided (among other things) that: (i) the "report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading"; (ii) the "financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows" of the Company; and (iii) they had "disclosed . . . to [Fossil's] auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function): (a) all significant deficiencies and material weakness in the design or operation of internal control . . . and

- 95 -

(b) any fraud, whether or not material, that involves management or other employees who have a significant role in [Fossil]'s internal control over financial reporting."

238.    The Sarbanes-Oxley Certifications were false because, as K. Kartsotis and Kovar knew or in bad faith or with severe recklessness disregarded, the Reports on Form 10-Q contained false and misleading statements as a result of the backdating alleged herein. Backdating by Board members, including Gold, Anderson, Stone, Steinberg, T. Kartsotis and K. Kartsotis, had been concealed from the Company's auditors, and the backdating scheme constituted a fraud that involved the top levels of management (including Barnes, Shroff, Tunnell, Kercho, T. Kartsotis and K. Kartsotis) and Audit Committee members – those who had the most significant role in Fossil's internal controls.

## INSIDER TRADING

239.    While defendants issued false and misleading periodic reports and proxy statements, causing Fossil's shares to trade at artificially inflated levels, they were also causing the Company to grant them millions of stock options, many of which were backdated to be priced at prices lower than if the option were dated on the true but concealed grant date. Insiders, including defendants, exercised many of these stock options, contributing to their ability to sell hundreds of millions of dollars worth of Fossil's stock. Defendants alone sold Fossil's stock for total proceeds well in excess of $300 million.

### INSIDER SALES: 1996-2006

| Last Name | First Name | Date | Shares | Price | Proceeds |
|-----------|-----------|------|--------|-------|----------|
| ANDERSON | KENNETH | 6/12/2002 | 22,500 | $14.58 | $328,050 |
|  |  | 6/12/2002 | 13,500 | $14.70 | $198,450 |
|  |  | 6/17/2003 | 7,500 | $15.52 | $116,400 |
|  |  | 11/20/2003 | 15,187 | $19.29 | $292,967 |
|  |  | 12/9/2005 | 15,187 | $20.00 | $303,740 |
|  |  | 12/30/2005 | 15,187 | $21.60 | $328,039 |
|  |  |  | **89,061** |  | **$1,567,645** |

| | | | | | |
|---|---|---|---|---|---|
| BARNES | MICHAEL | 12/9/1997 | 20,250 | $4.98 | $100,845 |
| | | 11/30/1998 | 24,189 | $8.14 | $196,895 |
| | | 12/1/1998 | 20,250 | $8.29 | $167,872 |
| | | 12/1/1998 | 16,875 | $8.40 | $141,750 |
| | | 12/1/1998 | 16,875 | $8.48 | $143,100 |
| | | 12/1/1998 | 13,500 | $8.29 | $111,915 |
| | | 12/1/1998 | 9,281 | $8.37 | $77,684 |
| | | 12/3/1998 | 16,875 | $8.55 | $144,281 |
| | | 3/19/1999 | 2,025 | $9.77 | $19,784 |
| | | 6/21/1999 | 20,250 | $14.00 | $283,500 |
| | | 6/21/1999 | 16,875 | $14.03 | $236,756 |
| | | 6/23/1999 | 30,375 | $13.92 | $422,819 |
| | | 6/24/1999 | 40,500 | $13.96 | $565,379 |
| | | 6/24/1999 | 34,759 | $14.14 | $491,494 |
| | | 6/24/1999 | 15,187 | $13.92 | $211,410 |
| | | 5/21/2001 | 7,875 | $9.98 | $78,592 |
| | | 5/21/2001 | 3,375 | $9.97 | $33,649 |
| | | 6/1/2001 | 4,500 | $9.97 | $44,865 |
| | | 6/1/2001 | 4,500 | $10.02 | $45,090 |
| | | 6/1/2001 | 4,500 | $10.04 | $45,180 |
| | | 6/1/2001 | 4,500 | $10.06 | $45,270 |
| | | 6/4/2001 | 4,500 | $9.97 | $44,865 |
| | | 6/4/2001 | 4,500 | $9.98 | $44,910 |
| | | 6/5/2001 | 6,750 | $10.06 | $67,905 |
| | | 6/5/2001 | 6,750 | $10.09 | $68,107 |
| | | 6/5/2001 | 6,750 | $10.10 | $68,175 |
| | | 6/5/2001 | 6,750 | $10.13 | $68,377 |
| | | 6/5/2001 | 4,500 | $10.06 | $45,270 |
| | | 6/5/2001 | 4,500 | $10.09 | $45,405 |
| | | 6/5/2001 | 4,500 | $10.11 | $45,495 |
| | | 6/7/2001 | 13,500 | $10.22 | $137,970 |
| | | 6/28/2002 | 7,500 | $15.06 | $112,950 |
| | | 6/28/2002 | 4,500 | $15.07 | $67,815 |
| | | 7/2/2002 | 8,398 | $14.00 | $117,579 |
| | | 7/2/2002 | 5,101 | $14.00 | $71,421 |
| | | 7/2/2002 | 4,500 | $14.04 | $63,180 |
| | | 8/19/2002 | 7,500 | $15.59 | $116,925 |
| | | 8/20/2002 | 12,195 | $15.59 | $190,120 |
| | | 8/20/2002 | 9,000 | $15.35 | $138,150 |
| | | 8/20/2002 | 7,500 | $15.42 | $115,650 |
| | | 8/20/2002 | 3,898 | $15.34 | $59,803 |
| | | 8/20/2002 | 2,101 | $15.34 | $32,237 |
| | | 9/26/2002 | 3,450 | $13.93 | $48,058 |
| | | 9/27/2002 | 6,378 | $13.46 | $85,848 |
| | | 5/27/2003 | 27,195 | $13.61 | $370,124 |
| | | 6/3/2003 | 31,642 | $14.98 | $474,004 |
| | | 6/5/2003 | 13,968 | $15.44 | $215,666 |
| | | 6/17/2003 | 7,500 | $15.34 | $115,050 |

| Date | Shares | Price | Total |
|---|---|---|---|
| 8/18/2003 | 30,000 | $18.70 | $561,000 |
| 8/20/2003 | 2,245 | $18.93 | $42,507 |
| 8/28/2003 | 5,254 | $18.94 | $99,520 |
| 9/23/2003 | 15,000 | $17.38 | $260,700 |
| 11/19/2003 | 3,750 | $19.34 | $72,525 |
| 11/19/2003 | 3,750 | $19.40 | $72,750 |
| 11/24/2003 | 3,750 | $19.28 | $72,300 |
| 11/24/2003 | 1,836 | $19.28 | $35,398 |
| 12/2/2003 | 3,750 | $19.60 | $73,500 |
| 12/2/2003 | 3,750 | $19.60 | $73,500 |
| 12/2/2003 | 3,750 | $19.54 | $73,275 |
| 12/2/2003 | 3,750 | $19.61 | $73,537 |
| 12/3/2003 | 15,750 | $19.48 | $306,810 |
| 12/5/2003 | 19,687 | $19.78 | $389,419 |
| 12/18/2003 | 3,750 | $18.13 | $67,987 |
| 12/18/2003 | 3,750 | $18.14 | $68,025 |
| 12/22/2003 | 15,000 | $18.30 | $274,500 |
| 12/23/2003 | 7,500 | $18.43 | $138,225 |
| 5/25/2004 | 2,000 | $24.20 | $48,400 |
| 9/7/2004 | 15,750 | $28.46 | $448,245 |
| 9/7/2004 | 12,971 | $28.33 | $367,468 |
| 9/7/2004 | 12,750 | $28.35 | $361,463 |
| 9/7/2004 | 11,250 | $28.71 | $322,988 |
| 9/7/2004 | 2,717 | $28.76 | $78,141 |
| 9/9/2004 | 4,000 | $28.30 | $113,200 |
| 9/9/2004 | 2,000 | $28.35 | $56,700 |
| 9/9/2004 | 1,500 | $28.32 | $42,480 |
| 3/1/2005 | 2,500 | $25.97 | $64,925 |
| 3/1/2005 | 2,500 | $25.98 | $64,950 |
| 3/1/2005 | 2,500 | $25.97 | $64,925 |
| 3/2/2005 | 2,700 | $26.03 | $70,281 |
| 3/9/2005 | 5,000 | $25.90 | $129,500 |
| 3/9/2005 | 2,500 | $25.85 | $64,625 |
| 3/9/2005 | 2,500 | $25.90 | $64,750 |
| 3/9/2005 | 2,500 | $25.88 | $64,700 |
| 3/9/2005 | 2,500 | $25.93 | $64,825 |
| 3/9/2005 | 2,500 | $25.79 | $64,475 |
| 3/9/2005 | 2,500 | $25.76 | $64,400 |
| 3/9/2005 | 2,500 | $25.86 | $64,650 |
| 3/9/2005 | 2,500 | $25.98 | $64,950 |
| 3/9/2005 | 2,500 | $25.93 | $64,825 |
| 3/9/2005 | 2,500 | $25.92 | $64,800 |
| 3/9/2005 | 2,500 | $25.97 | $64,925 |
| 3/9/2005 | 2,188 | $25.98 | $56,844 |
| 3/9/2005 | 750 | $26.08 | $19,560 |
| | **809,244** | | **$12,416,657** |

| | | | | | |
|---|---|---|---|---|---|
| GOLD | ALAN | 10/31/1997 | 10,125 | $1.67 | $16,909 |
| | | 10/31/1997 | 9,112 | $1.55 | $14,124 |
| | | 10/31/1997 | 1,012 | $1.67 | $1,691 |
| | | 3/23/2001 | 18,562 | $7.66 | $142,189 |
| | | 3/26/2001 | 675 | $7.66 | $5,170 |
| | | 6/5/2002 | 15,187 | $14.23 | $216,118 |
| | | 8/24/2004 | 30,374 | $28.49 | $865,355 |
| | | 12/16/2005 | 5,000 | $20.14 | $100,700 |
| | | 12/23/2005 | 5,000 | $20.58 | $102,900 |
| | | 9/11/2006 | 15,187 | $19.90 | $302,221 |
| | | 9/11/2006 | 10,000 | $19.90 | $199,000 |
| | | | **120,236** | | **$1,966,377** |
| | | | | | |
| GUNDY | RICHARD | 5/11/1998 | 282,079 | $5.62 | $1,585,283 |
| | | 5/11/1998 | 75,927 | $5.62 | $426,711 |
| | | 5/11/1998 | 50,622 | $5.62 | $284,493 |
| | | 5/11/1998 | 49,994 | $5.62 | $280,965 |
| | | 6/17/1999 | 337 | $13.18 | $4,448 |
| | | 6/18/1999 | 33,750 | $13.49 | $455,287 |
| | | 6/18/1999 | 16,875 | $13.44 | $226,800 |
| | | 6/18/1999 | 16,875 | $13.62 | $229,837 |
| | | 6/18/1999 | 16,875 | $13.70 | $231,187 |
| | | 6/18/1999 | 16,875 | $13.33 | $224,943 |
| | | 6/18/1999 | 1,687 | $13.25 | $22,359 |
| | | 6/21/1999 | 16,875 | $14.07 | $237,431 |
| | | 6/21/1999 | 16,537 | $14.22 | $235,163 |
| | | 6/21/1999 | 337 | $14.26 | $4,813 |
| | | 6/21/1999 | 337 | $14.31 | $4,829 |
| | | 6/30/1999 | 33,750 | $14.33 | $483,637 |
| | | 6/30/1999 | 4,725 | $14.37 | $67,898 |
| | | 7/1/1999 | 33,750 | $14.37 | $484,987 |
| | | 7/1/1999 | 16,875 | $14.40 | $243,000 |
| | | 7/1/1999 | 16,875 | $14.55 | $245,531 |
| | | 7/1/1999 | 10,462 | $14.81 | $154,949 |
| | | 12/28/2000 | 36,225 | $6.48 | $234,738 |
| | | 2/23/2001 | 22,500 | $7.90 | $177,750 |
| | | 2/26/2001 | 9,000 | $8.00 | $72,000 |
| | | 2/26/2001 | 9,000 | $8.02 | $72,180 |
| | | 2/27/2001 | 22,500 | $7.95 | $178,875 |
| | | 3/1/2001 | 4,500 | $7.77 | $34,965 |
| | | 3/1/2001 | 4,500 | $7.83 | $35,235 |
| | | 3/2/2001 | 9,000 | $7.77 | $69,930 |
| | | 3/2/2001 | 9,000 | $7.77 | $69,930 |
| | | 3/14/2001 | 14,287 | $8.29 | $118,443 |
| | | 3/14/2001 | 10,800 | $8.22 | $88,776 |
| | | 3/15/2001 | 4,500 | $8.24 | $37,080 |
| | | 3/15/2001 | 3,487 | $8.22 | $28,667 |
| | | 3/20/2001 | 4,500 | $8.01 | $36,045 |

| | | | | | |
|---|---|---|---|---|---|
| | | 6/11/2001 | 26,100 | $10.20 | $266,220 |
| | | 6/12/2001 | 1,350 | $10.26 | $13,851 |
| | | 6/3/2003 | 40,504 | $15.00 | $607,567 |
| | | 6/3/2003 | 36,000 | $15.00 | $540,000 |
| | | 6/3/2003 | 30,799 | $15.00 | $461,992 |
| | | 6/4/2003 | 124,458 | $15.03 | $1,870,603 |
| | | 6/4/2003 | 25,443 | $15.00 | $381,645 |
| | | 6/4/2003 | 15,750 | $15.00 | $236,250 |
| | | 6/4/2003 | 8,307 | $15.00 | $124,605 |
| | | 8/18/2003 | 25,312 | $18.80 | $475,875 |
| | | 11/24/2003 | 787 | $19.33 | $15,222 |
| | | 11/25/2003 | 8,400 | $19.33 | $162,372 |
| | | 11/26/2003 | 10,500 | $19.33 | $202,965 |
| | | 3/29/2004 | 18,000 | $22.00 | $396,000 |
| | | 3/29/2004 | 15,750 | $22.00 | $346,500 |
| | | 3/29/2004 | 12,750 | $22.00 | $280,500 |
| | | 3/29/2004 | 12,469 | $22.00 | $274,329 |
| | | 3/29/2004 | 6,090 | $22.00 | $133,980 |
| | | 8/26/2004 | 7,500 | $28.50 | $213,750 |
| | | 11/12/2004 | 19,687 | $28.00 | $551,236 |
| | | 2/25/2005 | 17,999 | $26.00 | $467,974 |
| | | 2/25/2005 | 15,750 | $26.00 | $409,500 |
| | | 2/25/2005 | 1,250 | $26.00 | $32,500 |
| | | 2/25/2005 | 1 | $26.00 | $26 |
| | | 2/28/2005 | 11,500 | $26.00 | $299,000 |
| | | 3/9/2005 | 4,400 | $26.78 | $117,832 |
| | | 3/9/2005 | 1,100 | $26.72 | $29,392 |
| | | 3/9/2005 | 1,000 | $26.71 | $26,710 |
| | | 3/9/2005 | 300 | $26.83 | $8,049 |
| | | 3/9/2005 | 200 | $26.83 | $5,366 |
| | | 3/9/2005 | 200 | $26.77 | $5,354 |
| | | 3/9/2005 | 100 | $26.81 | $2,681 |
| | | 3/9/2005 | 100 | $26.79 | $2,679 |
| | | 3/9/2005 | 100 | $26.75 | $2,675 |
| | | 3/16/2006 | 31,499 | $17.64 | $555,642 |
| | | | **1,407,678** | | **$16,910,005** |
| | | | | | |
| HATTORI | JUNICHI | 3/31/2003 | 2,391,749 | $9.47 | $22,649,861 |
| | | 6/9/2003 | 7,099 | $15.21 | $107,983 |
| | | 6/10/2003 | 5,062 | $14.77 | $74,773 |
| | | 6/10/2003 | 3,375 | $14.60 | $49,275 |
| | | 6/10/2003 | 1,338 | $14.91 | $19,949 |
| | | | **2,408,624** | | **$22,901,842** |
| | | | | | |
| KARTSOTIS | KOSTA | 5/11/1998 | 3,290,622 | $3.75 | $12,339,831 |
| | | 5/25/2004 | 1,305,000 | $22.56 | $29,440,800 |
| | | 5/28/2004 | 149,850 | $22.56 | $3,380,616 |
| | | | **4,745,472** | | **$45,161,247** |

| KARTSOTIS | TOM | 5/11/1998 | 3,802,312 | $5.62 | $21,368,992 |
|-----------|-----|-----------|-----------|-------|-------------|
| | | 6/9/1998 | 514,687 | $5.62 | $2,892,541 |
| | | 1/29/2002 | 15,187 | $8.21 | $124,689 |
| | | 3/11/2002 | 10,125 | $12.33 | $124,841 |
| | | 3/12/2002 | 2,250 | $12.29 | $27,652 |
| | | 3/13/2002 | 3,375 | $12.22 | $41,242 |
| | | 3/14/2002 | 24,750 | $12.06 | $298,485 |
| | | 3/15/2002 | 10,125 | $12.00 | $121,500 |
| | | 3/19/2002 | 13,500 | $12.00 | $162,000 |
| | | 3/20/2002 | 16,875 | $12.02 | $202,837 |
| | | 3/26/2002 | 40,500 | $11.97 | $484,784 |
| | | 3/27/2002 | 10,125 | $11.96 | $121,095 |
| | | 4/1/2002 | 20,250 | $11.81 | $239,152 |
| | | 4/2/2002 | 10,125 | $11.80 | $119,475 |
| | | 4/3/2002 | 10,125 | $11.80 | $119,475 |
| | | 4/4/2002 | 10,125 | $11.66 | $118,057 |
| | | 4/5/2002 | 10,125 | $11.84 | $119,880 |
| | | 4/8/2002 | 10,125 | $12.03 | $121,804 |
| | | 4/9/2002 | 10,125 | $12.16 | $123,120 |
| | | 4/10/2002 | 10,125 | $12.25 | $124,031 |
| | | 4/11/2002 | 10,125 | $12.49 | $126,461 |
| | | 4/12/2002 | 10,125 | $12.28 | $124,335 |
| | | 4/15/2002 | 10,125 | $12.35 | $125,044 |
| | | 4/16/2002 | 10,125 | $12.44 | $125,955 |
| | | 4/17/2002 | 2,250 | $12.44 | $27,990 |
| | | 4/18/2002 | 18,000 | $12.16 | $218,880 |
| | | 4/19/2002 | 10,125 | $12.23 | $123,829 |
| | | 4/23/2002 | 20,250 | $12.40 | $251,100 |
| | | 4/24/2002 | 10,125 | $12.60 | $127,575 |
| | | 4/26/2002 | 13,500 | $12.47 | $168,345 |
| | | 4/29/2002 | 16,875 | $12.45 | $210,094 |
| | | 4/30/2002 | 10,125 | $12.80 | $129,600 |
| | | 5/1/2002 | 10,125 | $12.43 | $125,854 |
| | | 5/2/2002 | 10,125 | $12.98 | $131,422 |
| | | 5/6/2002 | 20,250 | $13.10 | $265,275 |
| | | 5/8/2002 | 20,250 | $12.94 | $262,035 |
| | | 5/13/2002 | 30,375 | $12.33 | $374,523 |
| | | 5/14/2002 | 10,125 | $13.26 | $134,257 |
| | | 5/15/2002 | 10,125 | $13.99 | $141,648 |
| | | 5/16/2002 | 10,125 | $14.91 | $150,963 |
| | | 5/17/2002 | 5,625 | $14.75 | $82,969 |
| | | 5/22/2002 | 12,375 | $14.01 | $173,373 |
| | | 5/23/2002 | 19,125 | $13.92 | $266,220 |
| | | 5/24/2002 | 23,625 | $13.98 | $330,277 |
| | | 5/28/2002 | 2,250 | $14.20 | $31,950 |
| | | 5/29/2002 | 2,250 | $14.24 | $32,040 |
| | | 5/30/2002 | 11,250 | $13.98 | $157,275 |

| | | | |
|---|---:|---:|---:|
| 5/31/2002 | 2,250 | $13.85 | $31,162 |
| 6/4/2002 | 64,125 | $13.85 | $888,130 |
| 6/5/2002 | 15,187 | $14.44 | $219,307 |
| 6/6/2002 | 15,187 | $14.44 | $219,307 |
| 6/7/2002 | 15,187 | $15.24 | $231,457 |
| 6/10/2002 | 7,125 | $22.37 | $159,386 |
| 6/11/2002 | 11,625 | $15.04 | $174,840 |
| 6/12/2002 | 11,625 | $14.77 | $171,701 |
| 6/13/2002 | 11,625 | $14.73 | $171,236 |
| 6/14/2002 | 1,500 | $15.03 | $22,545 |
| 6/17/2002 | 18,750 | $15.06 | $282,375 |
| 6/18/2002 | 3,750 | $15.19 | $56,962 |
| 6/19/2002 | 16,500 | $15.33 | $252,945 |
| 6/20/2002 | 10,125 | $15.08 | $152,685 |
| 6/21/2002 | 7,650 | $15.08 | $115,362 |
| 6/25/2002 | 15,000 | $15.08 | $226,200 |
| 6/27/2002 | 27,975 | $14.52 | $406,197 |
| 6/28/2002 | 7,500 | $14.87 | $111,525 |
| 7/1/2002 | 12,750 | $14.06 | $179,265 |
| 7/5/2002 | 30,375 | $13.18 | $400,342 |
| 7/8/2002 | 8,625 | $13.19 | $113,764 |
| 7/9/2002 | 11,625 | $14.35 | $166,819 |
| 7/10/2002 | 2,625 | $14.22 | $37,327 |
| 7/11/2002 | 3,000 | $14.06 | $42,180 |
| 7/12/2002 | 6,750 | $14.00 | $94,500 |
| 7/16/2002 | 3,750 | $12.48 | $46,800 |
| 7/17/2002 | 22,125 | $12.44 | $275,235 |
| 7/18/2002 | 60,000 | $12.00 | $720,000 |
| 7/18/2002 | 24,375 | $12.03 | $293,231 |
| 7/22/2002 | 11,250 | $11.43 | $128,587 |
| 7/23/2002 | 7,125 | $11.27 | $80,299 |
| 7/24/2002 | 30,375 | $11.33 | $344,149 |
| 7/25/2002 | 10,125 | $11.86 | $120,082 |
| 7/26/2002 | 10,125 | $12.03 | $121,804 |
| 7/29/2002 | 10,125 | $12.31 | $124,639 |
| 7/30/2002 | 10,125 | $12.70 | $128,587 |
| 8/1/2002 | 1,500 | $12.31 | $18,465 |
| 8/5/2002 | 3,750 | $11.64 | $43,650 |
| 8/6/2002 | 41,250 | $11.40 | $470,250 |
| 8/7/2002 | 14,250 | $11.36 | $161,880 |
| 8/8/2002 | 10,125 | $11.39 | $115,324 |
| 8/9/2002 | 10,125 | $11.70 | $118,462 |
| 8/13/2002 | 20,250 | $11.89 | $240,772 |
| 8/14/2002 | 10,125 | $13.26 | $134,257 |
| 8/15/2002 | 10,125 | $14.63 | $148,129 |
| 8/16/2002 | 1,125 | $14.62 | $16,447 |
| 9/12/2002 | 10,125 | $15.37 | $155,621 |
| 9/13/2002 | 10,125 | $15.27 | $154,609 |

| | | | |
|---|---|---|---|
| 9/16/2002 | 10,125 | $15.46 | $156,532 |
| 9/17/2002 | 10,125 | $15.50 | $156,937 |
| 9/20/2002 | 3,375 | $14.56 | $49,140 |
| 9/25/2002 | 45,000 | $13.52 | $608,400 |
| 9/26/2002 | 22,500 | $13.72 | $308,700 |
| 10/2/2002 | 18,750 | $12.81 | $240,187 |
| 10/3/2002 | 3,375 | $12.60 | $42,525 |
| 10/15/2002 | 17,250 | $12.01 | $207,172 |
| 10/17/2002 | 45,000 | $12.14 | $546,300 |
| 10/18/2002 | 45,000 | $12.37 | $556,650 |
| 10/21/2002 | 42,750 | $12.80 | $547,200 |
| 10/23/2002 | 20,250 | $12.71 | $257,377 |
| 10/24/2002 | 7,125 | $13.06 | $93,052 |
| 10/25/2002 | 13,125 | $12.88 | $169,050 |
| 10/28/2002 | 8,625 | $13.16 | $113,505 |
| 10/30/2002 | 21,750 | $12.54 | $272,745 |
| 10/31/2002 | 10,125 | $12.82 | $129,802 |
| 11/1/2002 | 10,125 | $13.46 | $136,282 |
| 11/4/2002 | 2,625 | $14.61 | $38,351 |
| 11/5/2002 | 17,625 | $14.10 | $248,512 |
| 11/6/2002 | 10,125 | $14.74 | $149,242 |
| 11/7/2002 | 10,125 | $14.66 | $148,432 |
| 11/8/2002 | 4,125 | $14.67 | $60,514 |
| 11/11/2002 | 7,500 | $14.61 | $109,575 |
| 11/12/2002 | 18,750 | $14.68 | $275,250 |
| 11/13/2002 | 10,125 | $12.80 | $129,600 |
| 11/14/2002 | 10,125 | $13.45 | $136,181 |
| 11/18/2002 | 20,250 | $12.52 | $253,530 |
| 11/19/2002 | 10,125 | $12.45 | $126,056 |
| 11/20/2002 | 10,125 | $12.49 | $126,461 |
| 11/21/2002 | 10,125 | $12.65 | $128,081 |
| 11/22/2002 | 10,125 | $12.77 | $129,296 |
| 11/25/2002 | 10,125 | $14.09 | $142,661 |
| 11/26/2002 | 10,125 | $14.35 | $145,294 |
| 11/27/2002 | 10,125 | $13.89 | $140,636 |
| 11/29/2002 | 10,125 | $13.59 | $137,599 |
| 12/2/2002 | 10,125 | $13.62 | $137,902 |
| 12/3/2002 | 10,125 | $13.96 | $141,345 |
| 12/4/2002 | 10,125 | $13.83 | $140,029 |
| 12/6/2002 | 20,250 | $13.56 | $274,590 |
| 12/9/2002 | 10,125 | $13.54 | $137,092 |
| 12/10/2002 | 10,125 | $13.64 | $138,105 |
| 12/11/2002 | 10,125 | $14.02 | $141,952 |
| 12/12/2002 | 10,125 | $14.29 | $144,686 |
| 12/13/2002 | 10,125 | $14.22 | $143,977 |
| 12/16/2002 | 10,125 | $13.91 | $140,839 |
| 12/17/2002 | 10,125 | $14.30 | $144,787 |
| 12/19/2002 | 7,125 | $14.33 | $102,101 |

| | | | |
|---|---|---|---|
| 12/20/2002 | 23,250 | $13.96 | $324,570 |
| 12/23/2002 | 10,125 | $14.65 | $148,331 |
| 12/26/2002 | 20,250 | $13.90 | $281,475 |
| 12/27/2002 | 3,000 | $13.91 | $41,730 |
| 12/30/2002 | 17,250 | $13.66 | $235,635 |
| 12/31/2002 | 10,125 | $13.66 | $138,307 |
| 1/2/2003 | 10,125 | $13.56 | $137,295 |
| 1/3/2003 | 10,125 | $14.13 | $143,066 |
| 1/6/2003 | 3,375 | $14.14 | $47,722 |
| 1/7/2003 | 16,875 | $13.94 | $235,237 |
| 1/8/2003 | 1,500 | $13.90 | $20,850 |
| 1/9/2003 | 18,750 | $13.69 | $256,687 |
| 1/13/2003 | 16,500 | $13.43 | $221,595 |
| 1/14/2003 | 7,875 | $13.36 | $105,210 |
| 1/16/2003 | 26,250 | $13.06 | $342,825 |
| 1/17/2003 | 10,125 | $13.24 | $134,055 |
| 1/22/2003 | 10,125 | $13.10 | $132,637 |
| 1/23/2003 | 10,125 | $12.98 | $131,422 |
| 1/27/2003 | 20,250 | $12.32 | $249,480 |
| 1/28/2003 | 10,125 | $12.32 | $124,740 |
| 1/31/2003 | 20,250 | $12.08 | $244,620 |
| 2/18/2003 | 9,750 | $12.00 | $117,000 |
| 2/25/2003 | 15,000 | $12.02 | $180,300 |
| 2/28/2003 | 7,500 | $12.00 | $90,000 |
| 3/3/2003 | 37,500 | $12.00 | $450,000 |
| 3/18/2003 | 750 | $12.50 | $9,375 |
| 3/19/2003 | 57,000 | $12.00 | $684,000 |
| 3/19/2003 | 8,250 | $12.03 | $99,247 |
| 3/26/2003 | 6,750 | $12.00 | $81,000 |
| 3/27/2003 | 77,250 | $12.00 | $927,000 |
| 4/9/2003 | 15,000 | $12.00 | $180,000 |
| 4/24/2003 | 63,000 | $12.40 | $781,200 |
| 4/29/2003 | 67,500 | $12.56 | $847,799 |
| 5/7/2003 | 90,000 | $13.25 | $1,192,499 |
| 5/13/2003 | 90,000 | $13.68 | $1,231,199 |
| 5/21/2003 | 41,250 | $13.37 | $551,512 |
| 5/22/2003 | 45,750 | $13.46 | $615,795 |
| 6/18/2003 | 46,500 | $15.50 | $720,750 |
| 6/19/2003 | 7,500 | $15.50 | $116,250 |
| 6/24/2003 | 90,000 | $15.28 | $1,375,199 |
| 7/2/2003 | 39,750 | $16.06 | $638,385 |
| 7/3/2003 | 3,750 | $16.22 | $60,825 |
| 7/8/2003 | 18,750 | $17.14 | $321,375 |
| 7/9/2003 | 71,250 | $17.04 | $1,214,099 |
| 7/22/2003 | 90,000 | $16.93 | $1,523,699 |
| 7/30/2003 | 69,750 | $17.50 | $1,220,624 |
| 8/5/2003 | 3,750 | $17.09 | $64,087 |
| 8/6/2003 | 26,250 | $16.87 | $442,837 |

| | | Date | Shares | Price | Total |
|---|---|---|---|---|---|
| | | 8/13/2003 | 90,000 | $18.61 | $1,674,899 |
| | | 8/19/2003 | 5,250 | $19.02 | $99,855 |
| | | 9/16/2003 | 71,250 | $17.02 | $1,212,674 |
| | | 9/17/2003 | 3,750 | $16.96 | $63,600 |
| | | 9/24/2003 | 60,000 | $17.50 | $1,049,999 |
| | | 9/25/2003 | 1,500 | $17.16 | $25,740 |
| | | 9/30/2003 | 49,500 | $16.36 | $809,820 |
| | | 10/1/2003 | 39,000 | $16.36 | $638,040 |
| | | 10/9/2003 | 75,000 | $17.58 | $1,318,499 |
| | | 10/14/2003 | 9,750 | $17.81 | $173,647 |
| | | 10/15/2003 | 9,000 | $17.76 | $159,840 |
| | | 10/23/2003 | 15,000 | $17.01 | $255,150 |
| | | 10/28/2003 | 90,000 | $17.40 | $1,565,999 |
| | | 11/5/2003 | 25,500 | $17.93 | $457,215 |
| | | 11/11/2003 | 90,000 | $18.34 | $1,650,599 |
| | | 11/19/2003 | 23,250 | $19.42 | $451,515 |
| | | 12/17/2003 | 75,000 | $18.02 | $1,351,499 |
| | | 12/23/2003 | 75,000 | $18.58 | $1,393,499 |
| | | 12/31/2003 | 1,500 | $19.00 | $28,500 |
| | | 1/2/2004 | 11,250 | $18.75 | $210,937 |
| | | 1/7/2004 | 60,000 | $18.23 | $1,093,799 |
| | | 1/7/2004 | 30,000 | $18.32 | $549,600 |
| | | 1/14/2004 | 11,250 | $19.02 | $213,975 |
| | | 1/15/2004 | 53,250 | $19.00 | $1,011,749 |
| | | 1/20/2004 | 90,000 | $19.65 | $1,768,499 |
| | | 1/29/2004 | 3,750 | $19.48 | $73,050 |
| | | 2/3/2004 | 90,000 | $19.34 | $1,740,599 |
| | | 2/17/2004 | 61,500 | $18.92 | $1,163,579 |
| | | 5/25/2004 | 5,220,000 | $22.56 | $117,763,200 |
| | | 5/28/2004 | 599,400 | $22.56 | $13,522,464 |
| | | | **14,666,395** | | **$222,493,550** |
| | | | | | |
| KERCHO | RANDY | 12/1/1998 | 8,269 | $8.66 | $71,607 |
| | | 6/1/2001 | 1,125 | $10.00 | $11,250 |
| | | 6/1/2001 | 900 | $10.02 | $9,018 |
| | | 6/1/2001 | 225 | $10.04 | $2,259 |
| | | 6/4/2001 | 9,000 | $9.97 | $89,730 |
| | | 6/5/2001 | 11,250 | $9.99 | $112,387 |
| | | 6/5/2001 | 11,250 | $10.07 | $113,287 |
| | | 6/5/2001 | 11,250 | $10.08 | $113,400 |
| | | 6/5/2001 | 9,517 | $10.06 | $95,746 |
| | | 6/6/2001 | 22,500 | $10.13 | $227,925 |
| | | 8/21/2002 | 42,150 | $15.74 | $663,441 |
| | | 8/22/2002 | 13,537 | $15.44 | $209,019 |
| | | 12/27/2004 | 34,000 | $25.01 | $850,340 |
| | | 12/28/2004 | 3,968 | $25.01 | $99,240 |
| | | 8/29/2006 | 60,696 | $18.57 | $1,127,125 |
| | | | **239,638** | | **$3,795,773** |

| | | | | | |
|---|---|---|---|---|---|
| KOVAR | MICHAEL | 8/19/2003 | 7,200 | $19.09 | $137,448 |
| | | 11/19/2003 | 3,937 | $19.68 | $77,490 |
| | | 11/19/2003 | 3,600 | $19.68 | $70,848 |
| | | 11/19/2003 | 1,897 | $19.68 | $37,343 |
| | | 11/19/2003 | 1,702 | $19.68 | $33,505 |
| | | | **18,337** | | **$356,633** |
| | | | | | |
| MOORE | ALAN | 5/28/1996 | 111,375 | $2.98 | $331,897 |
| | | 5/28/1996 | 60,750 | $3.00 | $182,250 |
| | | 5/28/1996 | 45,562 | $3.01 | $137,143 |
| | | 5/29/1996 | 189,844 | $3.03 | $575,226 |
| | | 5/29/1996 | 63,281 | $3.01 | $190,476 |
| | | 5/29/1996 | 35,437 | $2.98 | $105,604 |
| | | 5/30/1996 | 75,937 | $3.13 | $237,684 |
| | | 5/30/1996 | 50,625 | $3.06 | $154,912 |
| | | 5/30/1996 | 50,625 | $3.11 | $157,444 |
| | | 5/30/1996 | 50,625 | $3.07 | $155,419 |
| | | 5/30/1996 | 25,312 | $3.03 | $76,697 |
| | | 5/31/1996 | 151,875 | $3.16 | $479,924 |
| | | 5/31/1996 | 101,250 | $3.13 | $316,912 |
| | | 5/31/1996 | 50,625 | $3.18 | $160,987 |
| | | 6/3/1996 | 50,625 | $3.06 | $154,912 |
| | | 6/4/1996 | 50,625 | $3.03 | $153,394 |
| | | 6/25/1997 | 108,844 | $3.38 | $367,892 |
| | | 6/26/1997 | 286,031 | $3.40 | $972,505 |
| | | 6/26/1997 | 60,750 | $3.38 | $205,335 |
| | | 6/27/1997 | 101,250 | $3.40 | $344,250 |
| | | 6/30/1997 | 50,625 | $3.45 | $174,656 |
| | | 6/30/1997 | 50,625 | $3.43 | $173,644 |
| | | 7/3/1997 | 75,937 | $3.48 | $264,262 |
| | | 7/3/1997 | 25,312 | $3.45 | $87,328 |
| | | | **1,923,748** | | **$6,160,752** |
| | | | | | |
| QUICK | MARK | 3/16/1999 | 16,200 | $10.03 | $162,486 |
| | | 3/30/1999 | 9,450 | $9.66 | $91,287 |
| | | 3/30/1999 | 4,050 | $9.62 | $38,961 |
| | | 3/30/1999 | 1,687 | $9.74 | $16,436 |
| | | 3/31/1999 | 8,775 | $9.62 | $84,415 |
| | | 5/13/1999 | 111,375 | $11.89 | $1,324,247 |
| | | 5/17/1999 | 67,500 | $11.70 | $789,749 |
| | | 5/17/1999 | 45,225 | $11.62 | $525,514 |
| | | 5/17/1999 | 5,994 | $11.74 | $70,369 |
| | | 5/18/1999 | 24,300 | $11.70 | $284,310 |
| | | 5/18/1999 | 16,875 | $11.74 | $198,112 |
| | | 5/18/1999 | 10,125 | $11.85 | $119,981 |
| | | 5/19/1999 | 117,787 | $11.81 | $1,391,069 |
| | | 5/19/1999 | 5,062 | $11.85 | $59,991 |

|  |  | 5/20/1999 | 50,625 | $12.11 | $613,068 |
|--|--|--|--|--|--|
|  |  | 5/20/1999 | 33,750 | $12.00 | $405,000 |
|  |  | 6/13/2001 | 2,475 | $10.07 | $24,923 |
|  |  | 6/15/2001 | 31,642 | $9.52 | $301,229 |
|  |  | 6/15/2001 | 21,550 | $9.57 | $206,238 |
|  |  | 6/15/2001 | 13,941 | $9.57 | $133,415 |
|  |  | 5/21/2002 | 11,250 | $13.86 | $155,925 |
|  |  | 5/21/2002 | 10,800 | $13.84 | $149,472 |
|  |  | 5/22/2002 | 27,000 | $13.84 | $373,680 |
|  |  | 5/22/2002 | 2,140 | $13.84 | $29,614 |
|  |  | 9/15/2003 | 6,333 | $17.00 | $107,661 |
|  |  | 9/16/2003 | 34,579 | $16.99 | $587,505 |
|  |  | 9/16/2003 | 150 | $17.00 | $2,550 |
|  |  | 3/29/2004 | 19,687 | $22.00 | $433,125 |
|  |  | 3/29/2004 | 15,750 | $22.00 | $346,500 |
|  |  | 3/29/2004 | 12,757 | $22.00 | $280,665 |
|  |  | 3/29/2004 | 11,812 | $22.00 | $259,875 |
|  |  | 3/29/2004 | 10,500 | $22.00 | $231,000 |
|  |  | 3/29/2004 | 2,250 | $22.00 | $49,500 |
|  |  | 3/29/2004 | 742 | $22.00 | $16,335 |
|  |  | 3/30/2004 | 22,500 | $22.00 | $495,000 |
|  |  | 3/2/2005 | 10,000 | $26.36 | $263,600 |
|  |  | 2/24/2006 | 9,315 | $17.24 | $160,591 |
|  |  | 2/24/2006 | 9,315 | $17.24 | $160,591 |
|  |  | 3/8/2006 | 885 | $16.95 | $15,001 |
|  |  |  | **816,156** |  | **$10,958,986** |
|  |  |  |  |  |  |
| SHROFF | JAL | 6/30/1999 | 33,750 | $14.22 | $479,924 |
|  |  | 7/1/1999 | 33,750 | $14.29 | $482,287 |
|  |  | 9/1/1999 | 18,000 | $14.22 | $255,960 |
|  |  | 9/7/1999 | 13,725 | $14.22 | $195,169 |
|  |  | 5/30/2002 | 21,825 | $13.86 | $302,494 |
|  |  | 5/30/2002 | 2,475 | $13.85 | $34,279 |
|  |  | 5/30/2002 | 1,800 | $13.86 | $24,948 |
|  |  | 5/30/2002 | 675 | $13.87 | $9,362 |
|  |  | 6/3/2002 | 40,837 | $13.44 | $548,855 |
|  |  | 5/19/2003 | 25,312 | $13.50 | $341,718 |
|  |  | 5/19/2003 | 25,312 | $13.42 | $339,693 |
|  |  | 9/24/2003 | 15,000 | $17.50 | $262,500 |
|  |  | 9/25/2003 | 45,000 | $17.48 | $786,599 |
|  |  | 4/1/2004 | 21,750 | $22.47 | $488,722 |
|  |  | 4/2/2004 | 16,218 | $22.56 | $365,878 |
|  |  | 9/17/2004 | 8,000 | $28.90 | $231,200 |
|  |  | 9/17/2004 | 5,000 | $28.75 | $143,750 |
|  |  | 9/17/2004 | 5,000 | $28.86 | $144,300 |
|  |  | 9/17/2004 | 3,000 | $28.98 | $86,940 |
|  |  | 9/17/2004 | 2,000 | $28.80 | $57,600 |
|  |  | 9/17/2004 | 2,000 | $28.85 | $57,700 |

| | | | | | |
|---|---|---|---|---|---|
| | | 9/20/2004 | 5,000 | $28.80 | $144,000 |
| | | 9/21/2004 | 5,000 | $28.80 | $144,000 |
| | | 9/21/2004 | 1,700 | $28.60 | $48,620 |
| | | 9/24/2004 | 1,600 | $29.92 | $47,872 |
| | | 9/24/2004 | 500 | $30.02 | $15,010 |
| | | 9/24/2004 | 500 | $30.12 | $15,060 |
| | | 9/24/2004 | 300 | $29.95 | $8,985 |
| | | 9/24/2004 | 300 | $29.97 | $8,991 |
| | | 9/24/2004 | 100 | $29.93 | $2,993 |
| | | 9/27/2004 | 818 | $30.20 | $24,704 |
| | | 9/29/2004 | 15,500 | $30.30 | $469,650 |
| | | 9/29/2004 | 14,700 | $30.20 | $443,940 |
| | | 9/29/2004 | 10,053 | $30.28 | $304,405 |
| | | 9/29/2004 | 10,000 | $30.35 | $303,500 |
| | | 9/29/2004 | 5,082 | $30.15 | $153,222 |
| | | 9/29/2004 | 2,447 | $30.22 | $73,948 |
| | | 9/29/2004 | 600 | $30.21 | $18,126 |
| | | 9/29/2004 | 600 | $30.23 | $18,138 |
| | | 9/29/2004 | 200 | $30.29 | $6,058 |
| | | | **415,430** | | **$7,891,102** |
| | | | | | |
| STONE | DONALD | 12/6/2001 | 25,312 | $9.58 | $242,493 |
| | | 12/6/2001 | 15,187 | $9.58 | $145,496 |
| | | 12/6/2002 | 8,850 | $13.46 | $119,121 |
| | | 12/6/2002 | 4,987 | $13.40 | $66,832 |
| | | 12/6/2002 | 600 | $13.36 | $8,016 |
| | | 12/6/2002 | 300 | $13.40 | $4,020 |
| | | 12/6/2002 | 300 | $13.44 | $4,032 |
| | | 12/6/2002 | 150 | $13.43 | $2,014 |
| | | 8/25/2004 | 15,187 | $28.00 | $425,236 |
| | | 12/16/2005 | 8,100 | $20.00 | $162,000 |
| | | 12/16/2005 | 3,600 | $20.08 | $72,288 |
| | | 12/16/2005 | 900 | $20.15 | $18,135 |
| | | 12/16/2005 | 787 | $20.04 | $15,771 |
| | | 12/16/2005 | 700 | $20.16 | $14,112 |
| | | 12/16/2005 | 400 | $20.09 | $8,036 |
| | | 12/16/2005 | 200 | $20.02 | $4,004 |
| | | 12/16/2005 | 200 | $20.05 | $4,010 |
| | | 12/16/2005 | 100 | $20.07 | $2,007 |
| | | 12/16/2005 | 100 | $20.10 | $2,010 |
| | | 12/16/2005 | 100 | $20.11 | $2,011 |
| | | | **86,061** | | **$1,321,645** |
| | | | | | |
| TUNNELL | THOMAS | 12/28/2000 | 21,375 | $6.39 | $136,586 |
| | | 6/18/2001 | 22,500 | $9.51 | $213,975 |
| | | 6/18/2001 | 14,611 | $9.51 | $138,955 |
| | | 6/18/2001 | 4,826 | $9.51 | $45,898 |
| | | 6/18/2001 | 223 | $9.51 | $2,118 |

| | | | |
|---|---|---|---|
| 6/11/2002 | 1,468 | $14.75 | $21,660 |
| 6/3/2003 | 13,234 | $15.08 | $199,576 |
| 6/3/2003 | 3,000 | $15.05 | $45,150 |
| 8/20/2003 | 9,000 | $18.93 | $170,370 |
| 12/30/2003 | 3,018 | $18.82 | $56,799 |
| 4/1/2004 | 6,328 | $22.40 | $141,758 |
| 4/1/2004 | 1,171 | $22.40 | $26,241 |
| 4/2/2004 | 11,725 | $22.56 | $264,527 |
| 4/2/2004 | 7,500 | $22.80 | $171,000 |
| 4/2/2004 | 4,438 | $22.80 | $101,198 |
| 4/2/2004 | 1,947 | $22.80 | $44,391 |
| 11/23/2004 | 3,016 | $27.07 | $81,643 |
| 1/11/2005 | 3,003 | $26.00 | $78,078 |
| 1/12/2005 | 5,997 | $26.00 | $155,922 |
| 1/12/2005 | 5,250 | $26.00 | $136,500 |
| 1/14/2005 | 18,000 | $27.32 | $491,760 |
| 1/14/2005 | 16,875 | $27.45 | $463,219 |
| 1/14/2005 | 16,465 | $27.20 | $447,848 |
| 1/14/2005 | 1,836 | $27.51 | $50,508 |
| | **196,809** | | **$3,685,680** |

**Total:**   **27,942,889**   **357,587,894**

240.     This also does not account for hundreds of thousands of "in-the-money" backdated stock options, and backdated and subsequently re-priced options, Company insiders continue to hold and which continue to vest.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

241.     Judge Furgeson has found demand futility is adequately pled in this action.

242.     Plaintiffs bring this action derivatively on behalf of Fossil to redress injuries suffered, and yet to be suffered, by the Company as a direct and proximate result of the breaches of fiduciary duty and other violations of law.  Fossil is named as a nominal defendant solely in a derivative capacity.

243.     Plaintiffs are shareholders of Fossil common stock and will adequately and fairly represent the interests of the Company in this litigation.

244.     The secret backdating scheme detailed herein subjects, and will persist in subjecting, Fossil to continuing harm because the adverse consequences of the injurious effects are still in effect.

245.     At all relevant times, the wrongful actions complained of herein were unlawfully

concealed from Fossil shareholders until at least November 2006.

246.     On the date of the first Complaint filed by plaintiffs, the Board of Directors of Fossil

consisted of nine members:  T. Kartsotis, K. Kartsotis, Barnes, Shroff, Gold, Anderson, Stone,

Steinberg and Wang.  Demand is excused because the Fossil Board played a central role in the

events leading up to the backdating debacle that has ensnarled Fossil, and the Board members face a

substantial likelihood of personal liability as a result of their actions, and conscious failures to act.

247.     Based upon the facts set forth throughout this Complaint, applicable law, and the

longstanding rule that equity does not compel a useless and futile act, a pre-filing demand upon the

Fossil Board to institute this action against the officers and members of Fossil's Board is excused as

futile.  Well over a majority of Fossil's directors as of the lawsuit's filing approved and/or accepted

backdated stock options.  A majority of the directors turned a blind eye to the backdating or falsely

certified the Company's internal controls despite their knowledge of the backdating.  Well over a

majority of the directors insider traded with knowledge of the backdating and its effect on Fossil's

financial statements.  And all approved false and misleading SEC filings.

**Disabled Fossil Directors as of Lawsuit Filing**

| Defendant Director | Board Tenure | *Received Backdated Options* | *Approved Backdated Options* | Signed False and Misleading SEC Filings Fossil Admitted "should not be relied upon" | Compensation or Audit Committee Tenure | Insider Trading Proceeds |
|---|---|---|---|---|---|---|
| K. Kartsotis | 1991-Present | | √ | 1996-2006 | | $45.1 MM |
| Barnes | 1993-Present | √ | √ | 1996-2006 | | $12.4 MM |
| Shroff | 1993-Present | √ | | 1996-2006 | | $7.8 MM |
| Gold | 1993-Present | | √ | 1996-2006 | Comp: 1996-2005 Audit: 1996-2005 | $1.9 MM |
| Anderson | 1993-Present | | √ | 1996-2006 | Comp: 1996-2005 Audit: 1996-2005 | $1.5 MM |
| Stone | 1993-Present | | √ | 1996-2006 | Comp: 1996-2005 Audit: 1996-2005 | $1.9 MM |
| Steinberg | 2000-Present | √ | √ | 2000-2006 | Comp: 2001-2005 Audit: 1999-2005 | |
| Wang | 2005-Present | | | 2005-2006 | | |

| Defendant Director | Board Tenure | *Received* Backdated Options | *Approved* Backdated Options | Signed False and Misleading SEC Filings Fossil Admitted "should not be relied upon" | Compensation or Audit Committee Tenure | Insider Trading Proceeds |
|---|---|---|---|---|---|---|
| T. Kartsotis | 1991-Present | | √ | 1996-2006 Sarbanes-Oxley | | $222 MM |

248.     Between at least 1996 and 2004, defendants T. Kartsotis, K. Kartsotis, Barnes, Shroff, Gold, Anderson, Stone and Steinberg, acting in their capacities as Fossil directors, granted undisclosed, in-the-money options to Fossil directors, officers and employees in direct violation of the Company's shareholder-approved stock option plans.  By engaging in such *ultra vires* acts over such an extended period of time, these defendants breached their duties of loyalty and good faith owed to Fossil.  They also consciously ignored red flags indicating that Fossil's stock option grants were manipulated to the lowest closing price.  The conscious decision by these defendants to refrain from correcting or prohibiting the manipulation of option grants to Fossil's directors, officers and employees constitutes bad faith.   Defendants T. Kartsotis, K. Kartsotis, Barnes, Shroff, Gold, Anderson, Stone and Steinberg, and each of them, therefore face a substantial risk of liability to Fossil for breach of the duty of good faith.

249.     As a result of their decisions to manipulate the price of options granted to Fossil directors, officers and employees, defendants T. Kartsotis, K. Kartsotis, Barnes, Shroff, Gold, Anderson, Stone and Steinberg violated the terms of Fossil's stock option plans and APB Opinion No. 25 in breach of their fiduciary duties of good faith and loyalty to Fossil.  These defendants therefore, face a substantial likelihood of liability to Fossil for the claims asserted in this Complaint. Thus, they cannot, and will not, disinterestedly or objectively evaluate any pre-suit demand upon the Fossil Board to bring, let alone vigorously prosecute, the claims for damages and other relief arising from the unlawful backdating scheme that plaintiffs may have made.

250.     A pre-suit demand upon the Fossil Board is also excused because a majority of its members personally and financially benefited from the unlawful backdating scheme particularized in

this Complaint.  For example, defendants Barnes and Steinberg stood on both sides of stock option grants, including the backdated grants on January 10, 1996, February 6, 1997, January 14, 1998, February 12, 1999, February 2, 2000, March 14, 2000, October 25, 2000, December 29, 2000, January 12, 2002, and February 23, 2004, to themselves and other Fossil executives.  In total, Barnes and Steinberg received nearly one million backdated options worth millions of dollars, which unjustly enriched them at the expense of Fossil.  Defendant Barnes also profited handsomely by selling over 800,000 shares of his personal Fossil stock, some via exercise of the backdated stock options that he received, for over $12.4 million in unlawful insider trading proceeds in violation of the securities laws and his fiduciary duties of good faith and loyalty.  Defendant Barnes sold these shares while in possession of non-public information, *i.e.*, the secret backdating scheme particularized herein which was causing Fossil's compensation expense to be materially understated and its net income and earnings to be materially overstated at all relevant times between 1996 and 2006.

251.    Defendants T. Kartsotis, K. Kartsotis, Shroff, Gold, Anderson and Stone also profited handsomely from the stock option timing scheme at Fossil.  While in possession of non-public information, *i.e.*, the existence of the secret backdating scheme and the fact that stock option awards were made at prices which violated Fossil's stock option plans, defendant T. Kartsotis sold 14,666,395 shares of his personal Fossil stock, for unlawful insider trading proceeds of $222,493,550; defendant K. Kartsotis sold 4,745,472 shares of his personal Fossil stock, for unlawful proceeds of $45,161,247; defendant Shroff sold 415,430 shares of his personal Fossil stock, for unlawful insider trading proceeds of $7,891,102; defendant Gold sold 120,236 shares of his personal Fossil stock, for unlawful insider trading proceeds of $1,966,377; defendant Anderson sold 89,061 shares of his personal Fossil stock, for unlawful insider trading proceeds of $1,567,645;

and defendant Stone sold 86,061 shares of his personal Fossil stock, for unlawful insider trading proceeds of $1,321,645.

252.    These sales violated the securities laws, as well as breached defendants' fiduciary duties of good faith and loyalty owed to Fossil.  As a result of their profiteering at the expense of Fossil, defendants T. Kartsotis, K. Kartsotis, Shroff, Gold, Anderson and Stone face a substantial likelihood of liability to Fossil based on their participation in, and financial profits from, the unlawful backdating scheme particularized herein.  Thus, they are not disinterested in the outcome of this litigation, and therefore, cannot and will not fairly and/or objectively evaluate any demand, let alone prosecute, the claims for damages and other relief arising from the unlawful backdating scheme that plaintiffs may have made.

253.    A pre-suit demand on the Fossil Board is also futile and, therefore, excused because all of its members signed Fossil's annual reports on Forms 10-K that contained false and misleading financial results and information.  Defendants Anderson, Barnes, Gold, K. Kartsotis, T. Kartsotis, Shroff and Stone signed Fossil's Forms 10-K from at least 1996-2005.  Defendant Steinberg signed Fossil's Forms 10-K for at least 1999-2005.

254.    In each of these Forms 10-K, defendants stated that stock options for Fossil's stock option plans are granted with an exercise price equal to the fair market value on the date of grant, or words to similar effect.  Instead, however, while under the stewardship of defendants Anderson, Barnes, Gold, K. Kartsotis, T. Kartsotis, Shroff, Stone and Steinberg the secret backdating scheme particularized in this Complaint was being perpetrated upon and causing great injury to Fossil.  More specifically, due to defendants' backdating scheme, Fossil's Form 10-K financial reports materially overstated the Company's compensation expenses and materially overstated its net income and earnings at all relevant times between 1996 and 2005, and will need to be restated.

255.     As a result of their decision to sign and publish Fossil's false financial results, which will be restated because of the unlawful stock option backdating scheme, defendants Anderson, Barnes, Gold, K. Kartsotis, T. Kartsotis, Shroff, Stone and Steinberg are not disinterested in the outcome of this litigation.  Instead, they each face a substantial likelihood of being found personally liable for making false statements in Fossil's financial reports in breach of their fiduciary duties of good faith and honesty and in violation of securities laws.  As such, defendants Anderson, Barnes, Gold, K. Kartsotis, T. Kartsotis, Shroff, Stone and Steinberg cannot, and will not, disinterestedly and objectively evaluate any demand to bring, let alone vigorously prosecute, the claims for damages and other relief arising from their backdating scheme that plaintiffs may have made.

256.     To compound matters, defendants Anderson, Barnes, Gold, K. Kartsotis, T. Kartsotis, Shroff, Stone and Steinberg caused Fossil to issue false and misleading proxy statements to Fossil shareholders.  With respect to Fossil's stock option granting practices, these proxy statements falsely stated that stock options granted under Fossil's stock option plans are granted with an exercise price of not less than 100% of the fair market value on the date of grant, or words to that effect.  Anderson, Barnes, Gold, K. Kartsotis, T. Kartsotis, Shroff, Stone and Steinberg face a substantial likelihood of liability to Fossil for breaching their fiduciary duties of good faith and loyalty and the securities and corporation laws by making false statements to Fossil shareholders in the Company's financial reports.

257.     Between 1996-2005, Fossil's reports on Form 10-K, which defendants Anderson, Steinberg, Barnes, Gold, K. Kartsotis, T. Kartsotis, Shroff and Stone, and each of them, signed at various times, contained a statement that "[t]he Company applies Accounting Principles Board Opinion No. 25 and related interpretations in accounting for its stock option plans.  Accordingly, no compensation cost . . . has been recognized for the Company's stock option plans."  *See, e.g.*, 1996-2005 Forms 10-K.  Under APB Opinion No. 25, a stock option must be granted at the fair market

price on the date of grant, and not backdated to a lower price, thus creating an in-the-money grant and a corresponding compensation expense, in order for an employer to avoid recognizing a compensation cost associated with its stock option plan.

258.    In violation of Fossil's stock option plans, options were granted to Fossil executives and employees with exercise prices equal to less than 100% of the fair market value of Fossil stock on the date of grant.  Granting options at prices less than equal to fair market value on the date of grant was *ultra vires* and could not have been accomplished but for the Fossil Board's decisions to make such option awards.  Thus, defendants' statements in Fossil's 1996-2005 Form 10-K reports were false and misleading when issued.  As a result, defendants Anderson, Steinberg, Barnes, Gold, K. Kartsotis, T. Kartsotis, Shroff and Stone face a substantial likelihood of liability to Fossil for breaching their fiduciary duties of good faith and honesty owed to the Company and violating the securities and corporation laws.  Therefore, they are not disinterested in this litigation and are unable to fairly and/or objectively evaluate, let alone vigorously prosecute, the claims for damages and other relief asserted in this Complaint.

259.    Furthermore, demand is excused because the secret options pricing scheme was not, and could not have been, an exercise of good faith business judgment.  As represented in Fossil's annual reports on Form 10-K and proxy statements, the stated purpose of the Company's shareholder-approved stock option plans is attracting, motivating, and retaining quality executives and employees.  However, by granting options with backdated or misdated exercise prices, defendants undermined the purpose of the stock option plans by awarding executives and employees compensation that had intrinsic value regardless of Fossil's stock performance.  In effect, this practice was nothing more than secret handouts to executives and employees at the expense of unsuspecting shareholders.

260.    In combination with the particularized allegations above, a pre-suit demand is also excused as futile in this action for the following reasons:

(a)     There was no basis or justification for backdating stock options.  It was designed solely to benefit certain of the defendants in a manner that was inconsistent with their fiduciary duties of good faith and loyalty to Fossil, and the Company's public disclosures, to the detriment of Fossil.  Consequently, the secret backdated stock option manipulation scheme detailed herein constituted a waste of corporate assets, and could not have been the product of the proper exercise of business judgment by defendants;

(b)     As members of the Compensation Committee, defendants Gold, Anderson, Stone and Steinberg were responsible at various times for administering and managing Fossil's executive compensation program and stock option plans.  As members of the Compensation Committee, Gold, Anderson, Stone and Steinberg secretly granted in-the-money stock options worth millions of dollars to themselves and other Fossil insiders and/or concealed the existence of the unlawful backdating scheme.  By such actions, defendants Gold, Anderson, Stone and Steinberg breached their fiduciary duties of good faith and loyalty to Fossil and violated the terms of Fossil's stock options plans, for which they are liable to the Company;

(c)     The members of Fossil's Board have demonstrated their unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks of the corporation for the violations of law complained of herein.  The targets of such an action are people with whom the Fossil Board members have developed professional relationships, who are their friends and with whom they have entangling financial alliances, interests and dependencies, and therefore, they are not able to and will not vigorously prosecute any such action;

- 116 -

(d)     All of the defendants authorized the filing of annual reports on Form 10-K and proxy statements, in support of their nomination as directors, which failed to disclose that the defendants' stock option grants had been misdated.  They also authorized the filing of shareholder-approved stock option plans, which misrepresented that the options carry the stock price of the day of the award.  Any suit by defendants to remedy the wrongs complained of herein would expose them to a substantial likelihood of liability for securities and proxy violations, as well as breach of fiduciary duty.  Therefore, they are hopelessly conflicted in making a supposedly independent determination of a demand that they cause the Company to bring this action;

(e)     All of the defendants participated in, approved, or through a conscious failure to act or abdication of duty, permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Fossil's shareholders and/or acting with negligence, gross negligence or recklessness disregarded the wrongs complained of herein, and therefore are not disinterested parties in the outcome of this litigation;

(f)     Plaintiffs' claims arising under §14(a) of the Exchange Act are not subject to any state or federal pre-suit demand requirement.  Accordingly, plaintiffs are not required to make a pre-suit demand on the Fossil Board before bringing such a claim.  Had a pre-suit demand upon the Fossil Board been required, it would be excused as a matter of federal policy and state and federal law; and

(g)     Fossil's current and past officers and directors are protected against personal liability for their acts of mismanagement, waste and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance which they caused the Company to purchase for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Fossil. However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the

defendants in this case contain provisions which eliminate coverage for any action brought directly by Fossil against these defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of Fossil, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate a recovery.

### CONCEALMENT AND TOLLING OF THE STATUTE OF LIMITATIONS

261.    The Counts alleged herein are timely. As an initial matter, defendants wrongfully concealed their manipulation of the stock option plans and options grants by issuing false and misleading proxy statements and other SEC filings, including Reports on 10-Q and 10-K, Forms 3, 4 and 5, and Sarbanes-Oxley Certifications. *See supra* ¶¶107-147 (false proxy statements); ¶148 (Forms 3, 4 and 5); ¶¶149-229 (false Forms 10-K); ¶¶232-234 (false Forms 10-Q); ¶¶230-231, 235-238 (false Sarbanes-Oxley Certifications). Indeed, defendants took affirmative steps to conceal the backdating at Fossil by authorizing or otherwise causing the Company to issue these SEC filings and shareholder communications. Defendants falsely assured public investors that Fossil's option grants were made in accordance with the Company's stock option plans, and omitted that backdated or otherwise manipulated options were, in fact, actually issued on dates other than those disclosed. These SEC filings omitted the true grant date and proper price for backdated options, and failed to disclose that options were being backdated and mispriced. Many of these SEC filings also contained affirmative misrepresentations that stock options were being priced based on fair market value as of the date of the grant and were otherwise determined and granted in accordance with Fossil's stock option plans.

262.    K. Kartsotis and Kovar and the defendant directors who are or were members of Fossil's Audit Committee also misrepresented the adequacy of the Company's internal controls and

disclosures, the integrity of the Company's financial statements, and that Fossil's auditors were apprised of all material facts including fraudulent acts by members of management. *See supra* ¶¶107-108, 126, 130, 134, 138, 142, 146 (alleging false and misleading Audit Committee reports); ¶¶230-231, 235-238 (same, Sarbanes-Oxley Certifications). These false and misleading SEC filings prevented plaintiffs and Fossil's other public shareholders from becoming aware of the backdating practices at the Company and the Company's false and misleading financial statements.

263.    Other facts suggesting defendants' concealment include the admitted lack of adequate documentation or recordation in connection with stock option grants. The Company has admitted that it had to review hundreds of thousands of documents, including circumstantial evidence of proper authorization dates of option grants to determine actual grant dates of options. For example, with respect to over 20% of the option grants, investigators had to review e-mail or other circumstantial evidence to determine proper grant dates. The Company has also admitted to "material weakness in our internal control over financial reporting relating to equity grant administration and accounting for and disclosure of equity grants." Still though, the Company's admissions to date do not disclose or tend to reveal the full extent of the conduct (backdating) alleged herein and thereby omit the material facts plaintiffs allege. Even the Company admits that it still has not determined the full impact of the backdating.

264.    Finally, as fiduciaries of Fossil and its public shareholders, the defendants cannot rely on any limitations defense where they withheld from the Company's public shareholders the facts that give rise to the claims asserted herein, *e.g.*, that the Company's Board had abdicated its fiduciary responsibilities to oversee the Company's executive compensation practices, and that the option grant dates had been manipulated to maximize the profit for the grant recipients and, accordingly, to maximize the costs for the Company.

265.     Plaintiffs allege the following Counts for redress of all alleged conduct that occurred during the period in which they have owned Fossil stock, except as follows.  Plaintiffs assert claims under Count I for conduct and statements that occurred starting from September 13, 2003, *i.e.*, **three** years prior to the date the first filed of the consolidated actions was initiated.  Plaintiffs assert claims under Counts II and III for conduct and statements that occurred starting from September 13, 2001, *i.e.*, **five** years prior to the date the first filed of the consolidated actions was initiated.  To the extent plaintiffs allege facts that occurred ***prior*** to September 13, 2003 and September 13, 2001, in support of plaintiffs' claims under Count I, and plaintiffs' claims under Counts II and III, respectively, it is to demonstrate a pattern and practice of backdating and issuing false statements, and the state of mind of defendants, among other things, in support of plaintiffs' claims that seek redress only for wrongful conduct and statements that occurred on or ***after*** September 13, 2003, with respect to plaintiffs' claims under Count I, and on or ***after*** September 13, 2001, with respect to plaintiffs' claims under Counts II and III.

## COUNT I

**(Against Defendants Kercho, K. Kartsotis, T. Kartsotis, Tunnell, Gold, Anderson, Stone and Steinberg for Violation of Section 14(a) of the Exchange Act)**

266.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as through fully stated herein.

267.     Defendants, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, solicited by means of a proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing statements which, at the time and in the light of the circumstances under which they were made, were false and misleading with respect to material facts, or omitted to state material facts necessary in order to make the statements therein not false or misleading or necessary to correct

statements in earlier communications with respect to the solicitation of the proxy for the same meeting or subject matter which was false or misleading.

268.    The proxy statements violated §14(a) and Rule 14a-9 because they omitted material facts, including the fact that certain of the defendants were causing Fossil to engage in backdating options and were receiving backdated options.

269.    In the exercise of reasonable care, defendants should have known that the proxy statements were materially false and misleading.

270.    The misrepresentations and omissions in the proxy statements were material to plaintiffs and would be material to reasonable investors who voted on each proxy statement.  The proxy statements were an essential link in the accomplishment of the continuation of defendants' unlawful stock option backdating, as revelations of the truth would have immediately thwarted a continuation of shareholders' endorsement of the directors' positions and proxy recommendations, the executive officers' compensation, and the Company's compensation policies and practices.

271.    The Company was damaged as a result of the material misrepresentations and omissions in the proxy statements.

272.    By engaging in the conduct alleged above, defendants violated §14(a) of the Exchange Act, and Rule 14a-9 promulgated thereunder.

273.    Plaintiffs, as shareholders of Fossil, seek damages and other relief for Fossil.

## COUNT II

**(Against Defendants T. Kartsotis, K. Kartsotis, Kercho, Kovar, Tunnell, Barnes, Gold, Anderson, Stone and Steinberg for Violation of Section 10(b) of the Exchange Act)**

274.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as through fully stated herein.

275.    Defendants signed and/or otherwise approved SEC filings that were false and misleading and that did not disclose the backdating practices that were occurring at Fossil and the

resulting affects of those practices on the Company's financial results.  Fossil's SEC filings, as identified above, included false and misleading financial statements that understated compensation expense and overstated income, net income and EPS.  The Company's SEC filings, including Reports on Form 10-K and proxy statements, also otherwise made false and misleading statements concerning Fossil's stock option grants and granting practices.  Forms 3, 4 and 5 falsely stated the option grant dates of options.  Defendants knew or severely recklessly disregarded the fact that the Company's SEC filings were false and misleading – due to the backdating – in that the financial statements contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

276.    Throughout the relevant period, the defendants identified herein individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, also engaged and participated in a continuous course of conduct which caused the Company to issue artificially low-priced options to officers, directors and other employees, including defendants.  Those persons thereby received option grants that improperly priced the common stock to be sold by the Company at prices lower than the fair market value as of the date of the grant and otherwise lower than what the option exercise price would have been had the option been dated properly as of the date of the grant.  Defendants and others subsequently exercised many of those options (some of which are identified herein) and thereby purchased stock from the Company at a lower price than they would have, had the options been correctly dated and priced. Defendants knew their options were backdated when they did this.  The Company, on the other hand, relied on defendants' conduct and statements in connection with the dating and pricing of options, option values, compliance with Fossil's stock option plans, compensation expense, and financial reporting and internal recordation related to option grants.

277. Thus, defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices and a course of business that operated as a fraud or deceit upon Fossil and others in connection with their purchases of Fossil's common stock during the relevant period.

278. As a result of the misconduct by the defendants named in this Count, Fossil has suffered and will suffer damages in that it would not have issued options and stock to defendants and others at the prices indicated on backdated options had it known of the backdating. Fossil has also suffered damages in that it paid artificially inflated prices for the Company's common stock purchased on the open market. Pursuant to a stock repurchase program caused by defendants, during fiscal 1998 and 1999, the Company repurchased 188,500 and 90,500 shares of common stock on the open market, respectively, at a cost of approximately $2.6 million and $2.0 million. The Company also repurchased 3.75 million shares of its common stock on the open market, between September 18, 2000 and January 22, 2004. During fiscal years 2006, 2005 and 2004, the Company repurchased 1.3 million, 3.6 million and 247,000 shares, respectively, of its common stock on the open market at a cost of approximately $25.9 million, $75.3 million and $6.9 million, respectively.

279. Fossil would not have purchased its common stock at the prices it paid had the market previously been aware that the market price of Fossil's stock was falsely inflated by defendants' misleading statements. As a direct and proximate result of these defendants' wrongful conduct, Fossil suffered damages in connection with its issuances of the Company's options and purchases and issuances of common stock. By reason of such conduct, the defendants named in this Count are

liable to the Company pursuant to §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT III

### (Against Defendants Barnes, Kercho, Kovar, Steinberg, Shroff and Tunnel for Violation of Section 29(b) of the Exchange Act)

280.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as through fully stated herein.

281.    The backdated options contracts identified herein and all backdated options contracts entered by the Company were entered in violation of the Exchange Act and rules prescribed thereunder, including Rule 10b-5.  The backdated options contracts were authorized by defendants pursuant to materially false statements, omissions, and/or schemes or practices that acted as a fraud upon Fossil.  There is contractual privity between Fossil and the recipients of the backdated option contracts.  Fossil and its public investors are in the class of persons the Exchange Act was designed to protect.

282.    Accordingly, the backdated option contracts that have been exercised must be rescinded and the remaining backdated option contracts are void.

## COUNT IV

### (Against All Defendants for Breach of Fiduciary Duties and Aiding and Abetting Breach of Fiduciary Duties)

283.    Each of the defendants agreed to and did participate with the other defendants and/or aided and abetted one another in a deliberate course of action designed to divert corporate assets in breach of fiduciary duties the defendants owed to the Company.

284.    Defendants engaged in *ultra vires*, bad faith and/or fraudulent acts by backdating and/or accepting backdated stock options in violation of Fossil's stock plans, and (having backdated and/or accepted backdated stock options) by causing Fossil to file false and misleading SEC filings and financial statements in violation of SEC rules and regulations.  This conduct could not have been

ratified by a simple majority of shareholders.  Furthermore, the Board, through its deceptive conduct pleaded herein, acquired *de facto* control of Fossil to accomplish and perpetuate its self dealing in backdated "in-the-money" options.

285.    The conduct of each defendant constitutes actual omissions involving negligence, default, breach of duty or breach of trust.  Indeed, the defendants have violated fiduciary duties of care, loyalty, candor, and independence owed to Fossil and its public shareholders, have engaged in unlawful self dealing, and have acted to put their personal interests and/or their colleagues' interests ahead of the interests of Fossil and its shareholders.

286.    As demonstrated by the allegations above, defendants failed to exercise the care required and breached their duties of loyalty, good faith, candor, and independence owed to Fossil and its public shareholders, and they failed to disclose material information and/or made material misrepresentations to shareholders regarding defendants' option backdating scheme.

287.    Defendants T. Kartsotis, K. Kartsotis, Kercho, Kovar, Tunnell, Barnes, Shroff, Gold, Anderson and Stone also profited from sales of Fossil stock they made while in possession of material inside information, namely that Fossil's reported earnings were falsely inflated by understatement of compensation expense and that the Company's internal controls were materially impaired.  (Meanwhile, Fossil was purchasing its stock on the open market during the periods of time in which certain of the defendants were selling their shares.  *Compare supra* ¶278 (detailing Company's open market purchases of common stock) *with* ¶239 (insider trading table detailing defendants' sales of stock).  Defendants selling their stock notwithstanding their unique knowledge of Fossil's backdating was in breach of their fiduciary duties and in violation of the Exchange Act.

288.    By reason of the foregoing acts, practices and course of conduct, defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward Fossil and its public shareholders.

- 125 -

289.     As a proximate result of defendants' conduct, Fossil has been injured and is entitled to damages.

## COUNT V

### (Against All Defendants for Corporate Waste)

290.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as through fully stated herein.

291.     As a result of defendants' misconduct and waste of corporate assets Fossil has sustained damage.

292.     Plaintiffs, as shareholders of Fossil, seek damages and other relief for Fossil.

## COUNT VI

### (Against All Defendants for Gross Mismanagement)

293.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as through fully stated herein.

294.     Defendants have grossly mismanaged Fossil.  They have also failed to exercise independent or good faith oversight of Fossil or its executives, and thus have permitted that gross mismanagement.

295.     By their actions, defendants breached their duties to oversee, direct and control Fossil in a manner consistent with the legal duties of directors and officers of a publicly held company and under the applicable state laws.

296.     Plaintiffs, as shareholders of Fossil, seek damages and other relief for Fossil.

## COUNT VII

### (Against All Defendants for Unjust Enrichment)

297.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as through fully stated herein.

298.    As a result of the unlawful conduct detailed above, defendants have been or will be unjustly enriched at the expense of Fossil.  In particular, defendants will be unjustly enriched to the extent they have and/or will continue to receive excessive compensation, stock option and/or insider trading proceeds despite their breaches of fiduciary duty, gross mismanagement, abuse of control and other misconduct detailed herein.

299.    Defendants should be required to disgorge the gain which they unjustly obtained at the expense of Fossil.

300.    As a result of the defendants' misconduct and unjust enrichment, Fossil has sustained damage.

301.    Plaintiffs, as shareholders of Fossil, seek damages and other relief for Fossil.

## COUNT VIII

### (Against All Defendants for Abuse of Control)

302.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as through fully stated herein.

303.    Defendants, together with their corporate allies, own and/or control Fossil and have the power to dictate the outcome of Fossil's business and affairs.  As persons with the power to direct Fossil's business and affairs, defendants owed Fossil a fiduciary duty to act in the best interests of the Company and not for their own personal profit or gain.

304.    Nevertheless, over the past decade, defendants have abused their control by engaging in a secret stock option backdating scheme, and grossly mismanaging Fossil's business so badly that Fossil's market capitalization has collapsed and its goodwill and reputation have been ruined. Defendants also deliberately and/or recklessly refused to exercise independent and good faith oversight of Fossil and its executives, and therefore deliberately allowed the abuse of control complained of herein to occur.

305.     This conduct by defendants amounted to an abuse of their abilities to act in the best interest of Fossil in violation of their fiduciary obligations as controlling persons, directors and/or officers of Fossil.

306.     As a result of defendants' misconduct, Fossil has sustained damage.

307.     Plaintiffs, as shareholders of Fossil, seek damages and other relief for Fossil.

## COUNT IX

**(Against Defendants T. Kartsotis, K. Kartsotis, Barnes, Kovar, Kercho, Shroff, Gold, Anderson, Stone and Tunnell for Insider Selling and Misappropriation of Information)**

308.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as through fully stated herein.

309.     At the time of their stock sales, defendants T. Kartsotis, K. Kartsotis, Barnes, Kovar, Kercho, Shroff, Gold, Anderson, Stone and Tunnell knew that the Company's financial results were false and misleading due to the stock option backdating scheme detailed herein.  These defendants' sales of Fossil common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of good faith, honesty and loyalty.

310.     Since the use of the Company's proprietary information for their own gain constitutes a breach of the fiduciary owed by defendants T. Kartsotis, K. Kartsotis, Barnes, Kovar, Kercho, Shroff, Gold, Anderson, Stone and Tunnell to Fossil, plaintiffs, on behalf of the Company, are entitled to the imposition of a trust on any profits defendants T. Kartsotis, K. Kartsotis, Barnes, Kovar, Kercho, Shroff, Gold, Anderson, Stone and Tunnell obtained thereby.

311.     Plaintiffs, as shareholders of Fossil, seek damages and other relief for Fossil.

## COUNT X

**(Against All Defendants for Rescission)**

312.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as through fully stated herein.

313.     As a result of the acts alleged herein, the stock option contracts defendants and Fossil entered into during the relevant period were obtained through defendants' breaches of fiduciary duty, gross mismanagement and abuse of control.  Further, the backdated stock options were illegal grants and thus invalid as they were not authorized in accordance with the terms of Fossil's stock option plans which were also approved by its shareholders and filed with the SEC.

314.     All contracts which provide for stock option grants between defendants and Fossil that were entered into during the relevant period should, therefore, be rescinded, with all sums paid under such contracts returned to the Company, and all such executory contracts cancelled and declared void.

315.     Plaintiffs, as shareholders of Fossil, seek damages and other relief for Fossil.

## COUNT XI

### (Against All Defendants for an Accounting)

316.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as through fully stated herein.

317.     At all relevant times, defendants, as directors and/or officers of Fossil, owed the Company fiduciary duties, including good faith, honesty and loyalty.

318.     In breach of their fiduciary duties owed to Fossil, defendants caused Fossil, among other things, to grant backdated stock options to themselves and/or certain other officers and directors of Fossil.  By this wrongdoing, defendants breached their fiduciary duties owed to Fossil.

319.     Defendants possess complete and unfettered control over their improperly issued stock option grants and the books and records of the Company concerning the details of such improperly backdated stock option grants to Fossil executives and employees.

- 129 -

320.     As a result of defendants' misconduct, Fossil has been substantially injured and damaged financially and is entitled to a recovery as a result thereof, including the proceeds of those improperly granted options which have been exercised and sold.

321.     Plaintiffs demand an accounting be made of all stock options grants made to defendants, including, without limitation, the dates of the grants, the amounts of the grants, the value of the grants, the recipients of the grants, and the exercise date of stock options granted to defendants, as well as the disposition of any proceeds received by defendants via sale or other exercise of backdated stock option grants received by the defendants.

322.     Plaintiffs, as shareholders of Fossil, seek damages and other relief for Fossil.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs demand judgment as follows:

A.     Awarding money damages against all defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, to ensure defendants do not participate therein or benefit thereby;

B.     Directing all defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds and imposing a constructive trust thereon;

C.     Directing Fossil to take all necessary actions to reform and improve its corporate governance and internal control procedures to comply with applicable law, including, but not limited to, putting forward for a shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote adoption of the following Corporate Governance policies:

(i)      a proposal requiring that the office of CEO of Fossil and Chairman of the Fossil Board of Directors be permanently held by separate individuals and that the Chairman of the Fossil Board meet rigorous "independent" standards;

(ii)      a proposal to strengthen the Fossil Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

(iii)      appropriately test and then strengthen the internal audit and control functions;

(iv)      rotate independent auditing firms every five years;

(v)      control and limit insider stock selling and the terms and timing of stock option grants; and

(vi)      reform executive compensation;

D.      Ordering the imposition of a constructive trust over defendants' stock options and any proceeds derived therefrom;

E.      Awarding punitive damages;

F.      Awarding costs and disbursements in this action, including reasonable attorneys,' accountants,' and experts' fees; and

G.      Granting such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury.

DATED:  October 13, 2009          COUGHLIN STOIA GELLER
                                    RUDMAN & ROBBINS LLP
                                  TRAVIS E. DOWNS III (travisd@csgrr.com)
                                  JAMES I. JACONETTE (jamesj@csgrr.com)
                                  BENNY C. GOODMAN III (bennyg@csgrr.com)


                                       s/ JAMES I. JACONETTE
                                     JAMES I. JACONETTE

                                  655 West Broadway, Suite 1900
                                  San Diego, CA  92101
                                  Telephone:  619/231-1058
                                  619/231-7423 (fax)

                                  COUGHLIN STOIA GELLER
                                    RUDMAN & ROBBINS LLP
                                  SHAWN A. WILLIAMS (shawnw@csgrr.com)
                                  100 Pine Street, Suite 2600
                                  San Francisco, CA  94111
                                  Telephone:  415/288-4545
                                  415/288-4534 (fax)

                                  ROBBINS UMEDA LLP
                                  BRIAN J. ROBBINS
                                  (brobbins@robbinsumeda.com)
                                  CAROLINE A. SCHNEURER
                                  (cschneurer@robbinsumeda.com)
                                  SHANE P. SANDERS
                                  (ssanders@robbinsumeda.com)
                                  600 B Street, Suite 1900
                                  San Diego, CA  92101
                                  Telephone:  619/525-3990
                                  619/525-3991 (fax)

                                  Co-Lead Counsel for Plaintiffs

KENDALL LAW GROUP, LLP
JOE KENDALL (jkendall@kendalllawgroup.com)
State Bar No. 11260700
3232 McKinney Avenue, Suite 700
Dallas, TX  75204
Telephone:  214/744-3000
214/744-3015 (fax)

Liaison Counsel

SULLIVAN, WARD, ASHER & PATTON, P.C.
CYNTHIA J. BILLINGS (cbillings@swappc.com)
25800 Northwestern Highway
1000 Maccabees Center
Southfield, MI  48075-1000
Telephone:  248/746-0700
248/746-2760 (fax)

THE SHUMAN LAW FIRM
KIP B. SHUMAN (kip@schumanlawfirm.com)
885 Arapahoe Blvd.
Boulder, CO  80302
Telephone:  303/861-3003
303/830-6920 (fax)

Additional Counsel for Plaintiffs

Document1

## VERIFICATION

I, Hamilton Lindley, hereby declare as follows:

I am a member of the law firm Kendall Law Group, LLP, counsel for plaintiffs in the above-entitled action.  I have read the foregoing complaint and know the contents thereof.  I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

I am making this verification because the plaintiffs are absent from Dallas County where I maintain my office.

Executed this 13th day of October, 2009, at Dallas, Texas.


_____
                     Hamilton Lindley

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 13, 2009, I electronically filed the foregoing with the Clerk

of the Court using the CM/ECF system which will send notification of such filing to the e-mail

addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have

mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF

participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.  Executed on October 13, 2009.

s/ JAMES I. JACONETTE
JAMES I. JACONETTE

COUGHLIN STOIA GELLER
      RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail: jamesj@csgrr.com

# Mailing Information for a Case 3:06-cv-01672-F

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Aelish M Baig**
  aelishb@csgrr.com,e_file_sf@csgrr.com

- **Willie Briscoe**
  wbriscoe@thebriscoelawfirm.com

- **Roger F Claxton**
  roger@claxtonlaw.com

- **Patrick K Craine**
  patrick.craine@bgllp.com,trena.jackson@bgllp.com

- **Travis E Downs , III**
  travisd@csgrr.com,e_file_sd@csgrr.com

- **Benny C Goodman , III**
  bennyg@csgrr.com,karenc@csgrr.com,e_file_sd@csgrr.com

- **Andrew R Graben**
  graben@fr.com,nevans@fr.com

- **Geoffrey S Harper**
  harper@fr.com

- **Terence J Hart**
  terry.hart@bgllp.com,trena.jackson@bgllp.com

- **Robert J Hill**
  rhill@hillandhill-law.com

- **James I Jaconette**
  jamesj@csgrr.com,aserros@csgrr.com,e_file_sd@csgrr.com

- **Joe Kendall**
  administrator@kendalllawgroup.com,jkendall@kendalllawgroup.com

- **Hamilton Lindley**
  hlindley@kendalllawgroup.com,administrator@kendalllawgroup.com

- **Brian J Robbins**
  notice@robbinsumeda.com

- **Karl A Rupp**
  krupp@kendalllawgroup.com

- **Caroline A Schnurer**
  notice@robbinsumeda.com,mozaki@robbinsumeda.com,ssanders@robbinsumeda.com

- **John B Scott**
  jscott@scottyung.com,admin@scottyung.com,skitchens@scottyung.com

- **Kip B Shuman**
  kip@shumanberens.com,lisa@shumanberens.com

- **Steven H Stodghill**
  stodghill@fr.com,bhunter@fr.com

- **Scott Cashion Thomas**
  sthomas@fr.com,heddins@fr.com

- **Shawn A Williams**
  shawnw@csgrr.com

- **Andrew W Yung**
  ayung@scottyung.com,admin@scottyung.com,skitchens@scottyung.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Antonio Tony Piazza
Gregorio Haldeman Piazza Rotman & Matityahu
201 Mission St
Suite 1900
San Francisco, CA 94105-1858
```